IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL AND BETH
WEINSTEIN,                          :
                                    :
        Plaintiffs,                 :
                                    :    Civil Action No. 08-00216 (RJL)
        v.                          :
                                    :
UNITED STATES OF AMERICA,           :
                                    :
        Defendant.                  :

## OPPOSITION TO
## MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

## Preliminary Statement

Prevailing precedent in this Circuit undermines the government's argument that the discretionary-function exception to the Federal Tort Claims Act insulates the government from liability in this case. The government's liability arises from its negligence in failing to fill or sign the pothole on the paved trail in Rock Creek Park that caused the bicycle accident resulting in catastrophic injuries for which damages are sought in this action. In *Cope v. Scott*, a case also arising out of an accident in Rock Creek Park, the U.S. Court of Appeals for the D.C. Circuit stated that the discretionary-function exception does not shield the government from liability in cases, such as this one, "involving mundane decisions to fill or not fill potholes."[1] The court in that case also held that "the discretion regarding where and what type of signs to post is not the kind of discretion protected by the discretionary function

---

[1] 45 F.3d 445, 451 (D.C. Cir. 1995).

exception."[2]  Because the government's negligent conduct alleged in this case does

not fall within the discretionary-function exception, the government's motion to

dismiss or for summary judgment predicated on the application of the exception

should be denied.

## Background

The events giving rise to this action occurred on April 16, 2005.  Shortly after

noon, Plaintiff Michael Weinstein and a friend were riding their bicycles on the bike

path along Beach Drive and Klingle Road in Rock Creek Park.  (Ex. A: Compl. ¶ 7;

Ex. B: Nat'l Park Serv., Case Incident Record No. 011166.)  The National Park

Service ("NPS") owned and operated the bike path.   (Ex. A: Compl. ¶ 9.)  Mr.

Weinstein's bicycle hit a pothole on the bike path, causing him to lose control, pitch

forward over the handlebars, and strike his head and face on the paved pathway.

(Ex. A: Compl. ¶ 7; Ex. B: Nat'l Park Serv., Case Incident Record No. 011166.)  As

a result of the incident, Mr. Weinstein suffered serious injuries, including injuries to

his head, neck, and back, as well as permanent paralysis.  (Ex. A: Compl. ¶ 9.)

The Weinsteins, through counsel, submitted two requests to NPS for

information under the Freedom of Information Act ("FOIA"). (Ex. C: Letter from

Marc Fiedler, counsel for the Weinsteins, to William Line, Nat'l Park Serv. (July 22,

2005); Ex. D: Letter from Jennifer Galante, paralegal for the Weinsteins, to Lisa A.

Mendelson-Jelmini, Deputy Regional Director, Nat'l Park Serv. (May, 19, 2006).)

Among the materials that NPS sent in response to these requests, (*see* Ex. E: Letter

from Lisa A. Mendelson-Jelmini, Deputy Regional Director, Nat'l Park Serv., to

---

[2] *Id.*

Marc Fiedler, counsel for the Weinsteins (Dec. 8, 2005); Ex. F: Letter from Dwight

E. Pettiford, Chief of Police, Nat'l Park Serv., to Jennifer Galante, paralegal for the

Weinsteins (Aug. 1, 2006)), was a Case Incident Record regarding Mr. Weinstein's

accident, (Ex. B: Nat'l Park Serv., Case Incident Record No. 011166), as well as

numerous photographs of the accident scene, Mr. Weinstein's bicycle, and his

helmet.  According to the NPS Case Incident Record, a witness reported that it

appeared that Mr. Weinstein's "bicycle hit a pothole on the path causing him to lose

control, pitching him over the handlebars and striking his head and face onto the

paved pathway." (Ex. B: Nat'l Park Serv., Case Incident Record No. 011166.)

Indeed, some of NPS's photographs of the accident scene do depict a noticeable

pothole on the bike path.  (Ex. G: Green Exs. D1 & D2 (showing pothole near

marker no. 1).)

On March 28, 2007, Mr. Weinstein and his wife, Beth Weinstein, timely

presented their tort claims in writing to the United States Department of the Interior.

(*See* Ex. A: Compl. ¶ 5.)  On September 28, 2007, the agency denied their claims.

(*See* Ex. A: Compl. ¶ 6.)

On February 7, 2008, the Weinsteins filed this action under the Federal Tort

Claims Act.[3]  They allege that the government was negligent in failing to

appropriately and adequately maintain the bike-path surface and in failing to place

and maintain appropriate and adequate warning signs along the bike path. (Ex. A:

Compl. ¶¶ 11.)  They further allege that this negligence was a direct and proximate

cause of Mr. Weinstein's extensive injuries, his resulting economic losses, physical

---

[3] 28 U.S.C. §§ 1346(b), 2671-2680.

pain, and mental anguish, and Mrs. Weinstein's loss of consortium. (Ex. A: Compl. ¶¶ 12-14.) They seek an award of compensatory damages commensurate with their injuries. (*See* Ex. A: Compl. 5.)

On February 16, 2008, the government filed its Motion to Dismiss or, in the Alternative, for Summary Judgment. Invoking Rules 12(b)(1) and 56(c) of the Federal Rules of Civil Procedure, the government contends that the Court lacks subject-matter jurisdiction and that the government is entitled to judgment as a matter of law because the Weinsteins' claims of negligent failure to properly maintain the bike path and negligent failure to properly post adequate warning signs fall within the protection of the FTCA's discretionary-function exception.[4] (Mot. Dismiss or Summ. J. 1.)

The government filed with its motion a Statement of Material Facts to Which There is No Genuine Issue. At this early stage of the litigation, without the benefit of any discovery, the Weinsteins are not well situated to dispute the government's version of the material facts. Nevertheless, even assuming there is no genuine issue as to those facts, summary judgment is unwarranted because the government is not entitled to a judgment as a matter of law.

---

[4] *Id.* § 2680(a).

# Standard of Review

## A.    Dismissal for Lack of Subject-Matter Jurisdiction

"[I]t is extremely difficult to dismiss a claim for lack of subject matter jurisdiction."[5] Dismissals for lack of subject-matter jurisdiction in cases, such as this one, premised on federal-question jurisdiction are "exceptional."[6] Although plaintiffs bear the burden of establishing by a preponderance of the evidence that the court possesses subject-matter jurisdiction,[7] the burden is "not onerous."[8] Jurisdictional dismissals are warranted only where the claim is wholly insubstantial, implausible, completely devoid of merit, and frivolous.[9] Hence, "only the most extreme cases will fail the jurisdictional test of substantiality."[10]

---

[5] *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1260 (11th Cir. 1997) (citing *Simanonok v. Simanonok*, 787 F.2d 1517, 1519 (11th Cir. 1986)); *accord Santerre v. AGIP Petroleum Co.*, 45 F. Supp. 2d 558, 566 (S.D. Tex. 1999) (quoting *Garcia*).

[6] *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (internal quotation marks and citation omitted).

[7] *APWU v. Potter*, 343 F.3d 619, 623 (2nd Cir. 2003) (citations omitted); *National Treasury Employees Union v. Chertoff*, 385 F. Supp. 2d 1, 15 (D.D.C. 2005) (citations omitted).

[8] *Bd. of Trustees v.City of Painesville, Ohio*, 200 F.3d 396, 398 (6th Cir. 1999) (internal quotation marks and citations omitted).

[9] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy.'") (quoting *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666 (1974)); *Safe Air for Everyone*, 373 F.3d at 1039 (quoting *Bell v. Hood*, 327 U.S. 678, 682-83 (1946) (determining that dismissal for lack of subject-matter jurisdiction is warranted "where the alleged claim under the constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such claim is wholly insubstantial and frivolous")); *Bd. of Trustees*, 200 F.3d at 398 (citations omitted); *LaSalle Nat'l Trust*

### B.    Summary Judgment

"Summary judgment is appropriate only if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'"[11] "A dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[12]    The Court "must view the evidence in the light most favorable to the nonmoving party (here [the Weinsteins]), draw all reasonable inferences in [their] favor, and eschew making credibility determinations or weighing the evidence."[13]

---

*v. ECM Motor Co.*, 76 F.3d 140, 143 (7th Cir. 1996) (quoting, *inter alia*, *Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 70 (1978) ("the test is whether the cause of action alleged is *so patently without merit* as to justify . . . the court's dismissal for want of jurisdiction") (emphasis and ellipsis in original)).

[10] *LaSalle Nat'l Trust*, 76 F. 3d at 143.

[11] *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007) (quoting FED. R. CIV. P. 56(c)).

[12] *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[13] *Id.* (citations omitted); *see also Anderson,* 477 U.S. at 255.

# Argument

## The discretionary-function exception does not bar this action because the government's negligent failure to fill or sign the pothole was not based on public-policy considerations.

### A.    Governmental conduct that is not grounded in public-policy considerations does not fall within the discretionary-function exception.

The FTCA waives the government's sovereign immunity for tort claims arising out of the negligent conduct of government employees.[14] It grants to federal district courts

> exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for . . . personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).

The FTCA's broad waiver of sovereign immunity is subject to various exceptions, including the so-called discretionary-function exception. That exception provides that the government is not liable for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."[15]

The Supreme Court has created a two-part test for determining whether government conduct is exempt from suit under the discretionary-function

---

[14] *Gaubert v. United States*, 499 U.S. 315, 319 n.4 (1991).

[15] 28 U.S.C. § 2680(a).

7

exception.[16]  First, a court must "examin[e] the nature of the challenged conduct"

and "consider whether the action is a matter of choice for the acting employee."[17]

"[W]hen a federal statute, regulation, or policy specifically prescribes a course of

action for an employee to follow," then "the employee has no rightful option but to

adhere to the directive" and therefore the discretionary-function exception will not

apply.[18]

Second, "assuming the challenged conduct involves an element of judgment,

a court must determine whether that judgment is of the kind that the discretionary

function exception was designed to shield."[19]  Because "[t]he basis for the

discretionary function exception was Congress' desire to 'prevent judicial "second-

guessing" of legislative and administrative decisions grounded in social, economic,

and political policy through the medium of an action in tort,'" the exception

"protects only governmental actions and decisions based on considerations of public

policy."[20]  Thus, for example, "[a]lthough driving requires the constant exercise of

discretion," that is not the type of discretion to which the exception applies, and

therefore the exception would not protect the government against liability for a

---

[16] *See Gaubert*, 499 U.S. at 322-23; *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988).

[17] *Berkovitz*, 486 U.S. at 536.

[18] *Id.*; *accord Gaubert*, 499 U.S. at 322.

[19] *Berkovitz*, 486 U.S. at 536; *accord Gaubert*, 499 U.S. at 322-23.

[20] *Berkovitz*, 486 U.S. at 536-37 (quoting *United States v. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)); *accord Gaubert*, 499 U.S. at 323.

driver's negligence.[21] "Only discretionary actions of greater significance — those grounded in 'social, economic, or political goals' — fall within the protection of the statute."[22] The burden to demonstrate the applicability of the discretionary-function exception lies with the government.[23]

**B.    NPS's failure to fill the pothole was not grounded in public-policy considerations.**

NPS's negligent failure to fill the pothole that caused Mr. Weinstein's accident was simply not "'grounded in social, economic, and political policy'" and therefore was not "the kind [of conduct] that the discretionary function exception was designed to shield."[24] Like operating a motor vehicle, patching a pothole does require the exercise of some discretion, but not the type of discretion to which the FTCA's discretionary-function exception applies.[25]

In *Cope v. Scott*, the U.S. Court of Appeals for the District of Columbia Circuit expressly stated that the discretionary-function exception does not cover matters of routine maintenance, such as repairing a pothole.[26] In that case, a motorist involved in a traffic accident on Beach Drive in Rock Creek Park brought an FTCA

---

[21] *Gaubert*, 499 U.S. at 325 n.7; *accord Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995).

[22] *Cope*, 45 F.3d at 448 (citing *Gaubert*, 499 U.S. at 323).

[23] *Navarette v. United States*, 500 F.3d 914, 916 (9th Cir. 2007); *Cestonaro v. United States*, 211 F.3d 749, 756 n.5 (3rd Cir. 2000).

[24] *Berkovitz*, 486 U.S. at 536-37 (quoting *Varig Airlines*, 467 U.S. at 814).

[25] *See Gaubert*, 499 U.S. at 325 n.7.

[26] 45 F.3d 445, 451 (D.C. Cir. 1995).

action alleging negligent failure to maintain adequate skid resistance of the roadway and negligent failure to post a sign warning of the dangerous road conditions. The circuit court concluded that the government's failure to maintain adequate skid resistance of the roadway fell within the discretionary-function exception:

> The state of Beach Drive alleged by Cope could have been prevented only by reducing the traffic load, initially paving it with a different surface, resurfacing the curve entirely, or at least milling the curve to create grooves in the surface. Determining the appropriate course of action would require balancing factors such as Beach Drive's overall purpose, the allocation of funds among significant project demands, the safety of drivers and other park visitors, and the inconvenience of repairs as compared to the risk of safety hazards.[27]

Those balances require policy judgments that the circuit court "decline[d] to 'second-guess.'"[28]

In reaching this holding, the court carefully distinguished the policy decisions that would have been needed to maintain adequate skid resistance on Beach Drive from decisions involving routine maintenance, which "would not have prevented the alleged 'inadequate skid resistance.'"[29] The court explained that "no regular maintenance would have prevented the road from deteriorating in the way Cope alleges. *This case is therefore different from a case involving mundane decisions to fill or not fill potholes*, or even the cumulative effect of such decisions."[30]

---

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.* (emphasis added).

In support of this statement, the circuit court cited to the holding in *ARA Leisure Services v. United States*.[31] That case involved an FTCA action arising from an accident in which a tour bus went off a badly eroded stretch of road in a national park and rolled over, resulting in the death of five passengers and injury to twenty-five others.[32] Concluding that the failure to maintain the park road in a safe condition did not fall within the discretionary-function exception, the court in *ARA Leisure Services* noted that "Park Service maintenance work is not the kind of regulatory activity that the Supreme Court singled out" for protection under that exception.[33] The D.C. Circuit in *Cope* read *ARA Leisure Services* to mean that "all the 'decisions' that caused the road to deteriorate involved routine questions of maintenance not 'grounded in social, economic, or political policies.'"[34]

Likewise here, the failure to repair the pothole that caused Mr. Weinstein's bicycle accident involved merely "routine questions of maintenance not 'grounded in social, economic, or political policies.'"[35] Consequently, NPS's negligent maintenance of the bike path does not fall within the protection of the discretionary-function exception.

---

[31] 831 F.2d 193 (9th Cir. 1987), *cited with approval in Cope*, 45 F.3d at 451.

[32] *ARA Leisure Serv.*, 831 F.2d at 194.

[33] *Id.* at 195.

[34] *Cope*, 45 F.3d at 451.

[35] *Id.*

The Supreme Court's decision in *Indian Towing Company v. United States*[36],

and the Court's subsequent reading of that decision, further support the conclusion

that the discretionary-function exception does not immunize the government from

liability for its negligence in performing routine maintenance.  That case involved an

FTCA action for damages sustained when a tug went aground and cargo on a barge

was damaged allegedly because of the Coast Guard's negligent operation of a

lighthouse.  Rejecting the government's argument that it was shielded from liability

by the discretionary-function exception, Justice Frankfurter stated:

> The Coast Guard need not undertake the lighthouse service.  But once
> it exercised its discretion to operate a light on Chandeleur Island and
> engendered reliance on the guidance afforded by the light, it was obligated to
> use due care to make certain that the light was kept in good working order;
> and, if the light did become extinguished, then the Coast Guard was further
> obligated to use due care to discover this fact and to repair the light or give
> warning that it was not functioning.  If the Coast Guard failed in its duty and
> damage was thereby caused to petitioners, the United States is liable under
> the [FTCA].[37]

The Supreme Court later interpreted this to mean that while "the initial decision to

undertake and maintain lighthouse service was a discretionary judgment[,] . . . the

failure to maintain the lighthouse in good condition subjected the Government to suit

under the FTCA.  The latter course of conduct did not involve any permissible

exercise of policy judgment."[38]

More recently, this Court applied the same principle in an FTCA action

arising out of a bicycle accident.  In *Beckford v. United States*, a bicyclist suffered a

---

[36] 350 U.S. 61 (1955).

[37] *Id.* at 69.

[38] *Berkovitz*, 486 U.S. at 538 n.3.

fractured kneecap when, while riding at night, he struck a dark brown bollard that had been placed in the center of a brick path located within the C & O Canal National Historic Park and maintained by NPS.[39]  Ruling that the discretionary-function exception did not apply, District Judge Sporkin explained: "Any decisions regarding the maintenance of a brown bollard on the C & O Canal National Historic Park could not rise to the level of issues so fraught with policy that the exemption should apply since the 'nature' of the decision did not implicate policy judgment.[40]

Like the failure to properly maintain the lighthouse in *Indian Towing* and like the failure to properly maintain the bollard in *Beckford*, the failure to properly maintain the bike path in this case "did not involve any permissible exercise of policy judgment."[41]  That conduct, therefore, is not covered by the discretionary-function exception.

Nevertheless, in support of its contention that the exception does apply here, the government asserts that "the regular repair of every surface irregularity, hole, or crack on the Rock Creek Park Trail would intrude significantly upon park visitors' ability to experience the natural beauty of the park, and would simultaneously cripple the park's budget." (Coleman Decl. ¶ 12, *cited in* Mem. P. & A. Supp. Mot. Dismiss or Summ. J. 11.)  But this case is not about NPS's failure to repair "every surface irregularity, hole, or crack on the Rock Creek Park Trail"; rather, it is about the failure to repair a single substantial pothole.  And filling that pothole would have

---

[39] 950 F. Supp. 4, 6-7 (D.D.C. 1997).

[40] *Id.* at 9 (citing *Cope*, 45 F.3d at 449).

[41] *Berkovitz*, 486 U.S. at 538 n.3.

neither "intrude[d] significantly upon park visitors' ability to experience the natural beauty of the park" nor "cripple[d] the park's budget." To the contrary, that simple remedial action "would not have negatively affected the natural beauty or aesthetics of the park or the visitors' experience, and would not have placed an unreasonable burden on the National Park Service. For example, the pothole could have been repaired quickly by filling it with cold patch for less than $300, including labor and materials." (Ex. H: Dionne Decl. ¶ 10.)

If the government were right that fixing this pothole "would intrude significantly upon park visitors' ability to experience the natural beauty of the park, and would simultaneously cripple the park's budget," then NPS would never be able to properly maintain the bike trail in Rock Creek Park. In fact, however, documents produced by the government in response to the FOIA requests of the Weinsteins' counsel show that NPS workers routinely engage in repairing and maintaining the paved bike trail. (Ex. I: NPS Daily Work Reports.) Presumably the workers did this without substantially compromising visitors' experience of the park and without busting the park's budget. There is no sound reason based on public-policy considerations why NPS workers, in the course of their routine repair and maintenance of the bike trail, could not have filled the pothole that caused Mr. Weinstein's accident.

The authorities on which the government relies are inapposite either because they do not address the federal government's immunity under the FTCA's

discretionary-function exception,[42] or they do not actually decide whether a failure to repair and maintain facilities falls within the exception,[43] or they do not deal with conduct as mundane as filling a pothole.[44] The government does cite to *Cope*, but does not so much as mention the passage expressly distinguishing that case from one, such as this, "involving mundane decisions to fill or not fill potholes."[45]

In short, NPS's conduct in failing to fill the pothole that caused Mr. Weinstein's accident was not "'grounded in social, economic, and political policy'"[46] so as to warrant protection under the discretionary-function exception. Rather, that failure amounted to nothing more than "a mundane, administrative, garden-variety, housekeeping problem,"[47] which is the very type of problem for which the FTCA was intended to provide relief through an action in tort.[48]

---

[42] *Smith v. Washington Metro. Area Transit Auth.*, 290 F.3d 201, 206 (4th Cir. 2002) (addressing tort immunity of Washington Metropolitan Area Transit Authority under its Compact).

[43] *Id.* at 11 (remanding for determination whether failure to repair and maintain inoperative escalators was discretionary).

[44] *Merando v. United States*, 517 F.3d 160, 168 (3rd Cir. 2008) (addressing formulation and execution of hazardous-tree management plan); *Childers v. United States*, 40 F.3d 973 (9th Cir. 1994) (addressing decision to leave park trail open but unmaintained in winter); *Lopez v. United States*, 376 F.3d 1055 (10th Cir. 2004) (addressing placement of row of mailboxes on shoulder of highway).

[45] *Cope*, 45 F.3d at 451.

[46] *Berkovitz*, 486 U.S. at 537 (quoting *Varig Airlines*, 467 U.S. at 814).

[47] *Gotha v. United States*, 115 F.3d 176, 181 (3rd Cir. 1997).

[48] *See Dalehite v. United States*, 346 U.S. 15, 28 & n.19 (1953) (noting that "[u]ppermost in the collective mind of Congress were the ordinary common-law torts" and that "congressional thought was centered on granting relief for the run-of-the-mine accidents").

C.    **NPS's failure to sign the pothole was not grounded in public-policy considerations.**

Having failed to repair the pothole on the bike path, it was incumbent upon NPS to at least post a sign adequately warning cyclists of the hazardous condition of the trail. But this NPS did not do. Its failure to provide an adequate warning was not grounded in social, economic, or political policies and therefore does not fall within the discretionary-function exception.

Here again, the D.C. Circuit's decision in *Cope v. Scott* is instructive. In addition to claiming that the government failed to properly maintain the roadway of Beach Drive, the plaintiff in that case also claimed that the government negligently failed to post adequate warning signs about the nature of the road surface.[49] The court found the warning-sign claim was not barred:

> [T]he discretion regarding where and what type of signs to post is not the kind of discretion protected by the discretionary function exception. While it may be true, as the government claims, that the placement of signs involves judgments because engineering and aesthetic concerns determine where they are placed, such judgments are not necessarily protected from suit; only if they are "fraught with public policy considerations" do they fall within the exception, and we do not think that is the case here.[50]

Acknowledging NPS's "desire to maintain the park in as pristine a state as possible," the court nevertheless noted that many signs already exist on the stretch of road where the accident occurred.[51] The court explained that, "having taken steps to warn users of the dangers inherent in [the use of Beach Drive], the Park Service cannot

---

[49] *Cope*, 45 F.3d at 450, 451.

[50] *Id.* at 451-52.

[51] *Id.* at 452.

argue that its failure to ensure that those steps are effective involves protected 'discretionary' decisions."[52]  The court concluded:

> [T]he failure to post adequate warning of the dangers on the road does not implicate political, social, or economic decisions of the sort that the exception was designed to protect.  Beach Drive is a commuter route through an urban park.  The Park Service has already posted signs in an effort to alert drivers to safety hazards on the road.  In light of these factors, the Park Service has understandably been unable to articulate how the placement of the additional or different signs on the Beach Drive implicates the type of economic, social, or political concerns that the discretionary function exception protects from suit under the FTCA.[53]

---

[52] *Id.*

[53] *Id.*; *see also Boyd v. United States ex rel. U.S. Army, Corps of Engineers*, 881 F.2d 895, 898 (10th Cir. 1989) (holding that, in FTCA action arising from accident in which snorkeler was struck by boat and killed in lake supervised by Army Corps of Engineers, discretionary-function exception did not immunize failure to warn swimmers that boats were allowed in the area; "[a]n alleged failure to warn swimmers of dangerous conditions in a popular swimming area does not implicate any social, economic, or political policy judgments with which the discretionary function exception properly is concerned"); *Seyler v. United States*, 832 F.2d 120, 123 (9th Cir. 1987) (holding that, in FTCA action arising from accident in which motorcycle passenger was injured when motorcycle failed to negotiate turn on road maintained by Bureau of Indian Affairs, discretionary-function exception did not immunize failure to erect speed-limit signs; "we doubt that any decision not to provide adequate signs would be 'of the nature and quality that Congress intended to shield from tort liability.'") (citations omitted); *Hayes v. United States*, 539 F. Supp. 2d 393, 402-04 (D.D.C. 2008) (holding that, in FTCA action arising from accident in which bicyclist was injured trying to avoid hitting closed gate that blocked trail in Rock Creek Park, discretionary-function exception did not immunize failure to post sign providing sufficient warning that gate would be closed; "While NPS may, in fact, consider economics, engineering and an aesthetic concerns in deciding whether and in what manner to place signs along the portion of the Rock Creek Park Trail in question, the government has failed to demonstrate how the nature of these sign placement decisions implicates and is grounded in public policy concerns."); *Smith v. United States*, 546 F.2d 872, 876-77 (10th Cir. 1976) (holding that, in FTCA action arising from accident in which 14-year-old visitor to national park was severely burned when he fell into superheated thermal pool, discretionary-function exception did not immunize failure to warn of known dangers; policy decision to designate certain areas as "undeveloped" does not absolve government of duty to erect safety devices or signs cautioning about conditions that have been left undisturbed as policy matter).

Much of what was said in *Cope* about the failure to post adequate warnings rings true as well in this case, even though the bike path, unlike Beach Drive, is not a commuter route.[54] Although the government nowhere mentions it, and although it does not appear in any of the photographs submitted as exhibits by the government, there was at the time of Mr. Weinstein's accident, and there still is, a sign posted next to the stretch of the bike path where the accident occurred.    The sign says "Walk Your Bike" and is located south of the pothole that caused Mr. Weinstein's accident.  (Ex. H: Dionne Decl. ¶¶ 5, 6; Ex. G: Green Decl. ¶¶ 7-9 & Ex. D3.)  For a cyclist, such as Mr. Weinstein, approaching the pothole from the north, the sign was too small and was located too far past the pothole and around a curve in the trail to give fair warning of the need to take special precautions.  (Ex. H: Dionne Decl. ¶ 6.)  Had NPS installed an additional sign complying with nationally recognized standards, or at least had NPS relocated the existing "Walk Your Bike" sign a minimum of 50 meters north of its current location, Mr. Weinstein would have had some warning of the need to dismount from his bicycle before he reached the pothole.  (Ex. H: Dionne Decl. ¶ 6.)

To paraphrase what was said in *Cope*, NPS has already posted a sign in an effort to alert cyclists to a safety hazard on the bike trail.  NPS has been unable to articulate how the placement of an additional or different sign on the trail implicates the type of economic, social, or political concerns that the discretionary-function exception protects from suit under the FTCA.

---

[54] *Hayes*, 539 F. Supp. 2d at 404 (applying holding of *Cope v. Scott* regarding warning signs to Rock Creek Park recreational trail; "[n]othing in the language of *Cope v. Scott*. . . limits its application to roads permitting vehicle traffic").

The government's argument that its failure to post an adequate warning about the pothole constitutes a protected discretionary function does not withstand scrutiny. According to the government, "the placement of numerous signs along the Rock Creek Park Trail warning of every possible hazard, would detract from the aesthetics of the park, negatively impact park visitors' experience, and present an unnecessary drain on the park's budget." (Coleman Decl. ¶ 16, *cited with approval in* Mem. P. & A. Supp. Mot. Dismiss or Summ. J. 14.)    First, however, the Weinsteins do not claim that NPS was required to place a sign "warning of every possible hazard"; rather, they claim NPS is liable for failing to place a sign warning of the hazard that caused Mr. Weinstein's accident, namely, the pothole in the bike trail.

Second, the government's assertion to the contrary notwithstanding, the posting of a sign warning of the pothole would neither "detract from the aesthetics of the park" nor "negatively impact park visitors' experience." (Ex. H: Dionne Decl. ¶ 10; Ex. G: Green Decl. ¶ 14.) And if instead of posting a new sign, NPS had simply relocated the existing sign, the park's aesthetics and park visitors' experience would not have been adversely affected at all.

Third, posting a new warning sign would not have imposed "an unnecessary drain on the park's budget." Rather, the cost would have been minimal, that is, less than $500. (Ex. G: Green Decl. ¶ 13; *see also* Ex. H: Dionne Decl. ¶ 10 ("very reasonable cost").) Relocation of the existing sign would undoubtedly cost even less. (*See* Ex. H: Dionne Decl. ¶ 10.) In any event, "'[b]udgetary constraints . . . underlie virtually all government activity,'" so to permit general economic concerns

to trigger the discretionary-function exception "would allow the exception to swallow the FTCA's sweeping waiver of sovereign immunity."[55]

The cases on which the Government relies, holding that the failure to provide adequate warning of hazards falls within the discretionary-function exception, are all distinguishable. In each of those cases, no warning was provided, whereas in this case a warning was provided but was grossly inadequate.[56] Furthermore, to the extent those cases conflict with the decisions in *Cope v. Scott*[57] and *Hayes v. United States*[58]— both of which held that NPS's failure to adequately warn of hazards in Rock Creek Park was not protected by the discretionary-function exception — the government's cases from other jurisdictions are not controlling here.

In sum, NPS's failure either to provide an adequate sign warning of the pothole in addition to the "Walk Your Bike" sign or to relocate the "Walk Your Bike" sign to a place where it would have been more effective was not so "fraught

---

[55] *Cope*, 45 F.3d at 449 (*quoting ARA Leisure Servs.*, 831 F.2d at 196).

[56] *See Soldano v. United States*, 453 F.3d 1140 (9th Cir. 2006) (no warning of hidden hazard on national park road); *Rosebush v. United States*, 119 F.3d 438 (6th Cir. 1997) (no warning of dangers associated with fire pit at national forest campground); *Chantal v. United States*, 104 F.3d 207 (8th Cir. 1997) (no visual warning marking edge of step-like features at national memorial); *Valdez v. United States*, 56 F.3d 1177 (9th Cir. 1995) (no warning signs about hazards associated with waterfall); *Kiehn v. United States*, 984 F.2d 1100 (10th Cir. 1993) (no warning of unstable condition of sandstone rock formations on cliff at national monument); *Bowman v. United States*, 820 F.2d 1393 (4th Cir. 1987) (no signs warning of dangerous embankment on parkway connecting two national parks).

[57] 45 F.3d at 451-52.

[58] 539 F. Supp. 2d at 402-04.

with economic, political, or social judgments"[59] as to be encompassed by the discretionary-function exception. NPS's acts and omissions as to signage, therefore, are not insulated from suit under the FTCA.

# Conclusion

For these reasons, the Court should order that Defendant's motion to dismiss or for summary judgment be denied.

Respectfully submitted,

KOONZ, MCKENNEY, JOHNSON, DEPAOLIS & LIGHTFOOT, L.L.P.

/s/ William P. Lightfoot
William P. Lightfoot  #313593
Paulette E. Chapman  #416437
Kelly J. Fisher        #488431
2001 Pennsylvania Ave., N.W.
Suite #450
Washington, D.C. 20006
(202) 659-5500

*Counsel for Plaintiffs*

---

[59] *Cope*, 45 F.3d at 450; *see also Hayes*, 539 F. Supp. 2d at 402 ("the question is not whether the challenged decision *involved* policy considerations but whether the nature of the decision is grounded in such considerations").

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Opposition to Defendant United

States' Motion to Dismiss or for Motion for Summary Judgment was sent via electronic filing,

this 13th day of June 2008  to:


Wyneva Johnson, Esquire
U.S. ATTORNEY'S OFFICE FOR D.C.
Judiciary Center Building
555 4th Street, NW
Civil Division
Washington, DC 20530
(202) 514-7224
(202) 514-8780 (fax)
wyneva.johnson@usdoj.gov

*Attorney for Defendant United States*


_____ /s/ William P. Lightfoot _____
William P. Lightfoot

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL AND BETH                          :
WEINSTEIN,                                :
                                          :
        Plaintiffs,                       :
                                          :    Civil Action No. 08-00216 (RJL)
        v.                                :
                                          :
UNITED STATES OF AMERICA,                 :
                                          :
        Defendant.                        :

## ORDER

Upon consideration of Defendant United States' Motion to Dismiss or for Motion

for Summary Judgment, any Opposition thereto, and the entire record herein, it is by this

Court this _____ day of _____, 2008 hereby

**ORDERED** that Defendant United States' Motion to Dismiss or for Motion for

Summary Judgment is **DENIED**.

_____
        Judge Richard J. Leon

COPIES TO:

William P. Lightfoot
Koonz, McKenney, Johnson,
DePaolis & Lightfoot, LLP
2001 Pennsylvania Avenue NW, Suite 450
Washington, DC 20006
wlightfoot@koonz.com

*Attorney for Plaintiff Michael and Beth Weinstein*

Wyneva Johnson, Esquire
U.S. ATTORNEY'S OFFICE FOR D.C.
Judiciary Center Building
555 4th Street, NW
Civil Division
Washington, DC 20530
(202) 514-7224
(202) 514-8780 (fax)
wyneva.johnson@usdoj.gov

*Attorney for Defendant United States*

# Exhibit A

# Complaint

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL WEINSTEIN          :
10729 Lady Slipper Terrace
Rockville, MD 20852           :

and                         :

BETH WEINSTEIN           :
10729 Lady Slipper Terrace
Rockville, MD 20852         :     Civil Action No._____

Plaintiffs,         :

v.                 :

UNITED STATES OF AMERICA,   :

Defendant.        :

Serve:               :

Case: 1:08-cv-00216
Assigned To : Leon, Richard J.
Assign. Date : 2/7/2008
Description: General Civil

The Honorable Michael B. Mukasey   :
Attorney General of the
  United States of America       :
United States Department of Justice
950 Pennsylvania Avenue, N.W.    :
Washington, D.C. 20530
                        :

and                   :

Jeffrey A. Taylor, Esquire
United States Attorney
 for the District of Columbia
Judiciary Center            :
555 Fourth Street, N.W.
Washington, D.C. 20530     :

and                   :

James Weiner, General Counsel    :
Office of the Solicitor
United States Department of Interior :
Branch of Acquisitions & Intellectual
 Property                 :
MS-7308, MIB
1849 C Street, N.W.         :
Washington, DC 20240

LAW OFFICES
KOONZ, McKENNEY,
JOHNSON, DePAOLIS
& LIGHTFOOT
JAMES MONROE BUILDING
101 PENNSYLVANIA AVE., N.W.
SUITE 450
WASHINGTON, D.C. 20006

(202) 659-5500

# COMPLAINT
## (Federal Tort Claims Act)

Plaintiffs Michael Weinstein and Beth Weinstein bring this action for damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671-2680, against Defendant United States of America. Plaintiffs allege, upon personal knowledge and information and belief, as follows:

## Parties, Jurisdiction, and Venue

1.    Jurisdiction of this Court arises under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671-2680.

2.    Venue is proper in this Court under 28 U.S.C. § 1402(b) because the negligence of Defendant United States of America occurred in the District of Columbia.

3.    Plaintiffs Michael Weinstein and Beth Weinstein are adult citizens of the United States residing in the State of Maryland.

4.    Defendant United States of America at all relevant times owned and operated Rock Creek Park, in the District of Columbia, where Plaintiff Michael Weinstein was injured.

5.    Plaintiffs Michael Weinstein and Beth Weinstein presented their tort claims in writing to the United States Department of the Interior, National Park Service, within two years after their claims accrued, as required under 28 U.S.C. §§ 2401(b) and 2675(a).

6.    The United States Department of the Interior denied Plaintiffs' claims by letter dated **September 28, 2007**, sent by certified mail.

LAW OFFICES
KOONZ, MCKENNEY,
JOHNSON, DEPAOLIS
& LIGHTFOOT
JAMES MONROE BUILDING
301 PENNSYLVANIA AVE., N.W.
SUITE 450
WASHINGTON, D.C. 20006
(202) 659-5500

2

## Facts

7.    On or about **April 16, 2005 at approximately 12:30 p.m.**, Plaintiff Michael Weinstein was riding a bicycle on the bike path along Beach Drive at Klingle Road in Rock Creek Park.  The bicycle hit pavement surface irregularities such as a pothole and cracks on the path causing Michael Weinstein to lose control, to pitch forward over the handlebars, and to strike his head and face on the paved pathway.

8.    As a direct and proximate result of the accident, Plaintiff Michael Weinstein suffered serious injuries including injuries to his head, neck, back, and permanent paralysis.

9.    At all relevant times, the United States National Park Service, a federal agency of Defendant United States of America within the United States Department of the Interior, was in possession and control of the bike path in Rock Creek Park on which Plaintiff Michael Weinstein was riding his bicycle.  The National Park Service had responsibility to maintain the bike path and post signage on it.

10.    The National Park Service negligently failed to repair the pothole on the bike path or to post signs warning of the hazard.

## Count I
### (Negligence)

11.    Plaintiffs incorporate by reference paragraphs 1 through 10 and further allege that the accident was a direct and proximate result of the negligence of the United States of America in failing to appropriately and adequately maintain the bike path surface in a reasonable condition consistent with a uniform standard of

LAW OFFICES
KOONZ, McKENNEY,
JOHNSON, DePAOLIS
& LIGHTFOOT
JAMES MONROE BUILDING
001 PENNSYLVANIA AVE., N.W.
SUITE 450
WASHINGTON, D.C. 20006
(202) 659-5500

3

conduct where th[ ]cident occurred, and failing to place [ ]maintain appropriate and adequate warning signs along the bike path.

12.    As a direct and proximate result of the negligence of Defendant United States of America, Plaintiff Michael Weinstein suffered extensive and serious injuries, including permanent paralysis.

13.    As a further direct and proximate result of the negligence of Defendant United States of America, Plaintiff Michael Weinstein has incurred and will continue to incur a loss of earnings and wage-earning capacity; has sustained and will continue to sustain substantial expenses for medical care and treatment; and has suffered and will continue to suffer much physical pain and mental anguish.

## Count II
### (Loss of Consortium)

14.    Plaintiffs incorporate by reference paragraphs 1 through 13 and further allege that as a direct and proximate result of the negligence of Defendant United States of America, Plaintiff Beth Weinstein has suffered and will continue to suffer the loss of Plaintiff Michael Weinstein's material services, love, affection, companionship, sexual relations, and other benefits of their marital relationship.

LAW OFFICES
KOONZ, MCKENNEY,
JOHNSON, DEPAOLIS
& LIGHTFOOT
JAMES MONROE BUILDING
001 PENNSYLVANIA AVE., N.W.
SUITE 450
WASHINGTON, D.C. 20006
(202) 659-5500

4

## Prayer for Relief

WHEREFORE, Plaintiffs Michael and Beth Weinstein demand judgment against Defendant United States of America in the amount of twelve-million dollars ($12,000,000.00), plus costs.

Respectfully Submitted,

KOONZ, McKENNEY, JOHNSON,
DEPAOLIS & LIGHTFOOT, LLP

William P. Lightfoot  #313593
Paulette E. Chapman  #416437
Kelly J. Fisher     #488431
2001 Pennsylvania Ave., N.W.
Suite #450
Washington, D.C. 20006
wlightfoot@koonz.com
(202) 659-5500
Fax: (202) 785-3719

*Counsel for Plaintiffs*

Doc. 38281

LAW OFFICES
KOONZ, McKENNEY,
JOHNSON, DEPAOLIS
& LIGHTFOOT
JAMES MONROE BUILDING
2001 PENNSYLVANIA AVE., N.W.
SUITE 450
WASHINGTON, D.C. 20006
(202) 659-5500

5

# Exhibit B

# National Park Service
# Case Incident Record No. 011166

# UNITED STATES DEPARTMENT OF THE INTERIOR
## NATIONAL PARK SERVICE
# CASE INCIDENT RECORD

| 1 ORGANIZATION CODE | 2. ORGANIZATION (PARK) NAME | 3 LOCATION CODE | 4. CASE/INCIDENT NO. |
|---|---|---|---|
| 1 3 9 6 0 | United States Park Police - Rock Creek Park | 3 0 1 8 | 0 1 1 6 6 |

| 5. LOCATION OF INCIDENT | 6. WHEN DID IT OCCUR? | MO. | DAY | YR. | 24 HOUR TIME | HRS. | MIN. | 7. DAY OF WEEK |
|---|---|---|---|---|---|---|---|---|
| Bike Path along Beach at Klingle Rd. | | 04 | 16 | 05 | | 1 2 | 1 3 | 7 |

| 8. OFFENSE/INCIDENT CODE | 9. NATURE OF INCIDENT | 10. HOW REPORTED |
|---|---|---|
| | Injured Person | Telephone Call |

| 11. REPORTED BY | 12. ADDRESS | 13. PHONE { HOME BUSINESS* |
|---|---|---|

| 14. RECEIVED BY | 15. WHEN RECEIVED: DATE 04/16/05 | 16. TIME BROADCAST 1213 | 17. WHEN INVESTIGATED DATE 04/16/05 TIME 1215 |
|---|---|---|---|
| D. Rodacker | | | |

| 18. INVESTIGATED BY | 19. OFFICER/RANGER NO. | 20 WHEN CLEARED DATE 04/16/05 TIME 1215 1400 | 21. | DISPOSITION |
|---|---|---|---|---|
| D. Rodacker | 0 2 6 7 | | | |

| 22. INVOLVED PERSONS | 23. ADDRESS | 24. PHONE | 25 SEX | 26 RACE | 27 AGE | 28. DATE OF BIRTH |
|---|---|---|---|---|---|---|
| | | | M | W | 71 | * |
| | | | F | W | * | * |

**29. DETAILS OF INCIDENT**

On April, 16, 2005 at 1213 hours I was dispatched to the bike path located along Beach Drive at Klingle Rd. NW. Upon arrival I observed a male individual lying positioned on his side on the path. A pool of blood was around his head and was coming from the underside of his nose and mouth region. He was in and out of consciousness unable to speak or move. He was being attended to by his bike riding partner, N_____ ___ ____ who had originated the call. Also assisting was Ms. Barbara GOURDARZI, a Trauma Nurse from George Washington Hospital. The victim was identified as ____ ____ . Due to the apparent seriousness of the injuries, the EAGLE was requested. D-3 Officers and along with Metropolitan Police Department assisted with securing a landing zone on the Porter St. overpass.

DC Rescue Engine 31 and EMS Unit 22 also responded and assisted. The victim was attended to and flown by the EAGLE to MEDSTAR for treatment

_____ advised that she had witnessed the accident. She explained that they were both riding their bicycles south along the bike path. She advised that it appeared the victims bicycle hit a pothole on the path causing the victim to lose control, pitching him over the handlebars and striking his head and face onto the paved pathway. An inspection of the path revealed it to be dry and clear of debris however, a small pothole is located in the center of the path less than 15 feet from where the victim was found.

CIB Detectives Horman and Ludwig responded to the accident site to assess the incident. Sgt Ferstl also responded. He photographed the accident site documenting the path conditions.

Both the victims' and ____ ____ bicycles were transported to D-3 for safe keeping. ID Officer Blackmore will be taking custody of the victims cycle and helmet pending further investigation. I transported ____ ____ to the victims vehicle. She would drive the victims vehicle back to his residence and notify his wife, ____ _____ and the victims son, ____ _____ I was unable to gather all the report information on the victim at this time, therefore, I will follow up tomorrow to determine his medical status and gather the remainder of his information.

time cleared 1400 hours.

| 31 QUANTITY | PROPERTY STOLEN OR DAMAGED | 32. ESTIMATED VALUE | RECOVERED | |
|---|---|---|---|---|
| | | | 33. DATE | 34. VALUE |
| | | | | |
| | | | | |
| | | | | |
| PROPERTY CODE OF HIGHEST VALUE | | 36 TOTAL 00 | 37. TOTAL | 00 |

| INVESTIGATED BY (Signature and Date) | APPROVED BY (Signature and Date) |
|---|---|
| . Rodacker [signature] 267 04/16/05 | [signature] 83 4/17/05 |

# Exhibit C

# Letter from Marc Fiedler, Counsel for the Weinsteins, to William Line, National Park Service (July 22, 2005)

LAW OFFICES

# KOONZ, MCKENNEY, JOHNSON, DePAOLIS & LIGHTFOOT

A LIMITED LIABILITY PARTNERSHIP

JOSEPH H. KOONZ, JR.
ROGER C. JOHNSON
PETER C. DePAOLIS
WILLIAM P. LIGHTFOOT
MARC FIEDLER
PAULETTE E. CHAPMAN
DAVID M. SCHLOSS
JULIE H. HEIDEN
P. W. SCOTT LUCAS
KELLY J. GUGLIELMI
RON D. EARNEST

OF COUNSEL
ANDREW W. COHEN

SUITE 500
2020 K STREET, N.W.
WASHINGTON, D. C. 20006

(202) 659-5500
FAX (202) 785-3719
WWW.KOONZ.COM

6301 IVY LANE, SUITE 700
GREENBELT, MARYLAND 20770
(301) 345-5700

WILLOWWOOD PLAZA 1
10300 EATON PLACE, SUITE 200
FAIRFAX, VIRGINIA 22030
(703) 218-4410
FAX (703) 218-4411

P. O. BOX 6415
LEESBURG, VA 20178

REPLY TO
(202) 822-1869

July 22, 2005

William Line
National Park Service
1100 Ohio Avenue, S.W.
Washington, D.C. 20242

Re: FOIA Request

Dear Mr. Line:

This is a request under the Freedom of Information Act for information concerning the bicycle path along Beach Drive and Klingle Road in Rock Creek Park, Washington, D.C. ("Bicycle Path"), on April 16, 2005 ("Date"). The word "information" includes all documents, writings, notes, correspondence, emails, memoranda, records, studies, reports, orders, regulations, rules, standards, guidelines, graphs, charts or other data compilations, photographs, drawings, and audio or video recordings, regardless whether written, typewritten, handwritten, printed, or recorded and regardless whether created, transmitted, or stored on paper, computer, microfilm, microfiche, tapes, disks, or any other format.

1. Who or what entity held legal title to the Bicycle Path on that Date?

2. Provide all information pertaining to ownership of the Bicycle Path on that Date.

3. Who or what entity held an easement, license, or lease for, or other real-property interest in, the Bicycle Path on that Date?

4. Please provide all information concerning easements, licenses, leases, or other real-property interests pertaining to the Bicycle Path on that Date.

5. Please provide all information pertaining to transfers of real-property interests in the Bicycle Path from January 1, 1995, to the present.

6. Please provide all information pertaining to maintenance and repair of the Bicycle Path from January 1, 1995, to the present.

7. Who or what entity had legal responsibility for maintaining or repairing the Bicycle Path on that Date?

8. Please provide all information pertaining to responsibility for maintenance and repair of the Bicycle Path from January 1, 1995, to the present.

9. Please provide all information pertaining to accidents involving bicycles, hikers, or pedestrians on the Bicycle Path occurring from January 1, 1995 to the present.

10. Please provide all information pertaining to the safety of the Bicycle Path.

11. Please provide a copy of all complaints, judgments, and settlement agreements in court cases arising from accidents on the Bicycle Path from January 1, 1995, to the present.

If you have any questions about this request, please contact me. Also, please contact me if the costs to be charged for responding to this request will exceed $100. Thank you for your anticipated cooperation

Very truly yours,

Marc Fiedler

MF:amc

**Exhibit D**

**Letter from Jennifer Galante, Paralegal for the Weinsteins, to Lisa A. Mendelson-Jelmini, Deputy Regional Director, National Park Service (May, 19, 2006)**

LAW OFFICES
# KOONZ, McKENNEY, JOHNSON,
## DePAOLIS & LIGHTFOOT

A LIMITED LIABILITY PARTNERSHIP

JOSEPH H. KOONZ, JR.
ROGER C. JOHNSON
PETER C. DePAOLIS
WILLIAM P. LIGHTFOOT
MARC FIEDLER
PAULETTE E. CHAPMAN
DAVID M. SCHLOSS
JULIE H. HEIDEN
KELLY J. FISHER
PATRICK B. TEDESCO

OF COUNSEL
ANDREW W. COHEN

JAMES MONROE BUILDING
2001 PENNSYLVANIA AVENUE, N.W.
SUITE 450
WASHINGTON, D.C. 20006

(202) 659-5500
FAX (202) 785-3719
WWW.KOONZ.COM

6301 IVY LANE, SUITE 700
GREENBELT, MARYLAND 20770
(301) 345-5700

WILLOWWOOD PLAZA 1
10300 EATON PLACE, SUITE 200
FAIRFAX, VIRGINIA 22030
(703) 218-4410
FAX (703) 218-4411

P. O. BOX 6415
LEESBURG, VA 20178

REPLY TO

May 19, 2006

Lisa A. Mendelson-Jelmini
Deputy Regional Director
United States Department of the Interior
National Park Service
1100 Ohio Dr. , S.W.
Washington D.C . 20242

Re: FOIA Request

Dear Ms. Mendelson-Jelmini:

  This is a request under the Freedom of Information Act for information concerning the bicycle path along Beach Drive and Klingle Road in Rock Creek Park, Washington, D.C. ("Bicycle Path"), on April 16, 2005. The word "information" includes all documents, writings, notes correspondences, emails, memoranda, records, studies, reports, orders, regulations, standards, guidelines, graphs, charts or other data compilations, photographs, drawings, and audio or video recordings, regardless whether written, type written, handwritten, printed, or recorded, and regardless whether created, transmitted, or stored on paper, computer, microfilm, microfiche, tapes, disks, or any other format.

1. Please provide any photographs of the bicycle path along Beach Drive and Klingle Rd. in Rock Creek Park.
2. Please provide any photographs of the bicycle path along Beach Drive and Klingle Rd. in Rock Creek Park on April 16, 2005.
3. Please provide any photographs concerning the **bicycle** involved in the incident on April 16, 2005 along Beach Drive and Klingle Road in Rock Creek Park.

If you have any questions about this request, please contact me at 202-659-5505 or jgalante@koonz.com. Also, please contact me if the costs to be charged for responding to this request will exceed $100. Thank you for your anticipated cooperation.

Very truly yours,

Jennifer Galante

( Legal Assistant to Mr. Lightfoot)

doc 29578
cc: Michael Weinstein

# Exhibit E

# Letter from Lisa A. Mendelson-Jelmini, Deputy Regional Director, National Park Service, to Marc Fiedler, Counsel for the Weinsteins (Dec. 8, 2005)



# United States Department of the Interior

NATIONAL PARK SERVICE

National Capital Region

1100 Ohio Drive, S.W.

Washington, D.C. 20242

IN REPLY REFER TO:

DEC – 8 2005

A7221 (NCR-RCO)

Mr. Marc Fiedler
Law Office Koonz, McKenney,
    Johnson, Depaolis & Lightfoot
2020 K Street, N.W., Suite 500
Washington, D.C. 20006

Dear Mr. Fiedler:

We apologize for the delay in the completion of this Freedom of Information Act (FOIA) request. This letter follows on our letters to you of August 8, 2005 and August 12, 2005, both in response to your July 22, 2005, Freedom of Information Act (FOIA) request for records concerning the ownership and possession of the bicycle path along Beach Drive and Klingle Road in Rock Creek Park on April 16, 2005; maintenance and repair responsibility of this bicycle path from January 1, 1995 to the present; and accidents involving bicycles, hikers or pedestrians on the bicycle path from January 1, 1995 to the present, and any related court records. This letter also follows on your conversation with National Capital Region FOIA Officer Bill Line on October 27, 2005 in which you requested an explanation of the status of your FOIA request and in which Mr. Line provided you with an update, and a second conversation on November 30, 2005 in which you requested a partial release and in which Mr. Line told you the entire FOIA release was nearing completion.

The FOIA, 5 U.S.C. Section 522, generally provides that the Government shall make records available to the public for inspection and copying to the widest extent possible. Certain classes of records, however, may be exempt if sound grounds exist for invoking an exemption. The FOIA does not require that new records be created in response to a request and only applies to records in existence at the time of the request.

There are 237 records (pages) responsive to your request. Of these, we are providing 206 records in their entirety. We have made redactions from another 27 records pursuant to the FOIA exemption 5 U.S.C. § 552 (b)(6), which protects personnel and medical files and similar files, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. We are withholding another two records in part pursuant to 5 U.S.C. § 552 (b)(5), which protects intra-agency memoranda which are not available by law other than to a party in litigation with the agency. We are withholding in part one more record pursuant to both of these exemptions. We are reviewing another two records (pages) to determine whether we can release these two pages to you and we expect to make this decision shortly.



You have been billed $516.83, as provided for at 43 C.F.R. Part 2, Appendix C, (1). The attached itemized bill explains charges for search time and copies provided. You confirmed your willingness to pay the fees associated with the processing of your request by letter received in our office on September 30, 2005.

You may appeal this partial denial of your FOIA request by writing to the following address:

> Freedom of Information Appeals Officer
> Office of Information Resource Management
> U.S. Department of the Interior
> 1849 C Street, N.W., MS-7456-MIB
> Washington, D.C. 20240

You may also submit your Freedom of Information Act appeal via facsimile at (202) 208-6677. All communications concerning your appeal should be clearly marked with the words "FREEDOM OF INFORMATION ACT APPEAL" and your appeal must be received no later than 30 workdays after the date of this letter. Please refer to the enclosed regulations for additional details on appealing this decision.

Based on the subject of your FOIA request, we direct your attention to a National Park Service planning document which is now available, the Rock Creek Park General Management Plan (GMP) for the management of this park over the next decade. This plan also contains information about usage of Beach Drive in the park. This document is posted on the Rock Creek Park website at http://parkplanning.nps.gov/document.cfm and click on Rock Creek Park.

Pursuant to 43 C.F.R 2.21 (d)(5), Josefa O'Malley, Attorney-Advisor, Branch of National Parks, Office of the Solicitor, was consulted regarding this response. Again, we are sorry for the delay and we will soon be in touch about the remaining two pages.

Sincerely,

Lisa A Mendelson-Ielmini

Deputy Regional Director, National Capital Region

Enclosures

**Exhibit F**

**Letter from Dwight E. Pettiford, Chief of Police, National Park Service, to Jennifer Galante, Paralegal for the Weinsteins (Aug. 1, 2006)**

# United States Department of the Interior

### NATIONAL PARK SERVICE
### UNITED STATES PARK POLICE

Headquarters
1100 Ohio Drive, SW
Washington, D.C. 20024

IN REPLY REFER TO:

AUG 1 2006

AUG 4 2006

A7221(NCR-PPPD)

Ms. Jennifer Galante
Koonz, McKenney, Johnson,
  DePaolis & Lightfoot
2001 Pennsylvania Avenue, NW.
Suite 450
Washington, DC  20006

Dear Ms. Galante:

This responds to your Freedom of Information Act (FOIA) request dated May 19, 2006, and received by the United States Park Police FOIA Officer on June 22, 2006, in which you requested all documents, writings, notes, correspondences, emails, memoranda, records, studies, reports, orders, regulations, standards, guidelines, graphs, charts or other data compilations, photographs, drawings, and audio or video recordings, regardless whether written, type written, handwritten, printed, or recorded, and regardless whether created, transmitted or stored on paper, computer microfilm, microfiche, tapes, disks, or any other format, concerning the bicycle path along Beach Drive and Klingle Road in Rock Creek Park, Washington, DC, on April 16, 2005. You also requested:

1. Any photographs of the bicycle path along Beach Drive and Klingle Road in Rock Creek Park.
2. Any photographs of the bicycle path along Beach Drive and Klingle Road in Rock Creek Park on April 16, 2005.
3. Any photographs concerning the bicycle involved in the incident on April 16, 2005 along Beach Drive and Klingle Road in Rock Creek Park.

The FOIA, 5 U.S.C. § 552, generally provides that the Government shall make documents available to the public for inspection and copying to the widest extent possible. Certain classes of documents, however, may be exempt. The FOIA does not require that new records be created in response to a request and only applies to records in existence at the time of the request.

We have located and identified 73 photographs, and case incident report record #011166, which is responsive to your request. Pursuant to FOIA and Privacy Act routine use exemptions in NPS-19 (1/6/05), we are providing a copy of the responsive documents with redactions

consistent with 5 U.S.C. 552 (b)(7)(C), insofar as it is law enforcement records, the release of which could reasonably be expected to constitute an unwarranted invasion of personal privacy.

Under FOIA, you have the right to appeal this determination within 30 days of the date of this letter (Saturday, Sunday, and public holidays accepted):

> An appeal shall be initiated by filing your appeal in writing, i.e., by mail, fax, or e-mail. Your appeal shall be accompanied by copies of all correspondence between you and us and include in as much detail as possible why you believe that we are in error. 43 CFR 2.30.

Address your appeal, clearly marked "Freedom of Information Act Appeal," to the Freedom of Information Act Appeals Officer, U.S. Department of the Interior, 1849 C Street, NW., Mail Stop 5312, Washington, DC 20240. Please provide them with any other information you may have that leads you to believe that the requested records not located do, in fact, exist including where they might be found if the location is known to you.

The fee incurred in responding to your request is less than $30 and is not being charged in accordance with 43 CFR § 2.16 (b)(2).

Pursuant to 43 CFR 2.21(d)(5), Randolph J. Myers, Senior Attorney, Office of the Solicitor, U.S. Department of the Interior, Washington, DC 20240, was consulted regarding the decision.

Sincerely,

Dwight E. Pettiford
Chief of Police

# Exhibit G

# Green Declaration
and
# Green Exhibits A - I

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

MICHAEL WEINSTEIN

and

BETH WEINSTEIN-

              Plaintiffs,

            v.

UNITED STATES OF AMERICA

           Defendant.

Civil Case No.: 08CV216
Judge: RJL

### DECLARATION OF JAMES GREEN

I, James M. Green, PE, make this declaration in lieu of an affidavit pursuant to 28 U.S.C. §1746. I am aware that this declaration may be filed in the United States District Court for the District of Columbia, and that it is the legal equivalent of a statement under oath.

1.    I hold the following degrees:

- B.S. Physical Science, University of Maryland/ East Tennessee State University
- M.S. Environmental and Occupational Health, East Tennessee State University
- M.S. Civil Engineering, University of Tennessee- Emphasis on Operations Research

I am a registered professional engineer in the following states:

- North Carolina
- South Carolina
- Virginia
- New Jersey
- Washington State
- Maine
- Massachusetts
- Maryland
- Colorado

LAW OFFICES
KOONZ, McKENNEY,
JOHNSON, DePAOLIS
& LIGHTFOOT
JAMES MONROE BUILDING
2001 PENNSYLVANIA AVE., N.W.
SUITE 450
WASHINGTON, D.C. 20006
(202) 659-5500

I belong to the following committees:

- ASTM F09 Sport/Bicycles – Deals with standards for bicycles and their components.
- Human Powered Transportation Committee, Transportation Research Board, through the American Society of Civil Engineers – Deals with standards in the Nation's Infrastructure for pedestrian and cycling safety.
- Institute of Transportation Engineers – Member of those committees dealing with pedestrian and bicycling.
- Visibility Committee Transportation Research board

I am an Engineering graduate of the University of Tennessee and a member of those Professional Organizations that provide technical review on the Manual of Uniform Traffic Control Devices. I have extensive experience as a bicyclist, as well as I have published numerous articles and books related to bicycle safety. My Engineering Vitae is attached, Green Ex. A.

2.    I am familiar with nationally recognized standards of care in 2005 for management of multi-use trails and bicycle trail systems, including standards relating to safety issues and, specifically, requirements for posting of warning signs and the use of other devices or techniques to meet minimal requirements for the safety of members of the public while using such bicycle trails.

3.    I am familiar with the Manual on Uniform Traffic Control Devices (MUTCD) which is approved and published by the Federal Highway Administrator as the National Standard for the placement and use of signs that are placed on bicycle trails to regulate, warn, or guide users of the bicycle trail. (See page I-1 of MUTCD: Green Ex. B)
The MUTC states, "The Manual on Uniform Traffic Control Devices (MUTCD) is incorporated in 23 Code of Federal Regulations (CFR), Part 655, Subpart F and shall be recognized as the national standard for all traffic control devices installed on any street, highway, or bicycle trail open to public travel in accordance with 23 U.S.C. 109(d) and 402(a)".

4.    I am familiar with and have personal knowledge of the general topography, roads, paths, signs, and other features of the landscape in the area of Rock Creek Park referred to in the Case Incident Report of the National Park Service No. 011166, Green Ex. C. My personal knowledge of the area is based on a site visit I made to the area on May 31, 2008.

5.    I have reviewed the photographs attached as Green Exhibits D 1 through D 3 to this Declaration as well as the Case Incident Report attached as Green Ex. C. I have reviewed Exhibits C thru F to the US Motion to Dismiss the Plaintiffs' Weinstein claim. They are, Exhibit C: Declaration of Adrienne Coleman, Exhibit D: NPS Management Policies, Exhibit E: National Park Service Sign Manual, Exhibit F: Photographs.

6.    The National Park Service Sign Manual states that "This Manual constitutes the official National Park Service supplement to the Manual on Uniform Traffic Control Devices (MUTCD) published by the Federal Highway Administration, U.S. Department of Transportation. Together, the MUTCD and this Manual are utilized by the National Park Service to provide for park managers recommended standards, specifications and procedures for the NPS Sign System to assure a uniform and distinctive system of signing and graphics in meeting the Service's obligations....", Green Ex. E.

LAW OFFICES
KOONZ, MCKENNEY,
JOHNSON, DEPAOLIS
& LIGHTFOOT
JAMES MONROE BUILDING
2001 PENNSYLVANIA AVE., N.W
SUITE 450
WASHINGTON, D.C. 20006
(202) 659-5500

7.      When I visited the site of Plaintiff Weinstein's injury I observed a sign posted on the bicycle trail. The sign said "Walk Your Bike".

8.      When I review the photographs taken by the government official on the date of the incident, I observed a sign posted on the bicycle path. The sign reads "Walk Your Bike".

9.      I note that in the photographs produced by the US as Exhibit F, that the photos do not show a sign posted on the bicycle trail.

10.     I have evaluated the factors involved in the incident that occurred on April 16, 2005. In that incident Mr. Weinstein was rotated over his bicycle resulting in severe injury. I evaluated the accident scene at Rock Creek Park Trail on May 31, 2008. Since the Park Service utilizes MUTCD in their designs I have cited the 2003 MUTCD in my analysis.

11.     Form my evaluation of the scene it is my opinion to a reasonable degree of engineering certainty that the US Park Service failed to utilize the improper placement of signs on the path in violation of the Manual of Uniform Traffic Control Devices (MUTCD). Specifically, the sign that was placed stating "Walk your Bike", violates the following MUTCD Sections:

- Section 9B.01: Application and Placement of Signs- The placement of signs violate the placement sections. The MUTCD vertical and lateral placement criteria are violated on the subject sign. Green Ex. F
- Section 9B.02: Design of Bicycle Signs- The Sign "Walk Your Bike", does not exist in Table 9B-1 in the MUTCD. Green Ex. G
- Section 9B.18: Other Bicycle Warning Signs- The "Walk Your Bike", sign placement is violated in this section. Placement of the sign should be no less that 50 feet in advance of the condition. In this instance, the "Walk Your Bike", sign is at the condition of uneven pavement and poor sight distance leaving no time for the Cyclist to react. Green Ex. H
- Section 2C.05: Placement of Warning Signs- The Placement of the "Walk Your Bike" sign violates the principle of Perception, Identification Emotion, and Volition PIEV defined in this section. If the MUTCD had been followed, the placement of this sign would be approximately 50 meters back from the accident point. Green Ex. I

The MUTCD is violated as noted. The violation of the MUTCD did not allow the cyclist to avoid the hazardous condition that resulted in his rotation over the front of his cycle.

12.     Compliance with the cited sections of the MUTCD could have been achieved with little difficulty or expense by removing the "Walk Your Bike" sign and reinstalling it at approximately 50 meters from the hazard.

13.     The cost of complying with the cited sections of the MUTCD would have been minimal, that is less than $500.00.

14.     Compliance with the cited sections of the MUTCD would not have detracted for the aesthetics of the park.

LAW OFFICES
KOONZ, McKENNEY,
JOHNSON, DEPAOLIS
& LIGHTFOOT
JAMES MONROE BUILDING
2001 PENNSYLVANIA AVE., N.W.
SUITE 450
WASHINGTON, D.C. 20006

(202) 659-5500

15.     Compliance with the cited sections of the MUTCD would not have adversely affected park visitors' experience in the park.

16.     Compliance with the cited sections of the MUTCD would not have required the National Park Service to warn park visitors of every possible hazard in the park.

17.     I reviewed the photographs of the pot hole take by a government official, Ex D1-D3, and I visited the incident site and inspected the location of the pot hole.

18.     I know of nationally recognized standards for the maintenance and repair of bicycle facilities.  Green Ex. H

19.     In my opinion to a reasonable degree of engineering certainty, the presence of the pot hole and the failure to repair the pot hole violated the nationally accepted standard of care for maintenance of bicycle facilities.

I declare under penalty of perjury that the foregoing is true and correct based upon my knowledge and information.

Dated the 6th day of June, 2008

*James M. Green*
James M. Green

Doc. 40212

LAW OFFICES
KOONZ, McKENNEY,
JOHNSON, DePAOLIS
& LIGHTFOOT
JAMES MONROE BUILDING
2001 PENNSYLVANIA AVE... N.W.
SUITE 450
WASHINGTON, D.C. 20006
(202) 659-5500

## Clarification of Illegible Paragraph 11 of ongoing Affidavit

7.    When I visited the site of Plaintiff Weinstein's injury I observed a sign posted on the bicycle trail. The sign said "Walk Your Bike".

8.    When I review the photographs taken by the government official on the date of the incident, I observed a sign posted on the bicycle path. The sign reads "Walk Your Bike".

9.    I note that in the photographs produced by the US as Exhibit F, that the photos do not show a sign posted on the bicycle trail.

10.    I have evaluated the factors involved in the incident that occurred on April 16, 2005. In that incident Mr. Weinstein was rotated over his bicycle resulting in severe injury. I evaluated the accident scene at Rock Creek Park Trail on May 31, 2008. Since the Park Service utilizes MUTCD in their designs I have cited the 2003 MUTCD in my analysis.

11.    From my evaluation of the scene it is my opinion to a reasonable degree of engineering certainty that a casual factor of this incident was the improper placement of signs on the path in violation of the Manual of Uniform Traffic Control Devices (MUTCD). Specifically, the sign that was placed stating "Walk your Bike", violates the following MUTCD Sections:

- Section 9B.01: Application and Placement of Signs- The placement of signs violate the placement sections. The MUTCD vertical and lateral placement criteria are violated on the subject sign. Ex. F
- Section 9B.02: Design of Bicycle Signs- The Sign "Walk Your Bike", does not exist in Table 9B-1 in the MUTCD. Ex. G
- Section 9B.18: Other Bicycle Warning Signs- The "Walk Your Bike", sign placement is violated in this section. Placement of the sign should be no less that 50 feet in advance of the condition. In this instance, the "Walk Your Bike", sign is at the condition of uneven pavement and poor sight distance leaving no time for the Cyclist to react. Ex. H
- Section 2C.05: Placement of Warning Signs- The Placement of the "Walk Your Bike" sign violates the principle of Perception, Identification Emotion, and Volition PIEV defined in this section. If the MUTCD had been followed, the placement of this sign would be approximately 50 meters back from the accident point. Ex. I

The MUTCD is violated as noted. The violation of the MUTCD did not allow the cyclist to avoid the hazardous condition that resulted in his rotation over the front of his cycle.

I declare under penalty of perjury that the foregoing is true and correct based upon my knowledge and information.

**Green Exhibit A**

**Engineering Vitae**

**Forensic Engineering Vitae**

**James M. Green, P.E., DEE**

**GE ENGINEERING, INC.**
**120 Kalmia Dr.,**
**Asheville, NC  28804**
**Phone:  (828) 236-1492**
**Fax:  (828) 236-0355**
**Mobile Phone:  (828) 216-0518**
**E-mail:  green3176@bellsouth.net**
**Web:  www.bikereconstruction.com**

## EDUCATION

B.S. Physical Science, University of Maryland/East Tennessee State University
M.S. Environmental and Occupational Health, East Tennessee State University
M.S. Civil Engineering, University of Tennessee - Emphasis on Operations
Research

## EXPERIENCE

President of GE Engineering, Inc. (formerly Resource Engineering) – A Forensic
Engineering firm that emphasizes general accident reconstruction as well as the
principles of conspicuity. In that regard, the firm has reconstructed many
accidents, during the last 35 years, that involved bicycles, pedestrians,
motorcycles, mopeds, motor vehicles, transit authority vehicles, tractor trailers
and construction equipment.

The emphasis in these Professional Engineering efforts has been on the movement
of the various entities and the reaction times available to the operators under the

lighting conditions available at the time. An unusual area of expertise has been the application of Engineering Principles to determine causation to entities involved in athletic competition where an accident is involved.

As a Fellow in the American Society of Civil Engineers and the National Academy of Forensic Engineers, Mr. Green has actively provided critical information, from the reconstruction of accidents, to the Engineering Design community for use in needed design changes.

Competitive USA Triathlon racer for 25 years; including National and World qualifier and 5 time Ironman finisher. .

United States Cycling Federation and Regional Bicycle Racer for approximately thirty-five years.

Competitive Bicycle Racer and Rider for 46 years.

## PROFESSIONAL REGISTRATION

Registered Professional Engineer (2005), North Carolina, South Carolina, Virginia, New Jersey, Washington State, Maine, Massachusetts, Maryland and Colorado.

## PROFESSIONAL SOCIETY MEMBERSHIP (2004)

National Academy of Forensic Engineers (Fellow)
Professional Engineers of North Carolina
National Society of Professional Engineers
American Society of Civil Engineers (Fellow)
Professional Engineers in Private Practice
Institute of Transportation Engineers

## COMMITTEE MEMBERSHIP

ASTM E30.05 Forensic Engineering - Deals with standards for the practice of Forensic Engineering.

ASTM F09 Sports/Bicycles – Deals with standards for bicycles and their components.

Human Powered Transportation Committee, Transportation Research Board, American Society of Civil Engineers – Deals with standards in the Nation's Infrastructure for pedestrian and cycling safety.

Past Chairman of the Ethics Committee, National Academy of Forensic Engineers and Past President – Deals with the practice of Forensic Engineering.

Institute of Transportation Engineers – Member of those committees dealing with pedestrians and bicycling.

Visibility Committee, Transportation Research Board A3A04, American Society of Civil Engineers – Deals with visibility issues through the National Academy of Sciences.

Accident Reconstruction Committee, National Academy of Forensic Engineers –
Deals with the Engineering issues for all types of accident reconstruction.
Program and Technical Review Committee, National Academy of Forensic
Engineers – Deals with the peer review of submitted technical papers for
publication.

## MISCELLANEOUS MEMBERSHIP (2005)

**Fellow, National Academy of Forensic Engineers (NAFE)** – Elected Vice-
President in 1993 by a vote of Professional Engineers in the Academy which is
chartered by the National Society of Professional Engineers. Was Co-Chairman
of the Ethics Committee from 1992-1995. Was one of the writers of the Code of
Ethics for Forensic Engineering. Was President of the Academy for 1995 and
was a member of the Board of Directors. The goal of the National Academy of
Forensic Engineers is to promote the ethical practice of Forensic Engineering and
to exchange technical information through peer reviewed papers and seminars.

## AREAS OF EXPERTISE

I have testified, or provided technical support, on behalf of both Plaintiff and
Defendant in hundreds of cases involving fatal and non-fatal bicycle, motor
vehicle, transit authority, motorcycle, moped, vehicles, tractor trailers and
construction equipment and pedestrian accidents. A great deal of work has also
been accomplished in the area of infrastructure design, construction and operation
where the movement of these entities is concerned. Of particular interest is the
movement of these entities under certain environmental and sight constraints
(conspicuity). Due to proprietary agreements, in the Civil Engineering design
area, and the desire of most attorneys, in the Forensic Engineering area, not to
release case information, only a description of the areas in which I have worked is
provided. Further details may be obtained upon permission from the case
attorney. Expertise in the design area, as well as the Forensic Engineering area,
include, but are not limited to, the following:

**Cyclist and Pedestrian Movement** – Several Civil Engineering design projects
have been completed, and are ongoing, on the design and safe operation of
facilities where the safety of cyclists and pedestrians are of concern. These
projects generally deal with the proper design parameters to allow safe movement
of cyclists and pedestrians in traffic. Since intersection design parameters are
critical in this movement, a great deal of time has been spent in identifying these
parameters in daylight and nighttime conditions (conspicuity).

**Conspicuity** – The application of principles of conspicuity in determining the
causal factors of accidents has been given a great deal of study by GE
Engineering, Inc. (formerly Resource Engineering). Utilizing field test data, as
well as a detailed compilation of engineering literature, the areas of conspicuity
that are directly applicable to reconstructing accidents have been refined,
published, and accepted by the engineering community. These principles of
conspicuity have also been utilized in reconstructing all types of motor vehicle
accidents.

**Ongoing Work** - Determining the causal factors of bicycle accidents, as well as
all types of motor vehicle accidents, continues on an ongoing basis (2005). This

includes modeling accidents utilizing the data developed through actual on site measurements of thousands of accidents. This information is developed from input from engineers throughout the United States and the rest of the world on a continual basis.

**BMX tracks** – An evaluation of the design integrity of BMX race tracks. This includes the evaluation of berm design as it relates to rider accidents. A determination of the vector forces placed on a rider during a jump. This includes determining the trajectory of the bike rider as well as the biomechanics of the rider during the jump. An evaluation of the structural design and integrity of BMX off-road dirt, 10- and 12- speed racing and touring bicycles, including a determination of structural failure associated with impacts from riders jumping or falling.

**Failure to Warn** - Failure to warn analysis has also been conducted on those issues relating to the Manual of Uniform Traffic Control. Forensic and design analysis have been conducted on the design of roads and streets, traffic signals, painting on roadways, sign retroflectivity; as well as all areas relating to design criteria needed for the general public to perceive, react and avoid stimuli (conspicuity). A definition of those areas where failure to adequately warn the public of design constraints which was a causal factor in bicycle structural failure/operation. This failure to warn was determined to be, in some instances, a causal factor of an accident from improper bicycle assembly. Other analyses have shown failure to warn not to be a causal factor in certain bicycle accidents.

**Crush Profiles** - A determination of the velocity of impact from the deformation of bicycles, motor vehicles, mopeds, motorcycles, transit authority equipment, and off road equipment, has been quantitatively determined in the laboratory or on the roadway under controlled conditions. From the Engineering literature, the speed of impact can actually be determined. In the case of bicycles, frames from the major manufacturers were utilized to get actual speed of impact.

**Ethics** – Conducted and taught seminars in Professional Engineering ethics at North Carolina State University, University of Tennessee, Clemson University and at Professional Engineers of North Carolina seminars.


# PUBLICATIONS

*Bicycle Accident Reconstruction for the Forensic Engineer*, published by Bicycle Books, Inc., 1st Ed., James M. Green, P.E., 1991.

*Bicycle Accident Reconstruction: A Guide for the Attorney and the Forensic Engineer,* published by Lawyers and Judges Publishing Co., James M. Green, P.E., 1992.

"Nighttime Bicycle Accident Reconstruction," accepted for publication in the *American Society of Civil Engineering Transportation Engineering Journal*, James M. Green, P.E, 1993.

"A Determination of the Causal Factors of Bicycle Accidents," James M. Green, 1990.

"Bicycle Accident Reconstruction Techniques," *Journal of National Academy of Forensic Engineers*, James M. Green, P.E., 1989.

"A Determination of the Causal Factors of Bicycle Accidents at Railroad Crossings," *Journal of the National Academy of Forensic Engineers*, James M. Green, P.E. and Robert T. Hintersteiner, P.E., 1990.

"Determination of the Reaction Times Available to a Cyclist at Different Intersection Configurations," James M. Green, P.E., 1990.

"Highway Intersections – Killing Fields for Cyclists," James M. Green, P.E., 1990.

"The Effect of Conspicuity on Bicycle Accident Reconstruction," James M. Green, P.E., 1990.

"The Role of Component Failure on Bicycle Accident Reconstruction," James M. Green, P.E., 1990.

"The Employee Relationship Between Helmets and Bicycle Accident Reconstruction," James M. Green, P.E., 1991.

"The Impact of Roadway and Cycle Path Design on Bicycle Accident Reconstruction," James M. Green, P.E., 1991.

"A Determination of Braking Distance for Cyclists in Emergency Stopping Situations," James M. Green, P.E, 1993.

"A Determination of the Reaction Times Available to a Motor Vehicle Driver Overtaking a Cyclist at Night," James M. Green, P.E., 1992.
"A Determination of Force onto the Cycle Rider or Pedestrian During the Impact of a Motor Vehicle," James M. Green, P.E., 1992.

"A Determination of the Actual Point of Impact in Bicycle Accident Reconstruction Involving Motor Vehicles," James M. Green, P.E., 1994.

"The Derivation of a Formula for Determining the Speed of a Bicycle Rider Down an Incline," James M. Green, P.E., 1992.

"Basic Engineering and Physics Applicable to Bicycle Accident Reconstruction," James M. Green, P.E., 1992.

"Reconstruction of Bicycle Accidents at Night Utilizing the Principles of Conspicuity," James M. Green, P.E., 1992.

"A Determination of the Correct Method for Developing Motor Vehicle Speed of Impact in Bicycle Accident Reconstruction Collisions Using Engineering Literature and Field Verification," James M. Green, P.E., 1994.

"Determination of the Velocity of a Cyclist From Deformation of the Cycle From a Frontal Impact," James M. Green, P.E., 1994.

"The Engineering Dynamics of a Cyclist Being Thrown Over the Front of a Cycle During a Sudden Stop," James M. Green, P.E., 1994.

"A Determination of the Structural Integrity of Bicycle Frames Subjected to Frontal Static Force," James M. Green, P.E., 1994.

*Bicycle Accident Reconstruction and Litigation*, published by Lawyers and Judges Publishing Co., 4th Ed., James M. Green, P.E., Paul F. Hill, Esq., & Douglas Hayduck, 1996.

"The Causal Factor of Bus Wheel Injuries and a Remedial Method for Prevention of these Accidents," *Journal of the National Academy of Forensic Engineers*, Vol. XVIII, No. 1, June 2001.

*Bicycle Accident Reconstruction for the Forensic Engineer*, published by Trafford Publishing, 5th Ed., James M. Green, P.E. and contributing authors, 2001.

"Forensic Engineering Analysis of Total Reaction Time," *Journal of the National Academy of Forensic Engineers*, Vol. XX, No. 1, June 2003.

## BICYCLE RACING EXPERIENCE

I continue to test components and frames in high stress situations both in the laboratory and in racing situations.

State of Tennessee Road Racing Bicycle Champion – 1982, 1983.
Hawaiian Ironman Qualifier and Finisher – February 1981, February 1982, October 1982
Winner, Veterans Jonesborough 3-day State Race, United States Cycling Federation sanctioned, 1984.
Team Winner, Tennessee Pro Classic Stage Race, 1984 – First professional road race held in the United States since the 1930's

Winner – Regional 25-mile Time Trial Championships – Course Record Holder, 1981-1986

National United States Cycling Federation Qualifier for the National Road Racing Championships, 1982-1988

Top Ten United States Cycling Federation Time Trial Times, 1982-1987

Member of the Tri-Cities Road Club and Coors Racing Team, 1981-1989

Winner, Warriors Path Triathlon in age group, 1981 – 1984, First overall in Bicycle Time Trial

Fourth, Warriors Path Triathlon in age group, 1986, Second overall in Bicycle Time Trial

First in Age Group, State of Franklin 100 Mile Road Race, 1987, 1989, 1990

Fifth in Age Group, Cascade Falls Triathlon, Bend, OR, 1987

Third, Tullahoma Triathlon, 1990 – Southern Regional Championships; qualified for Nationals, 1.5 K swim, 40 K bike, 10 K run

Second, Chattanooga Triathlon, 1990, 1.5 K swim, 40 K bike, 10 K run

First Tennessee State Championship Triathlon, Fort Loudon, TN, 1990, 1.5 K swim, 40 K bike, 10 K run

Fourth, Muncie, IN, Midwest Regional Triathlon Championship, 1990, 1.2 mile swim, 56 mile bike, 13.1 mile run

First, Southeastern international distance Triathlon Championship, 1991, Cummings, GA, 1.5 K swim, 40 K bike, 10 K run, Qualified for Nationals

Third, Tullahoma Triathlon, 1991, 1.5 K swim, 40 K bike, 10 K run

Eighth, Muncie Endurathon, Triathlon, Muncie, IN, July 1999

First in Age Group, Double Dam Triathlon, Lenoir, TN, July 200, 1.5 K swim, 40 K bike, 10 K run

Fourth in Age Group, Long Course National Triathlon Championships, Tupper Lake, NY, July 2000, 1.2 mile swim, 56.1 mile bike, 13.1 mile run

First in Age Group, Festival of Flowers Triathlon, Greenwood, SC, June 2000, International Distance

First in Age Group, Long Course Mid-Atlantic Triathlon Championships, Raleigh, NC, October 2001, 1.2 mile swim, 56.1 mile bike, 13.1 mile run

Second in Age Group, Boulder Ironman, Boulder, CO, September 2001, 2.4 mile swim, 112 mile bike, 26.1 mile run

Sixth in Age Group, Long Course National  Championships, Tupper Lake, NY July 2001, 1.2 mile swim, 56.1 mile bike, 13.1 mile run

First in Age group, Pinehurst International Triathlon, Pinehurst, NC, October 2001

Third in Age Group, White Lake Half-Ironman, White Lake, NC, May 2001, 1.2 mile swim, 56.1 mile bike, 13.1 mile run

Eighth in Age Group, Eagleman Half-Ironman, Cambridge, MD, June 2001, 1.2 mile swim, 56.1 mile bike, 13.1 mile run

Qualified for the United States Long Course Triathlon Team in 2000, 2001, and 2003.

Second in Age Group, USC French Broad River Classic Time Trial, August 2001.

Fourth in Age Group, USCF French Broad River Classic Time Trial, August 2003.

First in Age Group, Kings Mountain, NC, International Distance Triathlon, July 2003.

The United States Cycling Federation (USCF) road races where I served as Course Engineer or as Race Promoter are as follows:

Tennessee Pro Classic – This is a one day road race held in the United States since the 1930's. The race consisted of several stages, including a criterium and stage races.

Johnson City Spring Classic – This is a one day road race held on a completely closed course.

District USCF Championships – This was a 100 mile road race held over mountainous terrain with multiple support vehicles and multiple classes of racers.

Greeneville Fun Fest Race – This was a closed course road race involving support crews and multiple classes of racers.

Kingsport Criterium – This was a closed criterium course consisting of all classes of racers as well as a technically demanding course.

**Green Exhibit B**

**Manual on Uniform Traffic Control Devices
Page I-1**












# Manual on Uniform Traffic Control Devices

## for Streets and Highways

### 2003 EDITION

Including Revision 1 dated November 2004
and Revision 2 dated December 2007








U.S. Department of Transportation
**Federal Highway Administration**





Case 1:08-cv-00216-RJL    Document 10-10    Filed 06/13/2008    Page 3 of 3

# MANUAL ON UNIFORM TRAFFIC CONTROL DEVICES
## INTRODUCTION

**Standard:**

**Traffic control devices shall be defined as all signs, signals, markings, and other devices used to regulate, warn, or guide traffic, placed on, over, or adjacent to a street, highway, pedestrian facility, or bikeway by authority of a public agency having jurisdiction.**

**The Manual on Uniform Traffic Control Devices (MUTCD) is incorporated by reference in 23 Code of Federal Regulations (CFR), Part 655, Subpart F and shall be recognized as the national standard for all traffic control devices installed on any street, highway, or bicycle trail open to public travel in accordance with 23 U.S.C. 109(d) and 402(a). The policies and procedures of the Federal Highway Administration (FHWA) to obtain basic uniformity of traffic control devices shall be as described in 23 CFR 655, Subpart F.**

**Any traffic control device design or application provision contained in this Manual shall be considered to be in the public domain. Traffic control devices contained in this Manual shall not be protected by a patent, trademark, or copyright, except for the Interstate Shield and any other items owned by FHWA.**

Support:

The need for uniform standards was recognized long ago. The American Association of State Highway Officials (AASHO), now known as the American Association of State Highway and Transportation Officials (AASHTO), published a manual for rural highways in 1927, and the National Conference on Street and Highway Safety (NCSHS) published a manual for urban streets in 1930. In the early years, the necessity for unification of the standards applicable to the different classes of road and street systems was obvious. To meet this need, a joint committee of AASHO and NCSHS developed and published the original edition of this Manual on Uniform Traffic Control Devices (MUTCD) in 1935. That committee, now called the National Committee on Uniform Traffic Control Devices (NCUTCD), though changed from time in time in name, organization, and personnel, has been in continuous existence and has contributed to periodic revisions of this Manual. The FHWA has administered the MUTCD since the 1971 edition. The FHWA and its predecessor organizations have participated in the development and publishing of the previous editions. There were eight previous editions of the MUTCD, and several of those editions were revised one or more times. Table I-1 traces the evolution of the MUTCD, including the two manuals developed by AASHO and NCSHS.

**Standard:**

**The U.S. Secretary of Transportation, under authority granted by the Highway Safety Act of 1966, decreed that traffic control devices on all streets and highways open to public travel in accordance with 23 U.S.C. 109(d) and 402(a) in each State shall be in substantial conformance with the Standards issued or endorsed by the FHWA.**

Support:

23 CFR 655.603 adopts the MUTCD as the national standard for any street, highway, or bicycle trail open to public travel in accordance with 23 U.S.C. 109(d) and 402(a). The "Uniform Vehicle Code (UVC)" is one of the publications referenced in the MUTCD. The UVC contains a model set of motor vehicle codes and traffic laws for use throughout the United States. The States are encouraged to adopt Section 15-116 of the UVC, which states that, "No person shall install or maintain in any area of private property used by the public any sign, signal, marking, or other device intended to regulate, warn, or guide traffic unless it conforms with the State manual and specifications adopted under Section 15-104."

The Standard, Guidance, Option, and Support material described in this edition of the MUTCD provide the transportation professional with the information needed to make appropriate decisions regarding the use of traffic control devices on streets and highways. The material in this edition is organized to better differentiate between Standards that must be satisfied for the particular circumstances of a situation, Guidances that should be followed for the particular circumstances of a situation, and Options that may be applicable for the particular circumstances of a situation.

Throughout this Manual the headings Standard, Guidance, Option, and Support are used to classify the nature of the text that follows. Figures, tables, and illustrations supplement the text and might constitute a Standard, Guidance, Option, or Support. The user needs to refer to the appropriate text to classify the nature of the figure, table, or illustration.

**Standard:**

**When used in this Manual, the text headings shall be defined as follows:**

1. **Standard—a statement of required, mandatory, or specifically prohibitive practice regarding a traffic control device. All standards are labeled, and the text appears in bold type. The verb shall is typically used. Standards are sometimes modified by Options.**

# Green Exhibit C

# National Park Service
# Case Incident Record No. 011166

FORM 10-343
REV. (176)

ENTERED

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE
## CASE INCIDENT RECORD

| 1 ORGANIZATION CODE | 2. ORGANIZATION (PARK) NAME | | 3 LOCATION CODE | 4. CASE/INCIDENT NO. |
|---|---|---|---|---|
| 1 3 9 6 0 | United States Park Police - Rock Creek Park | | 3 0 1 8 | 0 1 1 1 6 6 |

| 5. LOCATION OF INCIDENT | 6. WHEN DID IT OCCUR? | MO. | DAY | YR. | 24 HOUR TIME | HRS. | MIN. | 7. DAY OF WEEK |
|---|---|---|---|---|---|---|---|---|
| Bike Path along Beach at Klingle Rd. | | 0 4 | 1 6 | 0 5 | | 1 2 | 1 3 | 7 |

| 8 OFFENSE/INCIDENT CODE | 9. NATURE OF INCIDENT | 10. HOW REPORTED |
|---|---|---|
| | Injured Person | Telephone Call |

| 11. REPORTED BY | 12. ADDRESS | 13. PHONE { HOME BUSINESS |
|---|---|---|

| 14. RECEIVED BY | 15. WHEN RECEIVED: DATE | 16. TIME BROADCAST | 17. WHEN INVESTIGATED |
|---|---|---|---|
| D. Rodacker | 04/16/05 | 1213 | DATE 04/16/05   TIME 1215 |

| 18. INVESTIGATED BY | 19. OFFICER/RANGER NO. | 20 WHEN CLEARED | 21. DISPOSITION |
|---|---|---|---|
| D. Rodacker | 0 2 6 7 | DATE 04/16/05   TIME 1215  1400 | |

| 22. INVOLVED PERSONS | 23. ADDRESS | 24. PHONE | 25 SEX | 26 RACE | 27 AGE | 28. DATE OF BIRTH |
|---|---|---|---|---|---|---|
| 1 | | | | | | * |
| 2 | | | M | W | 71 | * |
| 3 | | | F | W | * | * |
| 4 | | | | | | |

29. DETAILS OF INCIDENT

On April, 16, 2005 at 1213 hours I was dispatched to the bike path located along Beach Drive at Klingle Rd. NW. Upon arrival I observed a male individual lying positioned on his side on the path. A pool of blood was around his head and was coming from the underside of his nose and mouth region. He was in and out of consciousness unable to speak or move. He was being attended to by his bike riding partner, N_____ W___, who had originated the call. Also assisting was Ms. Barbara GOURDARZI, a Trauma Nurse from George Washington Hospital. The victim was identified as _____. Due to the apparent seriousness of the injuries, the EAGLE was requested. D-3 Officers and along with Metropolitan Police Department assisted with securing a landing zone on the Porter St. overpass.

DC Rescue Engine 31 and EMS Unit 22 also responded and assisted. The victim was attended to and flown by the EAGLE to MEDSTAR for treatment

_____ advised that she had witnessed the accident. She explained that they were both riding their bicycles south along the bike path. She advised that it appeared the victims bicycle hit a pothole on the path causing the victim to lose control, pitching him over the handlebars and striking his head and face onto the paved pathway. An inspection of the path revealed it to be dry and clear of debris however, a small pothole is located in the center of the path less then 15 feet from where the victim was found.

CIB Detectives Horman and Ludwig responded to the accident site to assess the incident. Sgt Ferstl also responded. He photographed the accident site documenting the path conditions.

Both the victims' and _____ bicycles were transported to D-3 for safe keeping. ID Officer Blackmore will be taking custody of the victims bicycle and helmet pending further investigation. I transported _____ to the victims vehicle. She would drive the victims vehicle back to his residence and notify his wife, _____ and the victims son, _____. I was unable to gather all the report information on the victim at this time, therefore, I will follow up tomorrow to determine his medical status and gather the remainder of his information.

Time cleared 1400 hours.

| 30. QUANTITY | 31 PROPERTY STOLEN OR DAMAGED | 32. ESTIMATED VALUE | RECOVERED | |
|---|---|---|---|---|
| | | | 33. DATE | 34. VALUE |
| | | | | |
| | | | | |
| | | | | |

| 35. PROPERTY CODE OF HIGHEST VALUE | 36 TOTAL | 37. TOTAL |
|---|---|---|
| | 00 | 00 |

| INVESTIGATED BY (Signature and Date) | APPROVED BY (Signature and Date) |
|---|---|
| D. Rodacker  /s/ 267  04/16/05 | /s/  83  4/17/05 |

USPP FORM 43–11
Rev. 1/91

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE
UNITED STATES PARK POLICE

| YR | INCIDENT NUMBER |
|----|-----------------|
| 0 5 | ▮ 0 1 1 1 6 6 |

# EVIDENCE/PROPERTY CONTROL RECEIPT

LOCATION CODE
3 0 1 8

☐ EVIDENCE    ☐ FOUND PROPERTY    ☒ SAFEKEEPING

OFFENSE/INCIDENT: *Injured Person*    DATE: *4/16/05*    TIME: *1213*

LOCATION: *Bike Path @ Klingle & Beach* OFFICER: *D. Rodacker*    BADGE#: *267*

PROPERTY #: _____ NARCOTIC #: _____ DEA LAB #: _____ MCL #: _____

| ITEM # | QUANTITY | DESCRIPTION OF EVIDENCE/PROPERTY | LOCATION RECOVERED |
|--------|----------|-------------------------------|--------------------|
| 1 | 1 | *Bike - Treck 7500 w/ Red bag Serial # WB07Ø4689 ~ LAST Item* | *Path @ Klingle & Beach To D-3 Bike BARN* |

☐ NCIC CHECK MADE

EVIDENCE/PROPERTY OBTAINED FROM: _____

OWNER: *Same*    DEFENDANT(S): _____

OWNER'S ADDRESS: _____

RECOVERED/RECEIVED BY: *D. Rodacker*    DATE: *4-16-05* TIME: *1213*

ADDRESS: *D-3*

PROPERTY MAY BE:    RELEASED:    YES (X)  NO ( )    ITEM(S): *AFI*
                    DESTROYED:   YES ( )  NO (X)    ITEM(S):
CASE INVOLVES ASSET FORFEITURE:   YES ( )  NO (X)   ITEM(S):

CASE UNDER APPEAL: YES ( )  NO (X)

*Rodacker    267    4-16-05*
OFFICER SIGNATURE    BADGE    DATE

OFFICER/AUSA OR STATES ATTORNEY

*836    4/25/05*
SUPERVISOR SIGNATURE    DATE

NPS FORM
10-101
ENTERED

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE
UNITED STATES PARK POLICE

| YR | | INCIDENT NUMBER |
|----|----|----|
| 0 5 | ██ | 0 1 1 6 6 |

| LOCATION CODE |
|----|
| 3 0 1 8 |

# EVIDENCE/PROPERTY CONTROL RECEIPT

☐ EVIDENCE          ☐ FOUND PROPERTY          ☒ SAFEKEEPING

OFFENSE/INCIDENT: Injured Person                    DATE 04-16-05   TIME 1213

LOCATION S/B Bike Path w/s Klingle Rd OFFICER D Rodacker          BADGE# 269

PROPERTY #_____ NARCOTIC #_____ DEA LAB #_____ MCI # 05-909

| ITEM # | QUANTITY | DESCRIPTION OF EVIDENCE/PROPERTY | LOCATION RECOVERED |
|--------|----------|-----------------------------------|--------------------|
| 1 | 1 | Marin Mountain Bike Silver w/Black Front Fork #CS33F5B066 | |
| 2 | 1 | Black + Gray Helmet Specialized | |
| | | → Nothing Follows ← | |
| | | | ☐ NCIC CHECK MADE. |

EVIDENCE/PROPERTY OBTAINED FROM: S/B Bike Path w/o Klingle Rd

OWNER:_____ DEFENDANT(S): N/A

OWNER'S ADDRESS:_____

RECOVERED/RECEIVED BY D Rodacker          DATE 04-16-05   TIME 1213

ADDRESS D-3_____

PROPERTY MAY BE:   RELEASED:   YES (✓) NO ( )   ITEM(S): 1-2

                   DESTROYED:   YES ( ) NO (✓)   ITEM(S):_____

CASE INVOLVES ASSET FORFEITURE:   YES ( ) NO (✓)   ITEM(S):_____

CASE UNDER APPEAL:   YES ( )   NO (✓)

_Rodacker_ 269   4/16/05          OFFICER/AUSA OR STATES ATTORNEY

OFFICER SIGNATURE   BADGE   DATE          SUPERVISOR SIGNATURE   DATE

FORM NO. 10-344
(Rev. 3-73)

U.S. DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE
SUPPLEMENTARY CASE/INCIDENT RECORD

ORGANIZATION(PARK) NAME

United States Park Police - Rock Creek Park

LOCATION OF INCIDENT

Bike Path along Beach Drive At Klingle Rd NW

NATURE OF INCIDENT

Injured Person

| CASE/INCIDENT NUMBER | 0 | 1 | 1 | 1 | 6 | 6 |
|---|---|---|---|---|---|---|

| DATE OF INCIDENT | | | | | | |
|---|---|---|---|---|---|---|
| MO | | DA | | YR | | |
| 0 | 4 | 1 | 6 | 0 | 5 | |

COMPLAINANT'S NAME

COMPLAINANT'S ADDRESS

RESULTS OF INVESTIGATION

On April 17, 2005 made telephone contact with                  regarding the victim,                    . I asked about his hospital status and was advised that the victims spine was swollen and he was still unable to move. Additionally, she was able to supply the victims complete information as follows:

Address

The victims date of birth was

SUBMITTED BY (SIGNATURE AND DATE)

Denise Rodacker          267          07/06/06

APPROVED BY (SIGNATURE AND DATE)

7-6-06

# Green Exhibit D
## (including Green Exhibits D1 – D3)

# Photographs












# Green Exhibit E

# National Park Service Sign Manual
# (excerpt)

Case 1:08-cv-00216-RJL    Document 8-6    Filed 05/16/2008    Page 2 of 4

*D-871 C*
*File*
*NPS General*



NATIONAL
PARK
SERVICE

Department
of the Interior

# SIGN MANUAL

PLEASE RETURN TO:
TECHNICAL INFORMATION CENTER
DENVER SERVICE CENTER
NATIONAL PARK SERVICE

JANUARY 1988

SCANNED
9/29/00

ON MICROFILM

## CHAPTER 1: PURPOSE AND APPLICABILITY

### PURPOSE

This Sign Manual replaces the October 1978 edition of the National Park Service Sign System Specifications (NPS-SSS). It is designed for use by Park managers as an aid to the implementation of the National Park Service Traffic Control Sign System Guideline (NPS-52) and in arriving at management decisions regarding other park signing needs. It is intended that Park managers will utilize this Manual as a guide in the designing and ordering of all vehicular and pedestrian traffic control signing and other pertinent devices.

This Manual constitutes the official National Park Service supplement to the Manual on Uniform Traffic Control Devices (MUTCD) published by the Federal Highway Administration, U.S. Department of Transportation. Together, the MUTCD and this Manual are utilized by the National Park Service to provide for park managers recommended standards, specifications and procedures for the NPS Sign System to assure a uniform and distinctive system of signing and graphics in meeting the Service's obligations under Public Law 89-564, the Highway Safety Act of 1966, and the Highway Safety Program Standards 23 USC 402, in a manner consistent with National Park Service missions.

### APPLICABILITY

Long established and documented National Park Service policy [Park Road Standards (1968 and 1984)]holds that park roads have a unique purpose, which differs significantly from the purpose of roads on the Federal and state highway systems. The Park Road Standards contain the following admonishment to park visitors:

> Park roads are for leisurely driving only. If you are
> in a hurry, you might do well to take another route now,
> and come back when you have more time.

Signing on all park roads should be consistent with National Park Service policy that park roads are not intended to provide fast and convenient transportation, nor designed or intended to serve as commuter routes or connecting links to the Federal and state highway systems. Rather, they are intended to enhance the park experience while providing safe and efficient accommodation of park visitors.

In this regard, the MUTCD in conjunction with this NPS Sign Manual, should be utilized by Superintendents as guidance in making management decisions on the design, location, and application of road signs and markings on park roads; and it is the policy of the National Park Service to follow the MUTCD with respect to the format of all regulatory signs installed on NPS roads open to public vehicular traffic.

Nevertheless, the individual park manager, following the guidelines and procedures set down in NPS-52, has the responsibility for determining whether or not a sign is necessary or appropriate at a given location. The decision to utilize a particular sign at a particular location requires the professional judgment of the park manager--drawing upon available guides, resources, and traffic safety engineering expertise--and considering a variety of other factors, such as the appearance of the road as a whole and its relationship to the natural and/or historical environment through which it passes.

It is important in this regard, too, that such decisions bear in mind long standing NPS policy to minimally intrude upon the natural or historic setting in National Park System areas, and to avoid an unnecessary proliferation of signs, while striving to ensure for the safety of park visitors.

Through an agreement with the Federal Highway Administration, the National Park Service has developed several specific exceptions to specific sections of the MUTCD, as follows:

### Section 2A-27 Posts and Mountings

Add: Timber sign supports: A soil mounted timber sign support is acceptable as a breakaway support if it has a uniform cross section of not more than 24 square inches, or if within an 8-foot width path, there are:

Two posts, each no larger than 3" x 6" or 4" x 5" dimension stock, or round posts no larger than 5" diameter, or 15¾" circumference.

Three posts, each no larger than 3" x 5" or 4" x 4" dimension stock, or round posts no larger than 4½" diameter or 14" circumference.

### Section 2D-3 Color, Reflectorization, and Illumination

Add: Brown shall be the background color for all guide signs on National Park Service roads except for detour markers, detour signs, arrows, route markers, markers, or assemblies indicating a junction or intersection with an interstate highway.

### Section 2D-5 Lettering Style

Add: Modified Clarendon lettering shall be used on all National Park Service guide and informational signs.

Example of letter style is shown in Appendix A.

### Section 2D-6 Size of Lettering

Add: The size of lettering required for guide signs is directly a function of design speed. Die-cut letter fonts for the Modified Clarendon style are available in 3.75", 6", 9", and 12" capital heights. Corresponding lowercase sizes are two-thirds the capital height. Minimum standards for use of these letters are shown in Chapter 5 of this Manual.

### Section 2D-7 Amount of Legend

Detailed guidelines for determining sign size and text are found in Chapter 5 of this Manual.

**Green Exhibit F**

**Manual on Uniform Traffic Control Devices**
**§ 9B.01**

# CHAPTER 9B.  SIGNS

## Section 9B.01  Application and Placement of Signs

**Standard:**

Bicycle signs shall be standard in shape, legend, and color.

All signs shall be retroreflectorized for use on bikeways, including shared-use paths and bicycle lane facilities.

Where signs serve both bicyclists and other road users, vertical mounting height and lateral placement shall be as specified in Part 2.

On shared-use paths, lateral sign clearance shall be a minimum of 0.9 m (3 ft) and a maximum of 1.8 m (6 ft) from the near edge of the sign to the near edge of the path (see Figure 9B-1).

Mounting height for ground-mounted signs on shared-use paths shall be a minimum of 1.2 m (4 ft) and a maximum of 1.5 m (5 ft), measured from the bottom edge of the sign to the near edge of the path surface (see Figure 9B-1).

When overhead signs are used on shared-use paths, the clearance from the bottom edge of the sign to the path surface directly under the sign shall be a minimum of 2.4 m (8 ft).

**Guidance:**

Signs for the exclusive use of bicyclists should be located so that other road users are not confused by them.

The clearance for overhead signs on shared-use paths should be adjusted when appropriate to accommodate typical maintenance vehicles.

## Section 9B.02  Design of Bicycle Signs

**Standard:**

If the sign applies to motorists and bicyclists, then the size shall be as shown for conventional roads in Table 2B-1.

The minimum sign sizes for shared-use paths shall be those shown in Table 9B-1, and shall be used only for signs installed specifically for bicycle traffic applications.  The minimum sign sizes for bicycle facilities shall not be used for signs that are placed in a location that would have any application to other vehicles.

**Option:**

Larger size signs may be used on bicycle facilities when appropriate.

**Guidance:**

Except for size, the design of signs for bicycle facilities should be identical to that specified in this Manual for vehicular travel.

**Support:**

Uniformity in design includes shape, color, symbols, wording, lettering, and illumination or retroreflectorization.

## Section 9B.03  STOP and YIELD Signs (R1-1, R1-2)

**Standard:**

STOP (R1-1) signs (see Figure 9B-2) shall be installed on shared-use paths at points where bicyclists are required to stop.

YIELD (R1-2) signs (see Figure 9B-2) shall be installed on shared-use paths at points where bicyclists have an adequate view of conflicting traffic as they approach the sign, and where bicyclists are required to yield the right-of-way to that conflicting traffic.

**Option:**

A 750 x 750 mm (30 x 30 in) STOP sign or a 900 x 900 x 900 mm (36 x 36 x 36 in) YIELD sign may be used on shared-use paths for added emphasis.

**Guidance:**

Where conditions require path users, but not roadway users, to stop or yield, the STOP sign or YIELD sign should be placed or shielded so that it is not readily visible to road users.

**Green Exhibit G**

**Manual on Uniform Traffic Control Devices
§ 9B.02**

**Figure 9B-1.  Sign Placement on Shared-Use Paths**



When placement of STOP or YIELD signs is considered, priority at a shared-use path/roadway intersection should be assigned with consideration of the following:

    A.  Relative speeds of shared-use path and roadway users;

    B.  Relative volumes of shared-use path and roadway traffic; and

    C.  Relative importance of shared-use path and roadway.

Speed should not be the sole factor used to determine priority, as it is sometimes appropriate to give priority to a high-volume shared-use path crossing a low-volume street, or to a regional shared-use path crossing a minor collector street.

When priority is assigned, the least restrictive control that is appropriate should be placed on the lower priority approaches.  STOP signs should not be used where YIELD signs would be acceptable.

## Section 9B.04  Bicycle Lane Signs (R3-17, R3-17a, R3-17b)

**Standard:**

    **The BIKE LANE (R3-17) sign (see Figure 9B-2) shall be used only in conjunction with marked bicycle lanes as described in Section 9C.04, and shall be placed at periodic intervals along the bicycle lanes.**

**Guidance:**

    The BIKE LANE (R3-17) sign spacing should be determined by engineering judgment based on prevailing speed of bicycle and other traffic, block length, distances from adjacent intersections, and other considerations.

    The AHEAD (R3-17a)  sign (see Figure 9B-2) should be mounted directly below a R3-17 sign in advance of the beginning of a marked bicycle lane.

    The ENDS (R3-17b)  sign (see Figure 9B-2) should be mounted directly below a R3-17 sign at the end of a marked bicycle lane.

## Section 9B.05  BEGIN RIGHT TURN LANE YIELD TO BIKES Sign (R4-4)

**Option:**

    Where motor vehicles entering an exclusive right-turn lane must weave across bicycle traffic in bicycle lanes, the BEGIN RIGHT TURN LANE YIELD TO BIKES (R4-4) sign (see Figure 9B-2) may be used to inform both the motorist and the bicyclist of this weaving maneuver.

**Guidance:**

    The R4-4 sign should not be used when bicyclists need to move left because of a right-turn lane drop situation.

# CHAPTER 9B.  SIGNS

## Section 9B.01  Application and Placement of Signs

**Standard:**

Bicycle signs shall be standard in shape, legend, and color.

All signs shall be retroreflectorized for use on bikeways, including shared-use paths and bicycle lane facilities.

Where signs serve both bicyclists and other road users, vertical mounting height and lateral placement shall be as specified in Part 2.

On shared-use paths, lateral sign clearance shall be a minimum of 0.9 m (3 ft) and a maximum of 1.8 m (6 ft) from the near edge of the sign to the near edge of the path (see Figure 9B-1).

Mounting height for ground-mounted signs on shared-use paths shall be a minimum of 1.2 m (4 ft) and a maximum of 1.5 m (5 ft), measured from the bottom edge of the sign to the near edge of the path surface (see Figure 9B-1).

When overhead signs are used on shared-use paths, the clearance from the bottom edge of the sign to the path surface directly under the sign shall be a minimum of 2.4 m (8 ft).

**Guidance:**

Signs for the exclusive use of bicyclists should be located so that other road users are not confused by them.

The clearance for overhead signs on shared-use paths should be adjusted when appropriate to accommodate typical maintenance vehicles.

## Section 9B.02  Design of Bicycle Signs

**Standard:**

If the sign applies to motorists and bicyclists, then the size shall be as shown for conventional roads in Table 2B-1.

The minimum sign sizes for shared-use paths shall be those shown in Table 9B-1, and shall be used only for signs installed specifically for bicycle traffic applications.  The minimum sign sizes for bicycle facilities shall not be used for signs that are placed in a location that would have any application to other vehicles.

**Option:**

Larger size signs may be used on bicycle facilities when appropriate.

**Guidance:**

Except for size, the design of signs for bicycle facilities should be identical to that specified in this Manual for vehicular travel.

**Support:**

Uniformity in design includes shape, color, symbols, wording, lettering, and illumination or retroreflectorization.

## Section 9B.03  STOP and YIELD Signs (R1-1, R1-2)

**Standard:**

STOP (R1-1) signs (see Figure 9B-2) shall be installed on shared-use paths at points where bicyclists are required to stop.

YIELD (R1-2) signs (see Figure 9B-2) shall be installed on shared-use paths at points where bicyclists have an adequate view of conflicting traffic as they approach the sign, and where bicyclists are required to yield the right-of-way to that conflicting traffic.

**Option:**

A 750 x 750 mm (30 x 30 in) STOP sign or a 900 x 900 x 900 mm (36 x 36 x 36 in) YIELD sign may be used on shared-use paths for added emphasis.

**Guidance:**

Where conditions require path users, but not roadway users, to stop or yield, the STOP sign or YIELD sign should be placed or shielded so that it is not readily visible to road users.

Green Exhibit H

Manual on Uniform Traffic Control Devices
§ 9B.18

2003 Edition

**Figure 9B-3. Warning Signs for Bicycle Facilities** (Sheet 2 of 2)



---

## Section 9B.18  Other Bicycle Warning Signs

Option:

Other bicycle warning signs (see Figure 9B-3) such as BIKEWAY NARROWS (W5-4a) and Hill (W7-5) may be installed on bicycle facilities to warn bicyclists of conditions not readily apparent.

In situations where there is a need to warn motorists to watch for bicyclists traveling along the highway, the SHARE THE ROAD (W16-1) plaque (see Figure 9B-3) may be used in conjunction with the W11-1 sign.

Guidance:

If used, other advance bicycle warning signs should be installed no less than 15 m (50 ft) in advance of the beginning of the condition.

Where temporary traffic control zones are present on bikeways, appropriate signs from Part 6 should be used.

Option:

Other warning signs described in Chapter 2C may be installed on bicycle facilities as appropriate.

## Section 9B.19  Bicycle Route Guide Signs (D11-1)

Guidance:

If used, Bicycle Route Guide (D11-1) signs (see Figure 9B-4) should be provided at decision points along designated bicycle routes, including signs to inform bicyclists of bicycle route direction changes and confirmation signs for route direction, distance, and destination.

If used, Bicycle Route Guide signs should be repeated at regular intervals so that bicyclists entering from side streets will have an opportunity to know that they are on a bicycle route. Similar guide signing should be used for shared roadways with intermediate signs placed for bicyclist guidance.

Support:

Figure 9B-5 shows an example of the signing for the beginning and end of a designated bicycle route on a shared-use path. Figure 9B-6 shows an example of signing for an on-roadway bicycle route. Figure 9B-7 shows examples of signing and markings for shared-use paths.

# Green Exhibit I

# Manual on Uniform Traffic Control Devices
# § 2C.05

### *Table 2C-3. Minimum Size of Supplemental Warning Plaques*

| Size of Warning Sign | Size of Supplemental Plaque | | | |
|---|---|---|---|---|
| | Rectangular | | | Square |
| | 1 Line | 2 Lines | Arrow | |
| 600 x 600 (24 x 24) 750 x 750 (30 x 30) | 600 x 300 (24 x 12) | 600 x 450 (24 x 18) | 600 x 300 (24 x 12) | 450 x 450 (18 x 18) |
| 900 x 900 (36 x 36) 1200 x 1200 (48 x 48) | 750 x 450 (30 x 18) | 750 x 600 (30 x 24) | 750 x 450 (30 x 18) | 600 x 600 (24 x 24) |

Notes: 1. Larger supplemental plaques may be used when appropriate
2. Dimensions are shown in millimeters followed by inches in parentheses and are shown as width x height

Guidance:

Warning signs should be placed so that they provide adequate PIEV time. The distances contained in Table 2C-4 are for guidance purposes and should be applied with engineering judgment. Warning signs should not be placed too far in advance of the condition, such that drivers might tend to forget the warning because of other driving distractions, especially in urban areas.

Minimum spacing between warning signs with different messages should be based on the estimated PIEV time for driver comprehension of and reaction to the second sign.

The effectiveness of the placement of warning signs should be periodically evaluated under both day and night conditions.

Option:

Warning signs that advise road users about conditions that are not related to a specific location, such as Deer Crossing or SOFT SHOULDER, may be installed in an appropriate location, based on engineering judgment, since they are not covered in Table 2C-4.

### Section 2C.06  Horizontal Alignment Signs (W1-1 through W1-5, W1-11, W1-15)

Option:

The horizontal alignment Turn (W1-1), Curve (W1-2), Reverse Turn (W1-3), Reverse Curve (W1-4), or Winding Road (W1-5) signs (see Figure 2C-1) may be used in advance of situations where the horizontal roadway alignment changes. A One-Direction Large Arrow (W1-6) sign (see Figure 2C-1 and Section 2C.09) may be used on the outside of the turn or curve.

If the change in horizontal alignment is 135 degrees or more, the Hairpin Curve (W1-11) sign (see Figure 2C-1) may be used.

If the change in horizontal alignment is approximately 270 degrees, such as on a cloverleaf interchange ramp, the 270-degree Loop (W1-15) sign (see Figure 2C-1) may be used.

Guidance:

The application of these signs should conform to Table 2C-5.

When the Hairpin Curve sign or the 270-degree Loop sign is installed, either a One-Direction Large Arrow (W1-6) sign or Chevron Alignment (W1-8) signs should be installed on the outside of the turn or curve.

Option:

An Advisory Speed (W13-1) plaque (see Section 2C.46) may be used to indicate the speed for the change in horizontal alignment. The supplemental distance plaque NEXT XX km (NEXT XX MILES) (W7-3a) may be installed below the Winding Road sign where continuous roadway curves exist (see Section 2C.45). The combination Horizontal Alignment/Advisory Speed sign (see Section 2C.07), combination Horizontal Alignment/Intersection sign (see Section 2C.08), or the Curve Speed sign (see Section 2C.36) may also be used.

# Exhibit H

## Dionne Declaration
## and
## Dionne Exhibits 1 - 5

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL AND BETH   :
  WEINSTEIN     :
           :
  Plaintiffs,    :
           :  Civil Action No. 08-00216 (RJL)
           :
  v.        :
           :
UNITED STATES OF AMERICA, :
           :
  Defendant.    :

## DECLARATION OF DAVID G. DIONNE

I, David G. Dionne, make this declaration in lieu of an affidavit pursuant to 28 U.S.C. § 1746. I am aware that this declaration may be filed in the United States District Court for the District of Columbia, and that it is the legal equivalent of a statement under oath.

1. I have personal knowledge of the matters hereinafter set forth and am competent to testify thereto.

2. I am a graduate of West Virginia University with a B.S. in Wildlands Administration, with 26 years of experience managing multi-modal public trails, 16 years of experience in leadership positions in the creation of the national multi-use trail system, and 20 years of experience inspecting trails for public and employee safety, maintenance, visitor services, and other park-management functions.

3. I am familiar with nationally recognized standards of care that were applicable in 2005 for the management and maintenance of multi-use trails and bicycle-trail systems, including standards relating to visitor and employee safety, trail-surface maintenance, informational signs, safety-warning signs, and signs that meet the minimum standards of public safety for those using bicycle trails. Among these nationally recognized standards is the Guide for the Development of Bicycle Facilities, which was published in 1999 by the American Association of State Highway and Transportation Officials.

4. I am familiar with the 2003 Manual on Uniform Traffic Control Device ("MUTCD"), approved by the Federal Highway Administration as the national standard for the placement of signs, signals and other traffic-management devices for roads,

highways and bicycle trails such as the National Park Services' Rock Creek Park Trail in Washington, D.C.

5.      I am familiar with and have personal experience with and knowledge of the features, landscape, topography, trails, signs and trail conditions of the National Park Services' Rock Creek Park Trail. I have reviewed the NPS Incident Report 011166 generated as a result of the incident involving Mr. Weinstein, as well as photographs produced by the NPS personnel investigating the incident. I inspected the site of the incident and the surrounding area on June 9, 2008. I noted and photographed a poorly maintained trail surface, a "Walk Your Bike" sign, and vegetation and natural debris invading the travel portion of the trail. The trail surface was uneven, was broken by roots and alligator cracking, was potholed and had uneven pothole patches. The point on the trail where Mr. Weinstein's incident occurred is located near where the trail runs adjacent to Beach Drive, which has heavy vehicular traffic and numerous traffic signs.

6.      From my review of the NPS materials about the incident and my inspection of the site, I believe that Mr. Weinstein was cycling south on the Rock Creek Park Trail. As he crested the hill and began the downhill approach to the Klingle Road bridge underpass he traveled through a heavily wooded portion of the park with mature trees, shrubs and large boulders and rock surfaces lining the edges of the trail. To his right a steep slope with mature trees, woody vegetation, boulders and exposed roots crowded the trail edge. On his left the slope continued to drop away steeply towards Rock Creek, approximately 15 feet below the trail surface. The trail surface was narrow and in poor condition. Its hazards included cracked, uneven and irregular asphalt, uneven patches, eroded edges with dangerous drops to the sloped grade, and at least one pothole in the right center of the trail. As he gained speed on the reverse slope Mr. Weinstein would have had difficulty seeing these hazardous trail conditions because of the shadows cast by the adjacent vegetation. The small "Walk Your Bike" sign was located near the the Klingle Road bridge underpass, far past the pothole and around a curve in the trail, so cyclists such as Mr. Weinstein would have had great difficulty seeing and heeding the sign before reaching the pothole. For these reasons, Mr. Weinstein never had the opportunity to react to and avoid the pothole in the center right section of the trail. These conditions caused him to strike the pothole and rotate over his handlebars and resulted in his serious injuries.

7.      I am familiar with the National Park Service Sign Manual, which supplements the MUTCD. Together they provide to NPS managers required standards, specifications and procedures for providing uniform and distinctive signage that meets the NPS obligations for public safety.

8.      I am familiar with the 2001 National Park Service Management Policies manual, which provides overall program goals and direction for NPS employees who manage and maintain NPS facilities and lands. I am further familiar with NPS Director's Orders, which give specific guidance to unit managers.

9.     From my evaluation of the scene of the incident, it is my opinion to a reasonable degree of professional certainty that several violations of nationally recognized standards for the maintenance and signage of bicycle facilities were violated resulting in the incident involving Mr. Weinstein on April 16, 2005. Several National Park Service policies and Directors Orders were also violated. Specifically, the following standards, policies and orders were violated:

A. MUTCD Section 9B.02 – Design of Bicycle Signs (attached as Dionne Exhibit 1): The sign, "Walk Your Bike," is not recognized in Table 9B-1.

B. MUTCD Section 2C.05 – Placement of Warning Signs (attached as Dionne Exhibit 1): The sign provided by NPS was placed closer to the hazard than called for in Table 2C-4, i.e., it is less than 50 meters before the hazard.

C. MUTCD Section 2C.04 – Warning Sign Sizes (attached as Dionne Exhibit 1): The sign provided by NPS was smaller than called for in Table 2C-2, i.e., it is smaller than 24" x 24".

D. MUTCD Section 2C.03 – Design of Warning Signs (attached as Dionne Exhibit 1): The sign provided by NPS was the wrong color and shape, i.e., it is not diamond-shaped and does not have a black legend and border on a yellow background.

E. MUTCD Section 9B.16 – Bicycle Surface Condition Warning Sign (W8-10) (attached as Dionne Exhibit 1): A warning sign for the surface conditions was not provided in conditions that could cause a bicyclist to lose control of the bicycle. A word message that described conditions of concern to bicyclists, such as "Hazardous Trail Surface Ahead," was not used.

F. 2001 National Park Service Management Policies Section 8.2.5.1 – Visitor Safety (attached as Dionne Exhibit 2): NPS failed to "protect human life and provide for injury-free visits" to Rock Creek Park because it did not detect the pothole and either repair it or post adequate signage to warn of the hazardous condition.

G. 2001 National Park Service Management Policies Section 9.1.4.1 – Maintenance (attached as Dionne Exhibit 2): NPS failed "to conduct a program of preventive and rehabilitative maintenance and preservation to . . . provide a safe . . . environment to park visitors" because it did not detect the pothole and either repair it or post adequate signage to warn of the hazardous condition.

H. NPS Director's Order #50C – Public Risk Management Program, Section 1 (Background and Objective) (attached as Dionne Exhibit 3): NPS failed to meet its commitment to reducing the risks of accident and injury and their associated pain, suffering and financial expense because it did not detect the

pothole and either repair it or post adequate signage to warn of the hazardous condition.

I.  NPS Director's Order #50C – Public Risk Management Program, Section 4 (Operational Policies and Procedures), Paragraph C (Facility Design and Maintenance) (attached as Dionne Exhibit 3):  NPS failed to "operate and maintain facilities so as to minimize natural and man-made hazards" and failed to "take reasonable action to protect the public from [an unsafe] condition" because it did not detect the pothole and either repair it or post adequate signage to warn of the hazardous condition.

J.  NPS Director's Order #50C – Public Risk Management Program, Section 5 (Responsibilities), Paragraph K (Every Employee) (attached as Dionne Exhibit 3):  NPS employees failed to be "alert to safety issues" and failed to "mitigate visitor safety hazards as they are observed and as appropriate and within their authority" or to "take responsibility for reporting the safety hazard to someone who can [mitigate it]" because they did not detect the pothole and either repair it or post adequate signage to warn of the hazardous condition.

K.  NPS Director's Order #52C – Park Signs, Section 5 (Program Goals) (attached as Dionne Exhibit 4):  NPS failed to post signs that "[m]aximize the public's convenience and safety and reduce the Service's liability exposure by ensuring compliance with pertinent federal regulations and principles of sound engineering and communication" because it violated the provisions of the MUTCD, adopted in 23 C.F.R. § 655.603, as specified above.

L.  American Association of State Highway and Transportation Officials ("AASHTO"), 1999 Guide for the Development of Bicycle Facilities, Chapter 3 – Operation and Maintenance (attached as Dionne Exhibit 5):  NPS failed to provide on the bikeway a "smooth surface, free of potholes and debris" because it did not detect and repair the pothole.

10.     Compliance with the MUTCD, the NPS policies, the NPS Director's Orders, and the AASHTO Guide could have been easily accomplished at a very reasonable cost.  Compliance would not have violated the Organic Act of 1916, would not have negatively affected the natural beauty or aesthetics of the park or the visitors' experience, and would not have placed an unreasonable burden on the National Park Service.  For example, the pothole could have been repaired quickly by filling it with cold patch for less than $300, including labor and materials.

11.     The violations of the MUTCD, the NPS policies and Director's Orders, and the AASHTO Guide directly and substantially contributed to Mr. Weinstein's incident because they resulted in the failure to repair the pothole, the failure to effectively notify Mr. Weinstein of the hazardous trail-surface

condition, and thus the elimination of his opportunity to protect himself, causing his serious injuries.

12.     Mr. Weinstein's incident and resulting injuries most likely would have been averted if the NPS had (a) filled the pothole; (b) posted a warning sign that complied with the sections of the MUTCD cited above in Paragraph 9; or, at the very least, (c) moved the existing "Walk Your Bike" sign at least 50 meters north of the Klingle Road bridge underpass, which would have given Mr. Weinstein some warning of the need to dismount from his bicycle before he reached the pothole.

I declare under penalty of perjury that the foregoing is true and correct based upon my knowledge and information.

Dated the _11th_ day of June, 2008

David G. Dionne

**Dionne Exhibit 1**

**2003 Manual on Uniform Traffic Control Device
(excerpts)**



# Manual on Uniform Traffic Control Devices

## for Streets and Highways

## 2003 EDITION

U.S. Department of Transportation
**Federal Highway Administration**

## CHAPTER 2C. WARNING SIGNS

### Section 2C.01  Function of Warning Signs

Support:

Warning signs call attention to unexpected conditions on or adjacent to a highway or street and to situations that might not be readily apparent to road users. Warning signs alert road users to conditions that might call for a reduction of speed or an action in the interest of safety and efficient traffic operations.

### Section 2C.02  Application of Warning Signs

Standard:

**The use of warning signs shall be based on an engineering study or on engineering judgment.**

Guidance:

The use of warning signs should be kept to a minimum as the unnecessary use of warning signs tends to breed disrespect for all signs. In situations where the condition or activity is seasonal or temporary, the warning sign should be removed or covered when the condition or activity does not exist.

Support:

The categories of warning signs are shown in Table 2C-1.

Warning signs specified herein cover most of the conditions that are likely to be encountered. Additional warning signs for low-volume roads (as defined in Section 5A.01), temporary traffic control zones, school areas, highway-rail grade crossings, bicycle facilities, and highway-light rail transit grade crossings are discussed in Parts 5 through 10, respectively.

Option:

Word message warning signs other than those specified in this Manual may be developed and installed by State and local highway agencies.

### Section 2C.03  Design of Warning Signs

Standard:

**All warning signs shall be diamond-shaped (square with one diagonal vertical) with a black legend and border on a yellow background unless specifically designated otherwise. Warning signs shall be designed in accordance with the sizes, shapes, colors, and legends contained in the "Standard Highway Signs" book (see Section 1A.11).**

Option:

Warning signs regarding conditions associated with pedestrians, bicyclists, playgrounds, school buses, and schools may have a black legend and border on a yellow background or a black legend and border on a fluorescent yellow-green background.

### Section 2C.04  Size of Warning Signs

Standard:

**The sizes for warning signs shall be as shown in Table 2C-2.**

Guidance:

The Conventional Road size should be used on conventional roads.

The Freeway and Expressway sizes should be used for higher-speed applications to provide larger signs for increased visibility and recognition.

Option:

The Minimum size may be used on low-speed roadways where the reduced legend size would be adequate for the warning or where physical conditions preclude the use of the other sizes.

Oversized signs and larger sizes may be used for those special applications where speed, volume, or other factors result in conditions where increased emphasis, improved recognition, or increased legibility would be desirable.

Standard:

**The minimum size for supplemental warning plaques shall be as shown in Table 2C-3.**

Option:

Signs larger than those shown in Tables 2C-2 and 2C-3 may be used (see Section 2A.12).

### Table 2C-2. Warning Sign Sizes

| Description | | Conventional Road | Express-way | Freeway | Minimum | Oversized |
|---|---|---|---|---|---|---|
| Shape | Sign Series | | | | | |
| Diamond | W1, W2, W7, W8, W9, W11, W14, W15-1, W17-1 | 750 x 750 (30 x 30) | 900 x 900 (36 x 36) | 1200 x 1200 (48 x 48) | 600 x 600 (24 x 24) | ——— |
| | W1 Combination, W3, W4, W5, W6, W8-3, W10, W12 | 900 x 900 (36 x 36) | 1200 x 1200 (48 x 48) | 1200 x 1200 (48 x 48) | 750 x 750 (30 x 30) | ——— |
| Rectangular | W1 - Arrows | 1200 x 600 (48 x 24) | ——— | ——— | 900 x 450 (36 x 18) | 1500 x 750 (60 x 30) |
| | W1 - Chevron | 450 x 600 (18 x 24) | 750 x 900 (30 x 36) | 900 x1200 (36 x 48) | 300 x 450 (12 x 18) | ——— |
| | W7-4 | 1950 x 1200 (78 x 48) | 1950 x 1200 (78 x 48) | 1950 x 1200 (78 x 48) | ——— | ——— |
| | W7-4b, 4c | 1950 x 1500 (78 x 60) | 1950 x 1500 (78 x 60) | 1950 x 1500 (78 x 60) | ——— | ——— |
| | W10-9, 10 | 600 x 450 (24 x 18) | ——— | ——— | ——— | ——— |
| | W12-2p | 2100 x 600 (84 x 24) | 2100 x 600 (84 x 24) | 2100 x 600 (84 x 24) | ——— | ——— |
| | W13-2, 3, 5, W25 | 600 x 750 (24 x 30) | 900 x1200 (36 x 48) | 1200 x 1500 (48 x 60) | 600 x 750 (24 x 30) | 1200 x 1500 (48 x 60) |
| Pennant | W14-3 | 900 x 1200 x 1200 (36 x 48 x 48) | ——— | ——— | 750 x 1000 x 1000 (30 x 40 x 40) | 1200 x 1600 x 1600 (48 x 64 x 64) |
| Circular | W10-1 | 900 (36) Dia. | 1200 (48) Dia. | ——— | 750 (30) Dia. | 1200 (48) Dia. |

Notes: 1.  Larger signs may be used when appropriate
   2.  Dimensions are shown in millimeters followed by inches in parentheses and are shown as width x height

## Section 2C.05  Placement of Warning Signs

Support:

For information on placement of warning signs, see Sections 2A.16 to 2A.21.

The total time needed to perceive and complete a reaction to a sign is the sum of the times necessary for Perception, Identification (understanding), Emotion (decision making), and Volition (execution of decision), and is called the PIEV time.  The PIEV time can vary from several seconds for general warning signs to 6 seconds or more for warning signs requiring high road user judgment.

Table 2C-4 lists suggested sign placement distances for two conditions.  This table is provided as an aid for determining warning sign location.

### Table 2C-3. Minimum Size of Supplemental Warning Plaques

| Size of Warning Sign | Size of Supplemental Plaque | | | |
| | Rectangular | | | Square |
| | 1 Line | 2 Lines | Arrow | |
|---|---|---|---|---|
| 600 x 600 (24 x 24) 750 x 750 (30 x 30) | 600 x 300 (24 x 12) | 600 x 450 (24 x 18) | 600 x 300 (24 x 12) | 450 x 450 (18 x 18) |
| 900 x 900 (36 x 36) 1200 x 1200 (48 x 48) | 750 x 450 (30 x 18) | 750 x 600 (30 x 24) | 750 x 450 (30 x 18) | 600 x 600 (24 x 24) |

Notes: 1. Larger supplemental plaques may be used when appropriate
2. Dimensions are shown in millimeters followed by inches in parentheses and are shown as width x height

Guidance:

Warning signs should be placed so that they provide adequate PIEV time. The distances contained in Table 2C-4 are for guidance purposes and should be applied with engineering judgment. Warning signs should not be placed too far in advance of the condition, such that drivers might tend to forget the warning because of other driving distractions, especially in urban areas.

Minimum spacing between warning signs with different messages should be based on the estimated PIEV time for driver comprehension of and reaction to the second sign.

The effectiveness of the placement of warning signs should be periodically evaluated under both day and night conditions.

Option:

Warning signs that advise road users about conditions that are not related to a specific location, such as Deer Crossing or SOFT SHOULDER, may be installed in an appropriate location, based on engineering judgment, since they are not covered in Table 2C-4.

### Section 2C.06 Horizontal Alignment Signs (W1-1 through W1-5, W1-11, W1-15)

Option:

The horizontal alignment Turn (W1-1), Curve (W1-2), Reverse Turn (W1-3), Reverse Curve (W1-4), or Winding Road (W1-5) signs (see Figure 2C-1) may be used in advance of situations where the horizontal roadway alignment changes. A One-Direction Large Arrow (W1-6) sign (see Figure 2C-1 and Section 2C.09) may be used on the outside of the turn or curve.

If the change in horizontal alignment is 135 degrees or more, the Hairpin Curve (W1-11) sign (see Figure 2C-1) may be used.

If the change in horizontal alignment is approximately 270 degrees, such as on a cloverleaf interchange ramp, the 270-degree Loop (W1-15) sign (see Figure 2C-1) may be used.

Guidance:

The application of these signs should conform to Table 2C-5.

When the Hairpin Curve sign or the 270-degree Loop sign is installed, either a One-Direction Large Arrow (W1-6) sign or Chevron Alignment (W1-8) signs should be installed on the outside of the turn or curve.

Option:

An Advisory Speed (W13-1) plaque (see Section 2C.46) may be used to indicate the speed for the change in horizontal alignment. The supplemental distance plaque NEXT XX km (NEXT XX MILES) (W7-3a) may be installed below the Winding Road sign where continuous roadway curves exist (see Section 2C.45). The combination Horizontal Alignment/Advisory Speed sign (see Section 2C.07), combination Horizontal Alignment/Intersection sign (see Section 2C.08), or the Curve Speed sign (see Section 2C.36) may also be used.

### Table 2C-4.  Guidelines for Advance Placement of Warning Signs
### (Metric Units)

| Posted or 85th-Percentile Speed (km/h) | Advance Placement Distance [1] | | | | | | | | | | | | |
| | Condition A: Speed Reduction and Lane Changing in Heavy Traffic[2] | Condition B: Deceleration to the listed advisory speed (km/h) for the condition[4] | | | | | | | | | | | |
| | | 0[3] | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | 60 m | N/A[5] | N/A[5] | N/A[5] | — | — | — | — | — | — | — | — | — |
| 40 | 100 m | N/A[5] | N/A[5] | N/A[5] | N/A[5] | — | — | — | — | — | — | — | — |
| 50 | 150 m | N/A[5] | N/A[5] | N/A[5] | N/A[5] | N/A[5] | — | — | — | — | — | — | — |
| 60 | 180 m | 30 m | N/A[5] | N/A[5] | N/A[5] | N/A[5] | N/A[5] | — | — | — | — | — | — |
| 70 | 220 m | 50 m | 40 m | 30 m | N/A[5] | N/A[5] | N/A[5] | N/A[5] | — | — | — | — | — |
| 80 | 260 m | 80 m | 60 m | 55 m | 50 m | 40 m | 30 m | N/A[5] | N/A[5] | — | — | — | — |
| 90 | 310 m | 110 m | 90 m | 80 m | 70 m | 60 m | 40 m | N/A[5] | N/A[5] | N/A[5] | — | — | — |
| 100 | 350 m | 130 m | 120m | 115m | 110 m | 100 m | 90 m | 70m | 60m | 40m | N/A[5] | — | — |
| 110 | 380 m | 170 m | 160m | 150 m | 140 m | 130 m | 120m | 110m | 90m | 70m | 50m | N/A[5] | — |
| 120 | 420 m | 200 m | 190m | 185 m | 180 m | 170m | 160m | 140m | 130m | 110m | 90m | 60 m | 40 m |
| 130 | 460 m | 230 m | 230m | 230 m | 220 m | 210 m | 200 m | 180m | 170m | 150m | 120m | 100 m | 70 m |

Notes:

[1] The distances are adjusted for a sign legibility distance of 50 m for Condition A. The distances for Condition B have been adjusted for a sign legibility distance of 75 m, which is appropriate for an alignment warning symbol sign.

[2] Typical conditions are locations where the road user must use extra time to adjust speed and change lanes in heavy traffic because of a complex driving situation. Typical signs are Merge and Right Lane Ends. The distances are determined by providing the driver a PIEV time of 14.0 to 14.5 seconds for vehicle maneuvers (2001 AASHTO Policy, Exhibit 3-3, Decision Sight Distance, Avoidance Maneuver E) minus the legibility distance of 50 m for the appropriate sign.

[3] Typical condition is the warning of a potential stop situation. Typical signs are Stop Ahead, Yield Ahead, Signal Ahead, and Intersection Warning signs. The distances are based on the 2001 AASHTO Policy, Stopping Sight Distance, Exhibit 3-1, providing a PIEV time of 2.5 seconds, a deceleration rate of 3.4 m/second², minus the sign legibility distance of 50 m.

[4] Typical conditions are locations where the road user must decrease speed to maneuver through the warned condition. Typical signs are Turn, Curve, Reverse Turn, or Reverse Curve. The distance is determined by providing a 2.5 second PIEV time, a vehicle deceleration rate of 3 m/second², minus the sign legibility distance of 75 m.

[5] No suggested distances are provided for these speeds, as the placement location is dependent on site conditions and other signing to provide an adequate advance warning for the driver.

# CHAPTER 9B. SIGNS

## Section 9B.01  Application and Placement of Signs

Standard:

Bicycle signs shall be standard in shape, legend, and color.

All signs shall be retroreflectorized for use on bikeways, including shared-use paths and bicycle lane facilities.

Where signs serve both bicyclists and other road users, vertical mounting height and lateral placement shall be as specified in Part 2.

On shared-use paths, lateral sign clearance shall be a minimum of 0.9 m (3 ft) and a maximum of 1.8 m (6 ft) from the near edge of the sign to the near edge of the path (see Figure 9B-1).

Mounting height for ground-mounted signs on shared-use paths shall be a minimum of 1.2 m (4 ft) and a maximum of 1.5 m (5 ft), measured from the bottom edge of the sign to the near edge of the path surface (see Figure 9B-1).

When overhead signs are used on shared-use paths, the clearance from the bottom edge of the sign to the path surface directly under the sign shall be a minimum of 2.4 m (8 ft).

Guidance:

Signs for the exclusive use of bicyclists should be located so that other road users are not confused by them.

The clearance for overhead signs on shared-use paths should be adjusted when appropriate to accommodate typical maintenance vehicles.

## Section 9B.02  Design of Bicycle Signs

Standard:

If the sign applies to motorists and bicyclists, then the size shall be as shown for conventional roads in Table 2B-1.

The minimum sign sizes for shared-use paths shall be those shown in Table 9B-1, and shall be used only for signs installed specifically for bicycle traffic applications.  The minimum sign sizes for bicycle facilities shall not be used for signs that are placed in a location that would have any application to other vehicles.

Option:

Larger size signs may be used on bicycle facilities when appropriate.

Guidance:

Except for size, the design of signs for bicycle facilities should be identical to that specified in this Manual for vehicular travel.

Support:

Uniformity in design includes shape, color, symbols, wording, lettering, and illumination or retroreflectorization.

## Section 9B.03  STOP and YIELD Signs (R1-1, R1-2)

Standard:

STOP (R1-1) signs (see Figure 9B-2) shall be installed on shared-use paths at points where bicyclists are required to stop.

YIELD (R1-2) signs (see Figure 9B-2) shall be installed on shared-use paths at points where bicyclists have an adequate view of conflicting traffic as they approach the sign, and where bicyclists are required to yield the right-of-way to that conflicting traffic.

Option:

A 750 x 750 mm (30 x 30 in) STOP sign or a 900 x 900 x 900 mm (36 x 36 x 36 in) YIELD sign may be used on shared-use paths for added emphasis.

Guidance:

Where conditions require path users, but not roadway users, to stop or yield, the STOP sign or YIELD sign should be placed or shielded so that it is not readily visible to road users.

### Table 9B-1.  Minimum Sign Sizes for Bicycle Facilities *(Sheet 1 of 2)*

| Sign | MUTCD Code | Minimum Sign Size - mm (in) | |
|------|------------|---------------|----------|
| | | Shared-Use Path | Roadway |
| Stop | R1-1 | 450 x 450 (18 x 18) | 750 x 750 (30 x 30) |
| Yield | R1-2 | 450 x 450 x 450 (18 x 18 x 18) | 750 x 750 x 750 (30 x 30 x 30) |
| Bike Lane | R3-17 | — | 750 x 600 (30 x 24) |
| Bicycle Lane Supplemental Plaques | R3-17a,b | — | 750 x 300 (30 x 12) |
| Movement Restriction | R4-1,2,3,7 | 300 x 450 (12 x 18) | 450 x 600 (18 x 24) |
| Begin Right Turn Lane Yield to Bikes | R4-4 | — | 900 x 750 (36 x 30) |
| Bicycle Wrong Way | R5-1b | 300 x 450 (12 x 18) | 300 x 450 (12 x 18) |
| No Motor Vehicles | R5-3 | 600 x 600 (24 x 24) | 600 x 600 (24 x 24) |
| No Bicycles | R5-6 | 600 x 600 (24 x 24) | 600 x 600 (24 x 24) |
| No Parking Bike Lane | R7-9,9a | — | 300 x 450 (12 x 18) |
| Pedestrians Prohibited | R9-3a | 450 x 450 (18 x 18) | 450 x 450 (18 x 18) |
| Ride With Traffic Plaque | R9-3c | 300 x 300 (12 x 12) | 300 x 300 (12 x 12) |
| Bicycle Regulatory | R9-5,6 | 300 x 450 (12 x 18) | 300 x 450 (12 x 18) |
| Shared-Use Path Restriction | R9-7 | 300 x 450 (12 x 18) | — |
| Push Button for Green Light | R10-3 | 225 x 300 (9 x 12) | 225 x 300 (9 x 12) |
| To Request Green Wait on Symbol | R10-22 | 300 x 450 (12 x 18) | 300 x 450 (12 x 18) |
| Railroad Crossbuck | R15-1 | 600 x 112 (24 x 4.5) | 1200 x 225 (48 x 9) |
| Turn and Curve Warning | W1-1,2,3,4,5 | 450 x 450 (18 x 18) | 600 x 600 (24 x 24) |
| Arrow Warning | W1-6,7 | 600 x 300 (24 x 12) | 900 x 450 (36 x 18) |
| Intersection Warning | W2-1,2,3,4,5 | 450 x 450 (18 x 18) | 600 x 600 (24 x 24) |
| Stop,Yield,Signal Ahead | W3-1,2,3 | 450 x 450 (18 x 18) | 750 x 750 (30 x 30) |
| Narrow Bridge | W5-2 | 450 x 450 (18 x 18) | 750 x 750 (30 x 30) |
| Bikeway Narrows | W5-4a | 450 x 450 (18 x 18) | 750 x 750 (30 x 30) |

### Table 9B-1.  Minimum Sign Sizes for Bicycle Facilities (Sheet 2 of 2)

| Sign | MUTCD Code | Minimum Sign Size - mm (in) | |
|---|---|---|---|
| | | Shared-Use Path | Roadway |
| Hill | W7-5 | 450 x 450 (18 x 18) | 600 x 600 (24 x 24) |
| Bump or Dip | W8-1,2 | 450 x 450 (18 x 18) | 600 x 600 (24 x 24) |
| Bicycle Surface Condition | W8-10 | 450 x 450 (18 x 18) | 600 x 600 (24 x 24) |
| Bicycle Surface Condition Plaque | W8-10p | 300 x 225 (12 x 9) | 300 x 225 (12 x 9) |
| Advance Grade Crossing | W10-1 | 375 Dia. (15 Dia.) | 375 Dia. (15 Dia.) |
| Bicycle Warning | W11-1 | 450 x 450 (18 x 18) | 600 x 600 (24 x 24) |
| Pedestrian Crossing | W11-2 | 450 x 450 (18 x 18) | 600 x 600 (24 x 24) |
| Low Clearance | W12-2 | 450 x 450 (18 x 18) | 750 x 750 (30 x 30) |
| Playground | W15-1 | 450 x 450 (18 x 18) | 600 x 600 (24 x 24) |
| Share the Road Plaque | W16-1 | — | 450 x 600 (18 x 24) |
| Diagonal Arrow Plaque | W16-7p | — | 600 x 300 (24 x 12) |
| Bicycle Guide | D1-1b | 600 x 150 (24 x 6) | 600 x 150 (24 x 6) |
| Street Name | D1-1c | 450 x 150 (18 x 6) | 450 x 150 (18 x 6) |
| Bicycle Parking | D4-3 | 300 x 450 (12 x 18) | 300 x 450 (12 x 18) |
| Bike Route | D11-1 | 600 x 450 (24 x 18) | 600 x 450 (24 x 18) |
| Bicycle Route Sign | M1-8 | 300 x 450 (12 x 18) | 300 x 450 (12 x 18) |
| Interstate Bicycle Route Sign | M1-9 | 450 x 600 (18 x 24) | 450 x 600 (18 x 24) |
| Bicycle Route Supplemental Plaques | M4-11,12,13 | 300 x 100 (12 x 4) | 300 x 100 (12 x 4) |
| Route Sign Supplemental Plaques | M7-1,2,3,4,5,6,7 | 300 x 225 (12 x 9) | 300 x 225 (12 x 9) |

## Section 9B.13  Other Regulatory Signs

Option:

Other regulatory signs described in Chapter 2B may be installed on bicycle facilities as appropriate.

## Section 9B.14  Turn or Curve Warning Signs (W1 Series)

Guidance:

To warn bicyclists of unexpected changes in shared-use path direction, appropriate turn or curve (W1-1 through W1-7) signs (see Figure 9B-3) should be used.

The W1-1 through W1-5 signs should be installed no less than 15 m (50 ft) in advance of the beginning of the change of alignment.

## Section 9B.15  Intersection Warning Signs (W2 Series)

Option:

Intersection Warning (W2-1 through W2-5) signs (see Figure 9B-3) may be used on a roadway, street, or shared-use path in advance of an intersection to indicate the presence of an intersection and the possibility of turning or entering traffic.

Guidance:

When engineering judgment determines that the visibility of the intersection is limited on the shared-use path approach, Intersection Warning signs should be used.

Intersection Warning signs should not be used where the shared-use path approach to the intersection is controlled by a STOP sign, YIELD sign, or a traffic control signal.

## Section 9B.16  Bicycle Surface Condition Warning Sign (W8-10)

Option:

The Bicycle Surface Condition Warning (W8-10) sign (see Figure 9B-3) may be installed where roadway or shared-use path conditions could cause a bicyclist to lose control of the bicycle.

Signs warning of other conditions that might be of concern to bicyclists, including BUMP (W8-1), DIP (W8-2), PAVEMENT ENDS (W8-3), and any other word message that describes conditions that are of concern to bicyclists, may also be used.

A supplemental plaque may be used to clarify the specific type of surface condition.

## Section 9B.17  Bicycle Warning Sign (W11-1)

Support:

The Bicycle Warning (W11-1) sign (see Figure 9B-3) alerts the road user to unexpected entries into the roadway by bicyclists, and other crossing activities that might cause conflicts. These conflicts might be relatively confined, or might occur randomly over a segment of roadway.

Option:

A supplemental plaque with the legend AHEAD or XXX METERS (XXX FEET) may be used with the Bicycle Warning sign.

Guidance:

If used in advance of a specific crossing point, the Bicycle Warning sign should be placed at a distance in advance of the crossing location that conforms with the guidance given in Table 2C-4.

Standard:

**Bicycle Warning signs, when used at the location of the crossing, shall be supplemented with a diagonal downward pointing arrow (W16-7p) plaque (see Figure 9B-3) to show the location of the crossing.**

Option:

A fluorescent yellow-green background color with a black legend and border may be used for Bicycle Warning signs and supplemental plaques.

Guidance:

When the fluorescent yellow-green background color is used, a systematic approach featuring one background color within a zone or area should be used. The mixing of standard yellow and fluorescent yellow-green backgrounds within a zone or area should be avoided.

*Figure 9B-3. Warning Signs for Bicycle Facilities* (Sheet 1 of 2)



**Dionne Exhibit 2**

**2001 National Park Service Management Policies
(excerpts)**

Case 1:06-cv-00216-RJL    Document 10-20    Filed 06/13/2008    Page 2 of 4

# Management Policies 2001



### 8.2.5 Visitor Safety and Emergency Response

#### 8.2.5.1 Visitor Safety

The saving of human life will take precedence over all other management actions as the Park Service strives to protect human life and provide for injury-free visits. The Service will do this within the constraints of the 1916 Organic Act. The primary—and very substantial—constraint imposed by the Organic Act is that discretionary management activities may be undertaken only to the extent that they will not impair park resources and values.

While recognizing that there are limitations on its capability to totally eliminate all hazards, the Service and its concessioners, contractors, and cooperators will seek to provide a safe and healthful environment for visitors and employees. The Service will work cooperatively with other federal, tribal, state, and local agencies, organizations, and individuals to carry out this responsibility. The Service will strive to identify recognizable threats to the safety and health of persons and to the protection of property by applying nationally accepted codes, standards, engineering principles, and the guidance contained in Director's Orders #50, #58, and #83 and their associated reference manuals. When practicable, and consistent with congressionally designated purposes and mandates, the Service will reduce or remove known hazards and apply other appropriate measures, including closures, guarding, signing, or other forms of education. In doing so, the Service's preferred actions will be those that have the least impact on park resources and values.

The Service recognizes that the park resources it must protect are not only a visitor attraction, but that they may also be potentially hazardous. In addition, the recreational activities of some visitors may be of an especially high-risk, high-adventure type, which pose a significant personal risk to participants, and which the Service cannot totally control. Park visitors must assume a substantial degree of risk and responsibility for their own safety when visiting areas that are managed and maintained as natural, cultural, or recreational environments.

These management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level, who must work within the limits of funding and staffing. Examples include decisions about whether to install warning signs or artificial lighting; distribute weather warnings or advisories; initiate search and rescue operations, or render emergency aid; eliminate potentially dangerous animals; close roads and trails, or install guardrails and fences; and grant or deny backcountry or climbing permits. Some forms of visitor safeguards—such as fences, railings, and paved walking surfaces—typically found in other public venues may not be appropriate or practicable in a national park setting.

*(See Air Quality 4.7.1; Lightscape Management 4.10; General Policy 6.4.1; Siting Facilities to Avoid Natural Hazards 9.1.1.6; Waste Management and Contaminant Issues 9.1.6; Risk Management Program 10.2.4.8; Food Service Sanitation Inspections 10.2.4.14)*

#### 8.2.5.2 Emergency Preparedness and Emergency Operations

The National Park Service will develop a program of emergency preparedness in accordance with title VI of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 USC 5195—5197g); National Security Decision Directive 259 (February 4, 1987); Department of the Interior policy; and other considerations at the Washington headquarters, regional, and park levels. The purpose of the program will be to maximize visitor and employee safety and the protection of resources and property. This program will include a systematic method for alerting visitors about potential disasters and evacuation procedures.

Superintendents may assist other agencies with emergencies outside of parks, as authorized by 16 USC 1b(1). To the extent practicable, written agreements with other agencies, in accordance with Director's Order #20, must first be in effect. NPS employees who are outside the area of their jurisdiction, and who are directed by their supervisors to provide emergency assistance to other agencies, will be considered to be acting within the scope of their employment.

Park Service emergency operations will be conducted utilizing the Incident Command System (IS) of the National Interagency Incident Management System. The Unified Command System (within IS) will be utilized when other agencies are involved. Each park superintendent will develop and maintain an emergency operations plan to ensure an effective response to all types of emergencies that can be reasonably anticipated.

As one element of the emergency operations plan, or as a separate document, each park must have an oil and chemical spill response management plan for spills that result from NPS activities or from activities that are beyond the NPS's control (such as commercial through-traffic on roads that pass through a park). The plans will place first priority on responder and public safety. Employees will not be permitted to respond to hazardous material spills unless they are properly qualified and certified in accordance with Director's Order #30C: Hazardous Spill Response. The Service will seek to recover all allowable direct and indirect costs for responding to oil or hazardous materials spills.

Parks that have their own aircraft, or incidents of aircraft contracting, must have an aircraft crash rescue response plan in place.

*(See Emergency Management 5.3.1.1. Also see Director's Order 60A: Aviation Management)*

#### 8.2.5.3 Search and Rescue

To provide for the protection and safety of park visitors, the Service will make reasonable efforts to search for lost persons, and to rescue sick, injured, or stranded persons. This responsibility may be fulfilled by Service staff or by qualified search-and-rescue organizations or agencies that are capable of responding to life-threatening emergencies pursuant to the terms of a formal agreement. Deceased persons will be evacuated unless the level of risk to the rescue party is found to be unacceptably high. Search managers and superintendents will jointly determine when to terminate a search. The NPS will

### 9.1.3.2  Re-vegetation and Landscaping

The selection of plant materials and cultivation practices will be guided by the policies for management of plant materials in section 4.4, and the need for fire-resistant vegetation for defensible space. To the maximum extent possible, plantings will consist of species that are native to the park or that are historically appropriate for the period or event commemorated. The use of exotic plant species is restricted to situations that conform to the exotic species policy in section 4.4.4. Irrigation to maintain exotic plantings will be avoided, except when it is part of an approved management program essential to achieve park objectives, and when adequate and dependable supplies of water are available. When a decision has been made to irrigate, efficient application must be made of water to protect water resources and ecosystems. Low water use practices that measure soil moisture content, and other technologies such as drip irrigation and appropriate timing of water applications, should be employed.

Prior to using soil fertilizers or other soil amendments in park natural or altered landscapes, parks must develop a prescription designed to ensure that the amendments will not unacceptably alter the physical, chemical, or biological characteristics of the soil, biological community, or surface or ground waters.

Wherever practicable, soils and plants affected by construction will be salvaged for use in site restoration. Any surplus soils and plants may be used, as appropriate, for the restoration of other degraded areas within the park. Surplus soils not used in this way should be stockpiled for future use. If additional soil and plants are needed to restore disturbed sites, they may be obtained from other sites in the park if it is determined that the use of an in-park source will not significantly affect cultural or natural resources or ecological processes. In any case, imported soils must be compatible with existing soils, free of undesired seeds and organisms, and fulfill the horticultural requirements of plants used for restoration.

*(See Management of Native Plants and Animals 4.4.2; Genetic Resource Management Principles 4.4.1.2; Management of Exotic Species 4.4.4; Water Resource Management 4.6; Soil Resource Management 4.8.2.4; Cultural Landscapes 5.3.5.2; Water Supply Systems 9.1.5.1; Wastewater Treatment Systems 9.1.5.2. Also see Executive Order 13148 (Greening the Government Through Leadership in Environmental Management) section 207, "Environmentally and Economically Beneficial Landscaping")*

### 9.1.3.3  Borrow Pits and Spoil Areas

Materials from borrow pits, quarries, and other clay, stone, gravel, or sand sources on NPS lands, including submerged lands, will be extracted and used only:

- By the NPS or its agents or contractors;
- For in-park administrative uses;
- After compliance with NEPA, including written findings that extraction and use of in-park borrow materials does not, or will not, impair park resources or values, and is the park's most reasonable alternative based on economic, environmental, or ecological considerations; and
- After compliance with other applicable federal, state, and local requirements.

Parks should use existing pits, quarries, or sources, or create new pits, quarries, or sources in the park only after developing and implementing a park-wide borrow management plan that addresses the cumulative effects of borrow site extraction, restoration, and importation. NPS guidance documents, as well as natural and cultural resources and facilities management staff, should be consulted during plan development and the review of specific proposals.

In designated wild and scenic rivers, no new sources may be established, and existing sources should be closed and reclaimed. Borrow material may be extracted in proposed or designated wilderness areas only in small quantities for trail use and in accordance with an approved wilderness management plan.

Spoil may be used for beach nourishment or another resource management activity only if the superintendent first finds that the proposed nourishment or activity will not impair park resources and values, and is consistent with park planning documents.

All existing spoil areas within park units that meet the definition of "solid waste disposal site" (36 CFR Part 6) will be brought into compliance with NPS solid waste regulations in 36 CFR 6.5. The development of new spoil areas or borrow pits, or the expansion of existing ones, will be analyzed through the NEPA and NHPA processes. In addition, superintendents will comply with NPS solid waste regulations and other specific NPS requirements.

Proposed borrow pits and spoil areas outside of parks will also be evaluated to ensure that use by the Service or its contractors does not impair resources or values inside the park, and that extraction operations comply with all applicable statutes and regulations, including NEPA and NHPA.

*(See Decision-making Requirements to Avoid Impairments 1.4.7; Geologic Resource Management 4.8; Non-federally Owned Minerals 8.7.3; Re-vegetation and Landscaping 9.1.3.2)*

### 9.1.4  Maintenance

### 9.1.4.1  General

There is a maintenance responsibility and cost for every asset that is administered by the National Park Service. A regular, periodic inventory and condition assessment of park assets will be performed to identify deficiencies and to ensure the cost-effective maintenance of all facilities. The costs of operation and the useful life of facilities and equipment are directly related to the type and level of maintenance provided. Therefore, the Service will conduct a program of preventive and rehabilitative maintenance and preservation to (1) provide a safe, sanitary, environmentally protective, and esthetically pleasing environment for park visitors and employees; (2) protect the physical integrity of facilities; and (3) preserve or maintain facilities in their optimum sustainable condition to the greatest extent possible. Preventive and rehabilitative maintenance programs will incorporate sustainable design elements and practices to ensure that water and energy efficiency, pollution prevention, and waste prevention and reduction are standard practice.

**Dionne Exhibit 3**

**NPS Director's Order #50C**

60-day review draft.        Send comments to Dick Powell in WASO Risk Management by no later than 6-20-01.

**DIRECTOR'S ORDER #50C:  Public Risk Management Program**

**Approved:**

**Effective Date:**

**Sunset Date:**

This is the third in a series of three Director's Orders which focus on employee and visitor safety and risk management.  The other two are 50A (Workers Compensation Case Management, and 50B (Occupational Safety and Health).  In addition, other Director's Orders with implications for employee and visitor safety, health, and risk management are cross-referenced throughout this Director's Order.  This Director's Order and its accompanying reference manual (RM-50C) supersede NPS-50 and any other guidance documents that may offer conflicting information.

## 1. BACKGROUND AND OBJECTIVE

The National Park Service (NPS) has a continuing concern about the health and safety of its employees and others who spend time in the parks–whether as visitors, volunteers, contractors, concession employees, or in any other capacity.  Those who participate in work or recreational activities in the parks are always, to some extent, exposed to the risk of accident, injury or illness.  In recognizing this, the NPS is committed to reducing these risks and their associated pain, suffering, and financial expense.

Historically, public safety has been addressed primarily at the operating unit level and generally in response to mishaps.   This Director's Order sets a new direction with emphasis on prevention of visitor-related mishaps while ensuring appropriate response capabilities.

The objective of the NPS public risk management program is to establish and implement a continuously improving and measurable process that minimizes the occurrence of visitor injury, illness and property loss and achieves maximum effectiveness in communicating risk to the public, without negative impacts to park resources

## 2. GUIDING POLICIES AND PRINCIPLES

Within units of the National Park System, the NPS and its commercial operators, special use permittees, cooperators, and contractors will meet or exceed all applicable laws relating to public safety, health, and the environment.  Where conflicts arise between codes and standards, the more stringent requirement(s) will be used.

Section 8.2.5.1 of Management Policies provides policies and principles to guide the National Park Service's public risk management program.   According to those policies and principles, the saving of human life takes precedence over all other management actions.  While recognizing that competing concerns often restrict the Service's ability to eliminate hazards, the Service will strive to protect human life and provide for an injury-free visit, doing so within the constraints of the 1916 Organic Act and available resources. The Act requires the National Park Service to provide for the public enjoyment of the parks while conserving the scenery and natural and historic objects and wildlife therein "in such manner and by such means as will leave them unimpaired for the enjoyment of future generations" (16 U.S.C. 1).

The Service recognizes that the park resources it must protect are not only a visitor attraction, they may also be potentially hazardous. In addition, the recreational activities of some visitors may be of an especially high-risk, high-adventure type, which pose a significant personal risk to participants, and which the Service cannot totally control. Park visitors must assume a substantial degree of risk and responsibility for their own safety when visiting areas that are managed and maintained as natural, cultural, or recreational environments.

The means by which public safety concerns are to be met is left to the discretion of superintendents and other decision-makers at the park level. Examples include decisions about whether to install warning signs or artificial lighting; distribute weather warnings or advisories; initiate search and rescue operations, or render emergency aid; eliminate potentially dangerous animals; close roads and trails, or install guardrails and fences; and grant or deny backcountry or climbing permits."

Some forms of safeguards typically found in other public venues may not be appropriate or practicable in a park setting. For example, a campsite might present any number of "hazards" that could be mitigated by artificial lighting, paving, fences, guardrails, water purification systems, etc., but the park's decision to provide the opportunity for a backcountry experience may mean that none of these mitigation measures are taken.


## 3. AUTHORITY

The authority to issue this Director's Order and its associated Reference Manual is contained in 16 U.S.C. 1 through 4 (the National Park Service Organic Act) and the delegations of authority contained in Part 245 of the Department of Interior Manual.


## 4. OPERATIONAL POLICIES AND PROCEDURES

A. **Incident Prevention.** The NPS will strive to minimize the number and severity of visitor incidents. Through risk assessments, park areas will develop appropriate mitigation strategies, which may include elements of communication, education, facility design, and facility maintenance. (Refer to RM-50C.)

B. **Communication and Education.** The NPS will emphasize providing information and advice to assist park users in selecting and planning activities which match their levels of physical fitness, technical ability, provisioning and equipment. The goal of education is to encourage visitors to develop the judgment, skills and experience required to participate in activities safely. (Reference Director's Order #6.)

C. **Facility Design and Maintenance.** The NPS will strive to locate, design, build, operate and maintain facilities so as to minimize natural and man-made hazards. All visitor facilities will be inspected on a regular basis to identify and mitigate unsafe conditions. If it is not possible to correct an unsafe condition, the NPS will take reasonable action to protect the public from that condition. (Reference Director's Order #80.)

Where facilities or resources have inherent risks that are not mitigated through facility design or other physical means, and where access to those resources is important in order to achieve the park area's mission, communication and education will be used to assist visitors in choosing and engaging in use of those facilities or resources safely.

**D. Public Health.** Director's Order #83 establishes NPS policy with respect to all public health activities within areas of NPS jurisdiction, regardless of whether those activities are carried out by NPS or other Federal employees, or by other organizations, including the US Public Health Service (PHS). Public health includes illnesses associated with drinking water, wastewater, food safety, animal vectors, animal reservoir, hazardous wastes, indoor air pollution, institutional sanitation, radiation safety, medical wastes, solid wastes, air pollution, and other related area of environmental health.

**E. Incident Response.** The National Park Service will develop and maintain a program of emergency preparedness and response. The purposes of the emergency service programs will be to maximize visitor and employee safety and to protect resources and property. (Reference Director's Order and RM 51.)

**F. Incident Review.** After an incident, a review of the response and the incident should be conducted. Findings and recommendations of this review should be used to modify the park's risk management program, where applicable, and may also be used for developing training bulletins to be shared with other park areas. (Reference RM 50B.)

**G. Law Enforcement.** Law enforcement plays a significant role in prevention of accidents and illnesses, by requiring compliance with laws and regulations put in place for the protection of the visitor and the resource, and by engaging in opportunities to educate the public on the reasons for those rules. (Reference Director's Order #9.)

**H. Structural Fire Prevention.** Fire prevention and suppression is the primary consideration in all facilities. Structural fires will be suppressed to prevent the loss of human life and to limit property damage. (Reference Director's Order #58.)

**I. Wildland Fire.** The wildland fire program is designed, and will be managed to meet, resource management objectives for the various areas of the parks and to ensure that firefighter and public safety are not compromised. (Reference Director's Order #18.)

## 5. RESPONSIBILITIES

**A. Visitors.** The NPS expects that park users will exhibit a degree of self-reliance and responsibility for their own safety, commensurate with the degree of difficulty of activities they undertake. Park users are expected to:

1. Understand that there are inherent risks and potential consequences associated with visiting NPS sites.
2. Heed the information and advice provided through various NPS public risk management programs and observe/comply with applicable laws and regulations.
3. Seek out further information and advice from the park staff when they are uncertain about their level of preparedness or the nature of hazards and risks inherent in the activities they are planning.
4. Be properly provisioned and equipped and have levels of knowledge, skill, and physical fitness required for the activities that they choose to undertake.
5. Cope with adverse conditions one might reasonably expect to encounter, and consider the extent of their self-rescue capability in planning and conducting these activities.
6. Assume a high degree of responsibility for their own actions, safety, and survival as well as for those within their care.

**B.  Director**.

1.  Establishes Service-wide Public Risk Management policies and goals, and a system of accountability for accomplishment of those policies and goals.
2.  Issues Director's Orders to meet the Public Risk Management needs of the Service.

**C.  Associate Director, Park Operations and Education**

1.  Is delegated the authority and responsibility to carry out the elements of this Director's Order.
2.  Serves as the "Designated Agency Safety and Health Official" (DASHO) for the National Park Service.  Represents the NPS on issues concerning occupational and public safety management at DASHO meetings.
3.  Exercises the authority of the Director to develop and manage the Service's Public Risk Management program that results in the achievement of this policy.
4.  Issues a Risk management program Reference Manual (RM-50C) to provide detailed information on specific implementation requirements and strategies for a public risk management program in the National Park Service.
5.  Appoints and directly supervises the NPS Risk Management Program Manager (meeting OPM Standard GS-018/803).  Provides adequate resources for the effective implementation and administration of the program.
6.  Authorizes a Public Risk Management Council (a sub-council to the Risk Management Advisory Council) for the purpose of providing advice and assistance to the NPS Risk Management Council, NPS Risk Management Program Office and to the Service's Designated Agency Safety and Health Official (DASHO) on policy, programs, and concerns that are national in scope.
7.  Authorizes an evaluation of regional public risk management programs at least every three years.

**D.  Program Manager, Risk Management**

1.  Serves as a professional advisor/consultant to assist the Associate Director, Park Operations and Education, and the National Leadership Council in their development of Service-wide public risk management policy, direction, and goals.
2.  Coordinates periodic program review of public risk management programs, at least once every three years.  Assists and advises regions and centers on the accomplishment of a safety program review.
3.  Provides professional public risk management program assistance, and manages resources in support of Service-wide policy and programs.
4.  Provides statistics to managers relating to public injuries and illnesses.
5.  Represents NPS public safety interests on the Department's Bureau Safety Manager's Council.
6.  Maintains a library of resources for public risk management, including examples of successful programs.
7.  Maintains this Director's Order and RM-50C to ensure that information is current.
8.  Conducts periodic review of regional Public Risk Management programs.

**E.  Regional Director**

1.  Implements NPS Public Risk Management policies. Establishes clear goals, and develops work plans to facilitate the accomplishment of those goals.  Holds operating unit managers accountable for implementing effective risk management programs.
2.  Designates a Regional Public Risk Management Program Coordinator.
3.  Directs park managers to establish and maintain an active public risk management program and to review program effectiveness at a minimum of every three years in accordance with program elements in this Director's Order and RM-50C.
4.  Recognizes and rewards public safety achievements.

5

5.  Requires evaluation of regional Public Risk Management programs, at least once every three years.

## F. Regional Public Risk Management Coordinator

1.  Serves as an advisor/consultant on Public Risk Management issues.
2.  Advises the regional director on the status of park Public Risk Management efforts. Evaluates park programs to determine progress/status at least once every three years, based on the risk management program elements in this Director's Order and RM-50C.
3.  Provides advice and consultation to individual field unit managers on mitigation strategies for public safety issues.
4.  Conducts periodic review of each park's Public Risk Management programs.

## G. Operating Unit Manager (Superintendent/Center/Unit/Office Manager)

1.  Implements this Director's Order and RM-50C, including the development of work plans and implementation strategies.
2.  Exercises broad judgment and discretion to provide a safe and enjoyable park visit while achieving the mandate of the NPS Organic Act.
3.  Strive to minimize number and severity of visitor incidents.
4.  Develops, implements, and keeps current written, site-specific public risk management work plans.
5.  Annually conducts self-audits of public risk management program. Where risks are identified, ensures that they are communicated to the public using methods that will result in visitors' awareness of and knowledge needed to avoid injury, when encountering those risks.
6.  Obtains appropriate public risk management training for all personnel.
7.  Investigates all public safety incidents to identify causal factors and implement appropriate corrective actions to prevent recurrence.
8.  Establishes a Public Risk Management Program Coordinator to facilitate implementation of this Director's Order at the local level.
9.  Conducts a Technical Board of Investigation for all visitor fatalities using format in RM-50B
10. Requires that all public incidents be recorded using the NPS Incident Reporting System.
11. Establishes a system to reward Public Safety achievement.
12. Incorporates Public Risk Management elements in performance standards and competencies for employees at all levels of NPS individual operating units.

## H. Operating Unit Public Risk Management Coordinator

1.  Serves as a point of contact for Public Risk Management. Assists in the implementation of this Director's Order and RM 50-C.
2.  Ensures that an investigation of all serious visitor accidents is conducted and is accurately recorded in the NPS Incident Reporting System.
3.  Advises the site manager of all serious visitor accidents and incidents. May advise the Technical Board of Investigation on their responsibilities and authorities for accident investigation. (See Reference Manual 50B section on Investigative Responsibilities).

## I. Tort Claims Officer

Notes patterns and assists park in developing ways to prevent future tort claims

## J. Concession Management

6

1. Ensures that concessioners comply with the requirements of the NPS Concession Risk Management Program. Each concessioner is to develop its own risk management program, which is reviewed and approved by the park superintendent. (Reference Director's Order #48.)
2. Ensures that concessioners have an appropriate structural fire plan to ensure the protection of guests, employees, and assets.
3. Ensures that concessioners work closely with NPS managers to address specific safety issues.

## K. Every Employee

1. Is alert to safety issues; notes, reports and mitigates visitor safety hazards as they are observed, and as appropriate and within their authority.
2. If an employee who observes a safety hazard is unable to mitigate it personally, that employee must take responsibility for reporting the safety hazard to someone who can.

*----------End of Director's Order----------*

Dionne Exhibit 4

NPS Director's Order #52C

[Electronic copy. Original on file in Office of Policy and Regulations]

## DIRECTOR'S ORDER #52C: PARK SIGNS

**Approved:**   <u>Fran P. Mainella</u>
                      Director

**Effective Date:**   September 29, 2003

**Sunset Date:**   September 29, 2008

<u>Contents</u>

1. Purpose

2. Background

3. Authority to Issue this Director's Order

4. Guiding Principles

5. Program Goals

6. Deployment Limitations

7. Responsibilities

8. Other Sources of Guidance

---

## 1. PURPOSE

The purpose of this Director's Order, and the companion Sign Standards Reference Manual, is to establish and implement standards for the planning, design, fabrication, installation, inventory, and maintenance of outdoor signs for national parks. Signs addressed in the standards include motorist guidance signs both in, and leading to, parks; traffic regulatory signs; park and facility identification signs; and other signs relating to safety, wayfinding, resource protection, interpretation, and general park information.

## 2. BACKGROUND

The National Park Service is currently responsible for over 83 million acres visited annually by nearly 300 million people. This responsibility includes assisting in the movement of those visitors along 8,000 miles of roads and 14,000 miles of trails in a manner that ensures their convenience and their safety, and the protection of the natural and historic features they come to

enjoy. Because signs are the most frequently used method of communicating with park visitors, they are one of the principal tools used in addressing this charge. It is estimated that the National Park Service has as many as 800,000 signs. However, despite the importance of signs and their monetary value, the Service has not clearly designated who has Servicewide responsibility for them.

As early as 1920, the Service issued sign standards. The standards were periodically updated and eventually replaced, first in 1940, again in 1972, and once again in 1988. The 1998 guidelines focused on highway signs and did not address the full range of sign types that parks typically need. Since the early 1990s, efforts have been underway to establish new and more comprehensive sign standards.

With the recent focus on creating a stronger and more consistent graphic identity for the Service, and on ensuring that it is viewed as one organization (see Director's Order#52A), it is important that these efforts be intensified and result in new and improved sign standards as soon as practicable. It is also important that Servicewide responsibility for the promulgation and application of these standards be clearly identified. This Director's Order and companion Reference Manual replace all previous existing guidelines related to NPS signs.

## 3. AUTHORITY TO ISSUE THIS DIRECTOR'S ORDER

General Authority to issue this Director's Order and its associated reference manual is contained in 16 U.S.C. 1 through 4 (the National Park Service Organic Act) and the delegations of authority contained in part 245 of the Department of the Interior Manual. As is the case with all components of the NPS directives system, this order is intended only to improve the internal management of the NPS and it is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person.

## 4. GUIDING PRINCIPLES

From its earliest days, the National Park Service has relied on shared standards to ensure that its services and facilities are appropriate, consistent, and of good quality. One of the most successful sets of NPS standards is also one of its oldest. Shortly after the Service was created, Director Stephen Mather issued the Uniform Regulations of 1920. The standards required that all NPS rangers – no matter their location – would appear in uniforms of the same design. As a result of Mather's vision, the agency gained one of its most recognizable and enduring symbols. Equally important, park personnel were henceforth afforded the respect and authority that derives from the consistency of their dress and its association with the National Park Service.

The principles that underlie the NPS uniform program recognize the value of unity and the power of consistency – qualities that must also guide the development of new NPS sign standards. Like uniforms, signs that are distinctive and consistent in their appearance are recognized as an official voice of the agency. They speak with the authority that signs must have to be effective. Like park rangers, such signs also speak with a familiar voice. Visitors who travel from park to park are greeted by a graphic language that they come to know and understand. Communication is more assured, more rapid, and more effective. Furthermore, visitors are reminded that individual parks are part of a larger organization with common practices and shared purposes.

In addition to providing signs that are more authoritative, more functional, and more representative of a single organization, common standards offer other advantages. Costs associated with repetitive sign design can be reduced or even eliminated. Fabrication costs can

2

be lowered by taking advantage of mass production and purchasing. Maintenance costs are reduced by limiting material choices to those with the greatest durability. Sign planning and acquisition can be simplified by the use of standardized procedures that are supported by specialized software and internet applications. These same technologies can be used to digitally archive and access park sign plans and sign layouts for use in inventory, maintenance, and replacement efforts.

## 5. PROGRAM GOALS

NPS sign program management should result in signs that:

- Offer clear, concise, and consistent communications to park visitors while not intruding on natural and historic settings.

- Maximize the public's convenience and safety and reduce the Service's liability exposure by ensuring compliance with pertinent federal regulations and principles of sound engineering and communication.

- Build upon, but are not bound by, NPS design traditions.

- Strengthen the NPS public identity and perception as one organization by reflecting current NPS graphic design standards.

- Are appropriate in appearance, size, and material to a wide range of park environments.

- Allow changes as park communication needs and other circumstances change.

- Are easy to acquire, maintain, and replace, and are reasonably priced.

- Comply with NPS's commitment to rely more on standardized design.

## 6. DEPLOYMENT LIMITATIONS

Once a procurement system has been set up, superintendents are expected to convert park signs to the new standards to the extent permitted by available funding. However, in accordance with Director's Order #52A, existing stocks will be used until exhausted. Also, nothing in this policy will affect the continued use of existing entrance and other identity signs that have historic significance. Use of the standards in cultural landscapes, historic districts, and backcountry and wilderness areas will be moderated by the special nature of these areas and in accordance with established policies and practices. These standards are not generally intended to be applied to signs installed in parks by other government agencies, concessioners, and lessees of historic properties, although this may be granted or required by superintendents. Administrative mechanisms will be developed to allow for regional and park input in guiding a national sign program.

## 7. RESPONSIBILITIES

### 7.1 Associate Director, Park Planning, Facilities, and Lands

The Associate Director will:

- Issue an NPS Sign Standards Manual (Reference Manual 52C) to provide detailed

information on specific requirements and specifications for implementing a consistent sign program for the National Park Service.

- Authorize and approve periodic updates and additions to the NPS Sign Standards Manual as changes in needs, resources, technology, and other circumstances require.

- Authorize Servicewide training to ensure that the sign standards are well understood and properly employed.

- Report on NPS accomplishments in meeting Strategic Plan goals related to signs.

## 7.2  Regional Directors

All regional directors will:

- Implement NPS Sign Program policies, establish clear regional signage goals, develop work plans to facilitate the accomplishment of those goals, and hold park managers accountable for implementing effective sign programs in their respective areas.

- Designate and support a Regional Sign Program Coordinator.

- Ensure that park managers establish and maintain an active sign program in their respective areas, including the designation of a park sign coordinator, and the development of a park sign plan.

- Conduct region-wide evaluations of parks' progress in implementing NPS sign standards.

## 7.3  Harpers Ferry Center (HFC)

The Center Manager will:

- Develop NPS Sign Standards that meet the Program Goals of section 5, above and, upon approval by the Associate Director, disseminate them as the NPS Sign Standards Manual.

- Provide periodic updates and additions to the manual as needed.

- Designate, support, and directly supervise the NPS Sign Program Manager.

- Develop, issue, and oversee contracts for the manufacture and supply of signs to parks.

- Assist individual parks in establishing and maintaining comprehensive sign plans consistent with the NPS Sign Standards Manual.

- Compile data and provide an annual report on achieving target goals for the NPS sign program.

## 7.4  Park Facility Management Division

The Division will:

- Provide technical guidance on traffic control devices and motorist guidance signs in support of the NPS Sign Program, including assisting in periodic updates of the NPS Standards Manual.

- Assist with Servicewide training to ensure that the sign standards are well understood and properly employed.

4

- Serve as liaison with the Federal Highway Administration in securing technical traffic engineering and safety expertise and in maintaining ongoing FWHA approval of NPS sign standards.

## 7.5 Superintendents

All superintendents will:

- Establish and maintain an active sign program in their respective areas, including the designation of a park sign coordinator and the development of a park sign plan as described in Reference Manual 52C.

- Implement NPS Sign Program policies by utilizing the NPS Sign Program Standards in the planning, design, and acquisition of all signs within their purview, unless an exception has been granted by their regional director in consultation with the National Sign Program Manager.

- Prepare an evaluation of their park's progress in implementing NPS sign standards.

## 8. OTHER SOURCES OF GUIDANCE

Most of the following sources of guidance are available through the NPS policy web site at www.nps.gov/policy. Some of those in the list below may not yet be issued at the time this Director's Order is approved. Their status will also be indicated on the policy web site.

**8.1** The following orders and directives guide the National Park Service in the development and implementation of sign standards:

- <u>National Park Service Management Policies</u> (especially section 9.3.1.1).

- Director's Order #52A: Communicating the National Park Service Mission.
  This is the first in a series of Director's Orders aimed at helping to explain the NPS identity and its mission. In addition to Directors Order #52C, the others are:
  o Director's Order #52B: Graphic Design Standards.
  o Director's Order #52D: Use of the Arrowhead Symbol.

**8.2** The following directives include information relating to NPS sign design and construction:

- Director's Order #50C: Public Risk Management Program.

- Director's Order #87A: Park Roads and Parkways.

- Director's Order #42: Accessibility for People with Disabilities in National Park Service Facilities, Programs, and Services.

- The Americans with Disabilities Act of 1990.

- The manual of Uniform Traffic Control Devices (MUTCD) published by the Federal Highway Administration, U.S. Department of Transportation.

- NPS Implementation Plan (September 1998) prepared in response to the NAPA report "Strengthening the National Park Service Construction Program."

- 23 U.S.C. 402, Highway Safety Program; 23 U.S.C. 204, Federal lands Highway Program; and additional guidelines as provided by the Federal Highway Administration,

U.S. Department of Transportation.

- 18 U.S.C. 4124, relating to signs purchased from Federal Prison Industries (UNICOR).

----------------- *End of Director's Order* ---------------

Dionne Exhibit 5

**American Association of State Highway and Transportation Officials, 1999 Guide for the Development of Bicycle Facilities (excerpt)**



guide for the development of bicycle facilities

american association
of state highway and
transportation officials

1999

guide for the development of bicycle facilities



**american association of
state highway and
transportation officials**

444 north capitol street, nw
washington, dc  20001
(202) 624-5800 (tel)
(202) 624-5806 (fax)
www.aashto.org

**1999**    prepared by the aashto task force on geometric design

# Chapter 3
# Operation and
# Maintenance

The jurisdictions responsible for the operation, maintenance and policing of bicycle facilities should be established prior to construction. In addition to construction costs, operating and maintenance costs should be considered and included in the overall budget for the facility. Neglecting routine maintenance eventually may render bicycle facilities unridable and such deteriorating facilities may become a liability to the state or community. Bicyclists should be encouraged to report bicycle facilities that are in need of maintenance. A central contact person who can authorize maintenance work should be designated to receive such reports.

A smooth surface, free of potholes and debris, should be provided on all bikeways. Glass, sand, litter and fallen leaves often accumulate on bike lanes, paved shoulders and shared use paths; therefore, regular sweeping is desirable. Pavement edges should be uniform and should not have abrupt drop-offs. Signs and pavement markings should be inspected regularly and kept in good condition, and if determined to be no longer necessary, promptly removed. Highways with bicycle traffic may require a more frequent and higher level of maintenance than other highways.

For shared use paths, attention should be given to maintaining the full paved width and not allowing the edges to ravel. Trees, shrubs and other vegetation should be controlled to provide adequate clearances and sight distances. Trash receptacles should be placed and maintained at convenient locations. Seeded and sodded areas in the vicinity of shared use paths should be mowed regularly. Snow plowing should be used to remove snow from bikeways because de-icing agents and abrasives can damage bicycles. Also, enforcement is often necessary to prevent unauthorized motor vehicles from using a shared use path.

The routine maintenance of roadways and bikeways will usually provide good riding conditions. Several bicycle facility improvements described in this guide can be implemented during routine maintenance activities. Consideration also can be given to adjusting lane widths and providing wider outside curb lanes for bicyclists during restriping operations. The addition of edge lines can better delineate a shoulder, especially at night. When shoulders are resurfaced, a smooth surface suitable for bicycle riding should be considered.



Operation and Maintenance

# Exhibit I

# National Park Service Daily Work Reports
# (miscellaneous)

U.S. Department of the Interior
National Park Service
Maintimizer
**DAILY WORK REPORT**

Rock Creek Park
ROADS & TRAILS

| PAR 1 |
| --- |
| DATE M 10 / D 5 / Y 99 |

| EMPL. # | LABOR NAME | REG HRS | PREMIUM CODE | HR | REG HRS | PREMIUM CODE | HR | REG HRS | PREMIUM CODE | HR |
|---|---|---|---|---|---|---|---|---|---|---|
| WORK ORDER NUMBER | | | | | | | | | | |
| 3458-09 | BURRELL, JAMES | 8 | | | | | | | | |
| 3458-21 | BURTON, JIM | | | | | | | | | |
| 3458-04 | CARROLL, STANLE | 8 | | | | | | | | |
| 3458-10 | CREEK, DONALD | 8 | | | | | | | | |
| 3459-03 | FORBES, ALFRED | 8 | | | | | | | | |
| 3458-07 | HARRIS, KEVIN | 8 | | | | | | | | |
| 3459-08 | TAYLOR, LACY | | | | | | | | | |
| 3457-01 | WILSON, JIMMY | | | | | | | | | |

| EQPT. # | EQUIPMENT/VEHICLE | HOURS USED | | HOURS USED | | HOURS USED | |
|---|---|---|---|---|---|---|---|
| 44502 | CHEVY PICKUP | 8 | | | | | |
| 82677 | DODGE PICKUP | | | | | | |
| 25052 | CHEVY PICKUP | | | | | | |
| 44504 | CHEVY 6 PASS PICKUP | 8 | | | | | |
| 25001 | FORD DUMP TRUCK | | | | | | |
| 25002 | FORD DUMP TRUCK | | | | | | |
| 25051 | FORD DUMP TRUCK | | | | | | |
| 49059 | GMC DUMP TRUCK | | | | | | |
| 25131 | MITZI TRAIL TRUCK | | | | | | |
| 81173 | GMC 6 PASS DUMP | | | | | | |
| 83926 | CATERPILLAR DOZER | | | | | | |
| 17337 | PAYLOADER | | | | | | |
| 23034 | BACKHOE | | | | | | |
| 48901 | BOBCAT LOADER | 1 | | | | | |
| 83980 | BOBCAT LOADER | 7 | | | | | |
| 49056 | KUBUTA MINI | | | | | | |
| 39006 | FORD SWEEPER | | | | | | |
| 44485 | VIBRATORY ROLLER | | | | | | |

| MAT. # | TYPE OF MATERIAL | QTY USED | UNIT OF MEASURE | QTY USED | UNIT OF MEASURE | QTY USED | UNIT OF MEASURE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| ASSIGNED TO | SIGNATURE *Alfred Forbes* | REVIEWED BY |
|---|---|---|

**LOCATION**  WORK PERFORMED/ PROBLEMS ENCOUNTERED/ASSISTANCE NEEDED

Asphalt work on Oregon Bike
Trail work Along Oregon Ave

# DAILY WORK REPORT

| DATE |
|------|
| 3/13/00 |

| WORK ORDER NUMBER | 2110 Bike |
|---|---|

| EMPL. # | LABOR NAME | REG HRS | PREMIUM CODE | HR | REG HRS | PREMIUM CODE | HR | REG HRS | PREMIUM CODE | HR |
|---|---|---|---|---|---|---|---|---|---|---|
| 3458-09 | BURRELL, JAMES | 8 | | | | | | | | |
| 3458-21 | BURTON, JIM | 8 | | | | | | | | |
| 3458-04 | CARROLL, STANLE | 8 | | | | | | | | |
| 3458-10 | CREEK, DONALD | 8 | | | | | | | | |
| 3459-03 | FORBES, ALFRED | 8 | | | | | | | | |
| 3458-07 | HARRIS, KEVIN | | | | | | | | | |
| 3459-08 | TAYLOR, LACY | 4 | | | | | | | | |
| 3457-01 | WILSON, JIMMY | | | | | | | | | |

| EQPT. # | EQUIPMENT/VEHICLE | HOURS USED | | | HOURS USED | | | HOURS USED | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 44502 | CHEVY PICKUP | | | | | | | | | |
| 82677 | DODGE PICKUP | | | | | | | | | |
| 25052 | CHEVY PICKUP | | | | | | | | | |
| 44504 | CHEVY 6 PASS PICKUP | 8 | | | | | | | | |
| 25001 | FORD DUMP TRUCK | | | | | | | | | |
| 25002 | FORD DUMP TRUCK | | | | | | | | | |
| 25051 | FORD DUMP TRUCK | | | | | | | | | |
| 49059 | GMC DUMP TRUCK | 8 | | | | | | | | |
| 25131 | MITZI TRAIL TRUCK | | | | | | | | | |
| 81173 | GMC 6 PASS DUMP | | | | | | | | | |
| 83926 | CATERPILLAR DOZER | | | | | | | | | |
| 17337 | PAYLOADER | | | | | | | | | |
| 23034 | BACKHOE | | | | | | | | | |
| 48901 | BOBCAT LOADER | | | | | | | | | |
| 83980 | BOBCAT LOADER | | | | | | | | | |
| 49056 | KUBUTA MINI | | | | | | | | | |
| 39006 | FORD SWEEPER | | | | | | | | | |
| 44485 | VIBRATORY ROLLER | | | | | | | | | |

| MAT. # | TYPE OF MATERIAL | QTY USED | UNIT OF MEASURE | QTY USED | UNIT OF MEASURE | QTY USED | UNIT OF MEASURE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| ASSIGNED TO | SIGNATURE | Alfred Forbes | REVIEWED BY |
|---|---|---|---|

| LOCATION | WORK PERFORMED/ PROBLEMS ENCOUNTERED/ASSISTANCE NEEDED |
|---|---|
| | ASPHALT WORK BIKE TRAIL PARKWAY |

U.S. Department of the Interior
National Park Service
Maintimizer
**DAILY WORK REPORT**

PAR

Rock Creek Park

**ROADS & TRAILS**

DATE: M 3 D 20 Y 00

| WORK ORDER NUMBER | 2110 Bike | | | | | | | | | |

| EMPL. # | LABOR NAME | REG HRS | PREMIUM CODE | HR | REG HRS | PREMIUM CODE | HR | REG HRS | PREMIUM CODE | HR |
|---------|------------|---------|--------------|----|---------|--------------|----|---------|--------------|----|
| 3458-09 | BURRELL, JAMES | 8 | | | | | | | | |
| 3458-21 | BURTON, JIM | | | | | | | | | |
| 3458-04 | CARROLL, STANLE | 8 | | | | | | | | |
| 3458-10 | CREEK, DONALD | 8 | | | | | | | | |
| 3459-03 | FORBES, ALFRED | 8 | | | | | | | | |
| 3458-07 | HARRIS, KEVIN | 8 | | | | | | | | |
| 3459-08 | TAYLOR, LACY | | | | | | | | | |
| 3457-01 | WILSON, JIMMY | | | | | | | | | |

| EQPT. # | EQUIPMENT/VEHICLE | HOURS USED | | | HOURS USED | | | HOURS USED | | |
|---------|-------------------|------------|--|--|------------|--|--|------------|--|--|
| 44502 | CHEVY PICKUP | | | | | | | | | |
| 82677 | DODGE PICKUP | | | | | | | | | |
| 25052 | CHEVY PICKUP | | | | | | | | | |
| 44504 | CHEVY 6 PASS PICKUP | 8 | | | | | | | | |
| 25001 | FORD DUMP TRUCK | | | | | | | | | |
| 25002 | FORD DUMP TRUCK | | | | | | | | | |
| 25051 | FORD DUMP TRUCK | | | | | | | | | |
| 49059 | GMC DUMP TRUCK | | | | | | | | | |
| 25131 | MITZI TRAIL TRUCK | 8 | | | | | | | | |
| 81173 | GMC 6 PASS DUMP | | | | | | | | | |
| 83926 | CATERPILLAR DOZER | | | | | | | | | |
| 17337 | PAYLOADER | | | | | | | | | |
| 23934 | BACKHOE | 6 | | | | | | | | |
| 48901 | BOBCAT LOADER | | | | | | | | | |
| 83980 | BOBCAT LOADER | | | | | | | | | |
| 49056 | KUBUTA MINI | | | | | | | | | |
| 39006 | FORD SWEEPER | | | | | | | | | |
| 44485 | VIBRATORY ROLLER | 8 | | | | | | | | |

| MAT. # | TYPE OF MATERIAL | QTY USED | UNIT OF MEASURE | QTY USED | UNIT OF MEASURE | QTY USED | UNIT OF MEASURE |
|--------|------------------|----------|-----------------|----------|-----------------|----------|-----------------|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| ASSIGNED TO | | SIGNATURE Alfred L. Forbes | REVIEWED BY |

**LOCATION** — **WORK PERFORMED/ PROBLEMS ENCOUNTERED/ASSISTANCE NEEDED**

Asphalt Bike trail
behind old Bingam

U.S. Department of the Interior
National Park Service
Maintimizer
**DAILY WORK REPORT**

| PAR | | Rock Creek Park |
|---|---|---|
| DATE M-D-Y 10 16 01 | | ROADS & TRAILS |

**WORK ORDER NUMBER**

| EMPL.# | LABOR NAME | REG HRS | PREMIUM CODE | HRS | REG HRS | PREMIUM CODE | HRS | REG HRS | PREMIUM CODE | HR |
|---|---|---|---|---|---|---|---|---|---|---|
| 3458-09 | BURRELL, JAMES | 8 | | | | | | | | |
| 3458-21 | BURTON, JIM | | | | | | | | | |
| 3458-04 | CARROLL, STANLEY | | | | | | | | | |
| 3455-10 | CREEK, DONALD | 8 | | | | | | | | |
| 3459-03 | FORBES, ALFRED | 8 | | | | | | | | |
| 3455-07 | HARRIS, KEVIN | | | | | | | | | |
| 3459-05 | TAYLOR, LACY | | | | | | | | | |
| 3457-01 | WILSON, JIMMY | | | | | | | | | |
| 57-04 | Sharp, Darryl | | | | | | | | | |
| | Gaines, G | | | | | | | | | |
| | Talford, T | 7 | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| EQPT.# | EQUIPMENT/TOOLS | HOURS USED | | HOURS USED | | HOURS USED | |
|---|---|---|---|---|---|---|---|
| 44502 | CHEVY PICKUP | CREEK | | | | | |
| 57672 | DODGE PICKUP | | | | | | |
| 23052 | CHEVY PICKUP | | | | | | |
| 44504 | CHEVY 6 PASS PICKUP | CREEK | | BURRELL | | | |
| 23001 | FORD DUMP TRUCK | | | | | | |
| 23002 | FORD DUMP TRUCK | | | | | | |
| 23053 | FORD DUMP TRUCK | | | | | | |
| 49059 | GMC DUMP TRUCK | | | | | | |
| 23131 | MITZI TRAIL TRUCK | | | | | | |
| 31173 | GMC 6 PASS DUMP | | | | | | |
| 83926 | CATERPILLAR DOZER | | | | | | |
| 17337 | PAYLOADER | | | | | | |
| 23034 | BACKHOE | | | | | | |
| 48901 | BOBCAT LOADER | | | | | | |
| 83980 | BOBCAT LOADER | | | | | | |
| 49036 | KUUUTA MINI | | | | | | |
| 39006 | FORD SWEEPER | FORBS 5 | | | | | |
| 44485 | VIBRATORY ROLLER | | | | | | |

| LOCATION | WORK PERFORMED/ PROBLEMS ENCOUNTERED/ASSISTANCE NEEDED |
|---|---|
| | Blowing Bike Trails |
| | Patching Potholes on Beach drive |
| | |
| | |
| | |
| | |

U.S. Department of the Interior
National Park Service
Maintimizer
DAILY WORK REPORT

| PAR | | | | Rock Creek Park |
|---|---|---|---|---|
| | DATE | | | ROADS & TRAILS |
| | M 9 | D 25 | Y 03 | |

WORK ORDER NUMBER

| EMPL. # | LABOR NAME | REG HRS | PREMIUM CODE | HRS | REG HRS | PREMIUM CODE | HRS | REG HRS | PREMIUM CODE | HR |
|---|---|---|---|---|---|---|---|---|---|---|
| 3458-20 | MURPHY, JAYNE | | | | | | | | | |
| 3459-21 | BURTON, JIM | 8 4 | | | | | | | | |
| 3458-61 | CARROLL, STANLY | 4 | | | | | | | | |
| 3455-10 | CREUS, DONALD | | | | | | | | | |
| 3459-03 | FORBES, ALFRED | | | | | | | | | |
| 3455-07 | HARRIS, KEVIN | | | | | | | | | |
| 3459-05 | TAYLOR, LACY | | | | | | | | | |
| 3457-01 | WILSON, JIMMY | | | | | | | | | |
| 3457-04 | SHARP, Dave, | | | | | | | | | |
| | Grindos, G. | 4 | | | | | | | | |
| | Talford, T | 4 | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| EQPT. # | EQUIPMENT/VEHICLE | HOURS USED | | HOURS USED | | HOURS USED | |
|---|---|---|---|---|---|---|---|
| 44502 | CHEVY PICKUP | | | | | | |
| 12677 | DODGE PICKUP | | | | | | |
| 25052 | CHEVY PICKUP | | | | | | |
| 44504 | CHEVY 6 PASS PICKUP | 4 | | | | | |
| 75001 | FORD DUMP TRUCK | | | | | | |
| 75002 | FORD DUMP TRUCK | 4 | | | | | |
| 21033 | FORD DUMP TRUCK | | | | | | |
| 49037 | GMC DUMP TRUCK | | | | | | |
| 23131 | MITZI TRAIL TRUCK | | | | | | |
| 84172 | GMC 6 PASS DUMP | | | | | | |
| 83926 | CATERPILLAR DOZER | | | | | | |
| 17337 | PAYLOADER | | | | | | |
| 25054 | BACKHOE | | | | | | |
| 48991 | BOBCAT LOADER | | | | | | |
| 83980 | BOBCAT LOADER | | | | | | |
| 49056 | KUBUTA MINI | 8 | | | | | |
| 39006 | FORD SWEEPER | | | | | | |
| 44183 | VIBRATORY ROLLER | | | | | | |

LOCATION            WORK PERFORMED/PROBLEMS ENCOUNTERED/ASSISTANCE NEEDED

Fix Zoo trail By Tunnel

Gregy W. Gaines

U.S. Department of the Interior
National Park Service
Maintenance
**DAILY WORK REPORT**

Rock Creek Park

ROADS & TRAILS

| PAR | | |
|---|---|---|
| DATE M D Y 10-3-03 | Kevin Harris | |

| WORK ORDER NUMBER | 423831 | 488207 | 401127 |

| EMPL # | LABOR NAME | REG HRS | PREMIUM CODE | HRS | REG HRS | PREMIUM CODE | HRS | REG HRS | PREMIUM CODE | HR |
|---|---|---|---|---|---|---|---|---|---|---|
| 3459-20 | MURPHY, JAMES | | | | | | | | | |
| 3459-21 | BENTON, JOE | 4 | | | 4 | | | 8 | | |
| 3458-44 | CARROLL, STANLEY | | | | | | | 8 | | |
| 3455-10 | CREUS, DONALD | | | | | | | 8 | | |
| 3459-03 | FORBES, ALFRED | | | | | | | | | |
| 3458-07 | HARRIS, KEVIN | 4 | | | 4 | | | 8 | | |
| 3459-05 | TAYLOR, LACY | | | | | | | | | |
| 3457-01 | WILSON, JIMMY | | | | | | | | | |
| 3459-04 | Sharp, Dave, I | | | | | | | | | |
| | Crandle's G | | | | | | | 8 | | |
| | Talford, T | | | | | | | 4 | | |

| EQPT # | EQUIPMENT/VEHICLE | HOURS USED | HOURS USED | HOURS USED |
|---|---|---|---|---|
| 44507 | CHEVY PICKUP | | | |
| 27677 | DODGE PICKUP | | | |
| 23057 | CHEVY PICKUP | | | |
| 44594 | CHEVY 6 PASS VEHICLE | | | |
| 75001 | FORD DUMP TRUCK | | | |
| 75002 | FORD DUMP TRUCK | | | |
| 21011 | FORD DUMP TRUCK | | | |
| 69859 | GMC DUMP TRUCK | | | |
| 21121 | MITZI TRAIL TRUCK | | | |
| 81173 | GMC 4 PASS DUMP | | | |
| 81926 | CATERPILLAR DOZER | | | |
| 17337 | PAYLOADER | | | |
| 23054 | BACKHOE | | | |
| 48901 | BOBCAT LOADER | | | |
| 83920 | BOBCAT LOADER | | | |
| 49916 | KUBUTA MINI | | | |
| 39006 | FORD SWEEPER | | | |
| 44465 | VIBRATORY ROLLER | | | |

**LOCATION**

**WORK PERFORMED/PROBLEMS ENCOUNTERED/ASSISTANCE NEEDED**

Repair Trail by Zoo Near Tunnel.
Move wood chips to Whitehaven

U.S. Department of the Interior
National Park Service
Maintenance
**DAILY WORK REPORT**

| PAR | | | Rock Creek Park |
| DATE | | | |
| M 9 | D 30 | Y 03 | ROADS & TRAILS |

**WORK ORDER NUMBER**

| EMPL # | LABOR NAME | REG HRS | PREMIUM CODE | HRS | REG HRS | PREMIUM CONE | HRS | REG HRS | PREMIUM CODE | HR |
|--------|------------|---------|--------------|-----|---------|--------------|-----|---------|--------------|-----|
| 3458-20 | MURPHY, JAMES | | | | | | | | | |
| 3458-21 | BOLTON, JIM | 8 | | | | | | | | |
| 3458-44 | CARROLL, STANLEY | 8 | | | | | | | | |
| 3455-10 | CREEK, DONALD | | | | | | | | | |
| 3459-03 | FORBES, ALFRED | | | | | | | | | |
| 3455-07 | HARRIS, KEVIN | | | | | | | | | |
| 3459-05 | TAYLOR, LACY | | | | | | | | | |
| 3457-01 | WILSON, JIMMY | | | | | | | | | |
| 3457-04 | Sharp, Darryl | | | | | | | | | |
| | Gainies, G | 8 | | | | | | | | |
| | Alford, T | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| EQPT # | EQUIPMENT/VEHICLE | HOURS USED | | HOURS USED | | HOURS USED | |
|--------|-------------------|------------|--|------------|--|------------|--|
| 44502 | CHEVY PICKUP | | | | | | |
| 82672 | DODGE PICKUP | | | | | | |
| 25052 | CHEVY PICKUP | | | | | | |
| 44504 | CHEVY 6 PASSENGER | 8 | | | | | |
| 75001 | FORD DUMP TRUCK | 8 | | | | | |
| 75002 | FORD DUMP TRUCK | | | | | | |
| 21051 | FORD DUMP TRUCK | | | | | | |
| 49032 | GMC DUMP TRUCK | | | | | | |
| 21131 | MITS TRAIL TRUCK | | | | | | |
| 83373 | GANG & PASS DUMP | | | | | | |
| 83826 | CATERPILLAR DOZER | | | | | | |
| 17337 | PAYLOADER | | | | | | |
| 23054 | BACKHOE | | | | | | |
| 48901 | BOBCAT LOADER | 8 | | | | | |
| 83980 | BOBCAT LOADER | | | | | | |
| 49856 | KUBOTA MINI | | | | | | |
| 39006 | FORD SWEEPER | | | | | | |
| 44483 | VIBRATORY ROLLER | | | | | | |

**LOCATION**          **WORK PERFORMED/ PROBLEMS ENCOUNTERED/ASSISTANCE NEEDED**

Repair Trail by Zoo Near the tunnel

U.S. Department of the Interior
National Park Service
Maintenance
**DAILY WORK REPORT**

| PAR | | | Rock Creek Park |
|-----|---|---|-----------------|
| | DATE | | |
| M | D | Y | ROADS & TRAILS |
| 9 | 30 | 03 | |

WORK ORDER NUMBER

| EMPL. # | LABOR NAME | REG THIS | PREMIUM CODE | HRS | REG THIS | PREMIUM CODE | HRS | REG THIS | PREMIUM CODE | HR |
|---------|------------|----------|--------------|-----|----------|--------------|-----|----------|--------------|-----|
| 3459-20 | MURRELL, JAMES | | | | | | | | | |
| 3459-23 | BURTON, JIM | 4 | | | | | | | | |
| 3458-04 | CARROLL, STANLEY | 4 | | | | | | | | |
| 3455-10 | CREEK, DONALD | | | | | | | | | |
| 3459-03 | FORBES, ALFRED | | | | | | | | | |
| 3459-07 | HARRIS, KEVIN | | | | | | | | | |
| 3459-05 | TAYLOR, LACY | | | | | | | | | |
| 3457-01 | WILSON, JIMMY | | | | | | | | | |
| 3457-04 | Sharp, Daryl | | | | | | | | | |
| | Gaines, G. | 8 | | | | | | | | |
| | Talford, T | | | | | | | | | |

| EQPT. # | EQUIPMENT/VEHICLE | HOURS USED | | HOURS USED | | HOURS USED | |
|---------|-------------------|------------|---|------------|---|------------|---|
| 44502 | CHEVY PICKUP | | | | | | |
| 52677 | DODGE PICKUP | | | | | | |
| 25052 | CHEVY PICKUP | | | | | | |
| 41504 | CHEVY 6 PASS PICKUP | 4 | | | | | |
| 25001 | FORD DUMP TRUCK | 4 | | | | | |
| 25032 | FORD DUMP TRUCK | | | | | | |
| 25051 | FORD DUMP TRUCK | | | | | | |
| 69032 | GMC DUMP TRUCK | | | | | | |
| 23131 | MITZI TRAIL TRUCK | | | | | | |
| 81173 | GMC 4 PASS DUMP | | | | | | |
| 83826 | CATERPILLAR DOZER | | | | | | |
| 47338 | PAYLOADER | | | | | | |
| 23056 | BACKHOE | | | | | | |
| 48991 | BOBCAT LOADER | 8 | | | | | |
| 83980 | BOBCAT LOADER | | | | | | |
| 49954 | KUBUTA MINI | | | | | | |
| 39206 | FORD SWEEPER | | | | | | |
| 44183 | VIBRATORY ROLLER | | | | | | |

LOCATION

WORK PERFORMED/ PROBLEMS ENCOUNTERED/ASSISTANCE NEEDED

Repair Trail by Zoo Near the tunnel

U.S. Department of the Interior
National Park Service
Maintenance
**DAILY WORK REPORT** #23813

Rock Creek Park
ROADS & TRAILS

| | | PAR | | | |
| DATE | M - D | 10 . 1 . 03 |

**WORK ORDER NUMBER**   401127

| EMPL. # | LABOR NAME | REG HRS | PREMIUM CODE | HRS | REG HRS | PREMIUM CODE | AMT | REG HRS | PREMIUM CODE | HR |
|---|---|---|---|---|---|---|---|---|---|---|
| 3458-28 | MERRILL, JAMES | | | | | | | | | |
| 3458-23 | CLAYTON, JIM | 4 | | | 8 | | | | | |
| 3458-44 | CARROLL, STALIN | 4 | | | | | | | | |
| 3455-10 | CRRUX, DONALD | | | | | | | | | |
| 3459-08 | FORBES, ALFRED | | | | 8 | | | | | |
| 3458-07 | HARRIS, KEVIN | 4 | | | 8 | | | | | |
| 3459-05 | TAYLOR, LACY | | | | | | | | | |
| 3457-01 | WILSON, JIMMY | | | | | | | | | |
| 3457-04 | SHARP, Greg. I | | | | | | | | | |
| | Gaines, G | 4 | | | | | | | | |
| | Talford, T | 4 | | | | | | | | |

| EQPT. # | EQUIPMENT/VEHICLE | HOURS USED | | | HOURS USED | | | HOURS USED | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 44502 | CHEVY PICKUP | | | | | | | | | |
| 87672 | DODGE PICKUP | | | | | | | | | |
| 25052 | CHEVY PICKUP | | | | | | | | | |
| 41504 | CHEVY 6 PASS PICKUP | 4 | | | | | | | | |
| 75001 | FORD DUMP TRUCK | 4 | | | | | | | | |
| 75002 | FORD DUMP TRUCK | | | | | | | | | |
| 25351 | FORD DUMP TRUCK | | | | | | | | | |
| 49832 | GMC DUMP TRUCK | 4 | | | | | | | | |
| 25121 | MITZI TRAIL TRUCK | | | | | | | | | |
| 41179 | GMC 4 PASS DUMP | | | | | | | | | |
| 83826 | CATERPILLAR DOZER | | | | | | | | | |
| 17337 | PAYLOADER | | | | | | | | | |
| 23056 | BACKHOE | | | | | | | | | |
| 48901 | BONCAT LOADER | 4 | | | | | | | | |
| 83980 | BONCAT LOADER | | | | | | | | | |
| 40836 | KUBUTA MOI | | | | | | | | | |
| 39006 | FORD SWEEPER | | | | | | | | | |
| 44485 | VIBRATORY ROLLER | | | | | | | | | |

**LOCATION**   WORK PERFORMED / PROBLEMS ENCOUNTERED/ASSISTANCE NEEDED

Repair Trail By Zoo

Gregory W. Grimes



*Facility Management Software System*

# Labor Utilization By Labor Group [Detail]

### 1346 ROCR Roads and Trails Crew

From: 10/1/2003   To: 10/7/2003

Sorted By:   Labor  Code

Total Number of Employees in this report:  8

*Note: Requires a valid value in the Park Alpha field in Labor Groups.*

Date Printed:  11/7/2005   9:10AM

Page 1 of 3

| | | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
| **5843  Burrell, James** | | | | **24.0** | **0.0** | **$670.56** |
| **Date** | **W/O #** | **Description of Work** | **Location #** | | | |
| 10/01/2003 | | | | 8.0 | 0.0 | $223.52 |
| | 401127 | Paid Leave FY-2004 | ROCR | 8.0 | 0.0 | $223.52 |
| 10/02/2003 | | | | 8.0 | 0.0 | $223.52 |
| | 401127 | Paid Leave FY-2004 | ROCR | 8.0 | 0.0 | $223.52 |
| 10/03/2003 | | | | 8.0 | 0.0 | $223.52 |
| | 401127 | Paid Leave FY-2004 | ROCR | 8.0 | 0.0 | $223.52 |
| **5844  Burton, James  (continued)** | | | | **24.0** | **0.0** | **$747.12** |
| **Date** | **W/O #** | **Description of Work** | **Location #** | | | |
| 10/01/2003 | | | | 8.0 | 0.0 | $249.04 |
| | 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $249.04 |
| 10/02/2003 | | | | 8.0 | 0.0 | $249.04 |
| | 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $249.04 |
| 10/03/2003 | | | | 8.0 | 0.0 | $249.04 |
| | 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 4.0 | 0.0 | $124.52 |
| | 488207 | Hauling Wood Chips to Public Gardens F | 26093 | 4.0 | 0.0 | $124.52 |
| **5847  Carroll, Stanley  (continued)** | | | | **40.0** | **0.0** | **$1,121.60** |
| **Date** | **W/O #** | **Description of Work** | **Location #** | | | |
| 10/01/2003 | | | | 8.0 | 0.0 | $224.32 |
| | 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $224.32 |
| 10/02/2003 | | | | 8.0 | 0.0 | $224.32 |
| | 401127 | Paid Leave FY-2004 | ROCR | 8.0 | 0.0 | $224.32 |
| 10/03/2003 | | | | 8.0 | 0.0 | $224.32 |
| | 401127 | Paid Leave FY-2004 | ROCR | 8.0 | 0.0 | $224.32 |
| 10/06/2003 | | | | 8.0 | 0.0 | $224.32 |

| Date | W/O # | Description of Work | Location # | Regular Hours | O/T Hours | Total Cost |
|------|-------|---------------------|------------|---------------|-----------|------------|
| **5847  Carroll, Stanley  (continued)** | | | | **40.0** | **0.0** | **$1,121.60** |
| | 438280 | Maint/Repair Road Signs on SB RC Pkwy | 51639 | 8.0 | 0.0 | $224.32 |
| 10/07/2003 | | | | 8.0 | 0.0 | $224.32 |
| | 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $224.32 |
| **5849  Creek, Donald  (continued)** | | | | **8.0** | **0.0** | **$207.44** |
| 10/01/2003 | | | | 8.0 | 0.0 | $207.44 |
| | 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $207.44 |
| **5855  Forbes, Alfred  (continued)** | | | | **32.0** | **0.0** | **$894.08** |
| 10/01/2003 | | | | 8.0 | 0.0 | $223.52 |
| | 401127 | Paid Leave FY-2004 | ROCR | 8.0 | 0.0 | $223.52 |
| 10/03/2003 | | | | 8.0 | 0.0 | $223.52 |
| | 401127 | Paid Leave FY-2004 | ROCR | 8.0 | 0.0 | $223.52 |
| 10/06/2003 | | | | 8.0 | 0.0 | $223.52 |
| | 438280 | Maint/Repair Road Signs on SB RC Pkwy | 51639 | 8.0 | 0.0 | $223.52 |
| 10/07/2003 | | | | 8.0 | 0.0 | $223.52 |
| | 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $223.52 |
| **5859  Harris, Kevin  (continued)** | | | | **40.0** | **0.0** | **$876.40** |
| 10/01/2003 | | | | 8.0 | 0.0 | $175.28 |
| | 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $175.28 |
| 10/02/2003 | | | | 8.0 | 0.0 | $175.28 |
| | 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $175.28 |
| 10/03/2003 | | | | 8.0 | 0.0 | $175.28 |
| | 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 4.0 | 0.0 | $87.64 |
| | 488207 | Hauling Wood Chips to Public Gardens F | 26093 | 4.0 | 0.0 | $87.64 |
| 10/06/2003 | | | | 8.0 | 0.0 | $175.28 |
| | 438280 | Maint/Repair Road Signs on SB RC Pkwy | 51639 | 2.0 | 0.0 | $43.82 |
| | 438239 | Maint/Repair Road Signs on Beach Dr FY | 26716 | 4.0 | 0.0 | $87.64 |
| | 438279 | Maint/Repair Road Signs on NB RC Pkwy | 26130 | 2.0 | 0.0 | $43.82 |
| 10/07/2003 | | | | 8.0 | 0.0 | $175.28 |
| | 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $175.28 |
| **5870  Rose, Louis  (continued)** | | | | **9.0** | **0.0** | **$223.47** |
| Date | W/O # | Description of Work | Location # | | | |

| | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|
| **5870** | **Rose, Louis  (continued)** | | **9.0** | **0.0** | **$223.47** |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| 10/03/2003 | | | | 2.0 | 0.0 | $49.66 |
| | 401303 | Replace Rear Brakes on Vehicle #82677 F | 26144 | 2.0 | 0.0 | $49.66 |
| 10/07/2003 | | | | 7.0 | 0.0 | $173.81 |
| | 401308 | Replace Water Pump & Belt on Vehicle # | 26144 | 4.0 | 0.0 | $99.32 |
| | 401715 | Replace Exhaust Pipe on Vehicle #17332 F | 26144 | 3.0 | 0.0 | $74.49 |

| | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|
| **5877** | **Wilson, Jimmy  (continued)** | | **40.0** | **0.0** | **$1,458.40** |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| 10/01/2003 | | | | 8.0 | 0.0 | $291.68 |
| | 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $291.68 |
| 10/02/2003 | | | | 8.0 | 0.0 | $291.68 |
| | 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $291.68 |
| 10/03/2003 | | | | 8.0 | 0.0 | $291.68 |
| | 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 4.0 | 0.0 | $145.84 |
| | 488207 | Hauling Wood Chips to Public Gardens F | 26093 | 4.0 | 0.0 | $145.84 |
| 10/06/2003 | | | | 8.0 | 0.0 | $291.68 |
| | 438280 | Maint/Repair Road Signs on SB RC Pkwy | 51639 | 2.0 | 0.0 | $72.92 |
| | 438239 | Maint/Repair Road Signs on Beach Dr FY | 26716 | 4.0 | 0.0 | $145.84 |
| | 438279 | Maint/Repair Road Signs on NB RC Pkwy | 26130 | 2.0 | 0.0 | $72.92 |
| 10/07/2003 | | | | 8.0 | 0.0 | $291.68 |
| | 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $291.68 |
| | | **Hours and Cost Totals for Labor Group:** | | **217.0** | **0.0** | **$6,199.07** |



*Facility Management Software System*

# Labor Utilization By Date [Detail]

## Rock Creek Park

| 6849  Gaines, Gregory |
| --- |
| From: 10/1/2003   To: 10/7/2003 |
| Regular Hrs. = 40.0        O/T Hrs. = 0.0        Total Cost =  $574.00 |

*Note: Requires a valid value in the Park Alpha field on the LABOR Screen.*

Date Printed:  11/7/2005    9:11AM

Page 1 of 1

| Date | Description of Work | Loc. # | Regular Hours | O/T Hours | Total Cost |
| --- | --- | --- | --- | --- | --- |
| **10/1/2003** | | | **8.0** | **0.0** | **$114.80** |
| 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632a | 8.0 | 0.0 | $114.80 |
| **10/2/2003** | | | **8.0** | **0.0** | **$114.80** |
| 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $114.80 |
| **10/3/2003** | | | **8.0** | **0.0** | **$114.80** |
| 401127 | Paid Leave FY-2004 | ROCR | 8.0 | 0.0 | $114.80 |
| **10/6/2003** | | | **8.0** | **0.0** | **$114.80** |
| 438239 | Maint/Repair Road Signs on Beach Dr FY-2004 | 26716 | 4.0 | 0.0 | $57.40 |
| 438279 | Maint/Repair Road Signs on NB RC Pkwy FY-2004 | 26130 | 2.0 | 0.0 | $28.70 |
| 438280 | Maint/Repair Road Signs on SB RC Pkwy FY-2004 | 51639 | 2.0 | 0.0 | $28.70 |
| **10/7/2003** | | | **8.0** | **0.0** | **$114.80** |
| 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $114.80 |



*Facility Management Software System*

# Labor Utilization By Date [Detail]

### Rock Creek Park

| 6851  Talford, Terry |
| --- |
| From: 10/1/2003   To: 10/7/2003 |
| Regular Hrs. = 40.0        O/T Hrs. = 0.0        Total Cost = $800.00 |

*Note: Requires a valid value in the Park Alpha field on the LABOR SCREEN.*

Date Printed: 11/7/2005   9:12AM

Page 1 of 1

| Date | Description of Work | Loc. # | Regular Hours | O/T Hours | Total Cost |
| --- | --- | --- | --- | --- | --- |
| **10/1/2003** | | | **8.0** | **0.0** | **$160.00** |
| 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $160.00 |
| **10/2/2003** | | | **8.0** | **0.0** | **$160.00** |
| 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $160.00 |
| **10/3/2003** | | | **8.0** | **0.0** | **$160.00** |
| 401127 | Paid Leave FY-2004 | ROCR | 4.0 | 0.0 | $80.00 |
| 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 4.0 | 0.0 | $80.00 |
| **10/6/2003** | | | **8.0** | **0.0** | **$160.00** |
| 438280 | Maint/Repair Road Signs on SB RC Pkwy FY-2004 | 51639 | 8.0 | 0.0 | $160.00 |
| **10/7/2003** | | | **8.0** | **0.0** | **$160.00** |
| 423813 | Maint Paved Bike Trail #5 FY-2004 | 46632 | 8.0 | 0.0 | $160.00 |



*Facility Management Software System*

# Labor Utilization By Labor Group [Detail]

### 1346  ROCR Roads and Trails Crew

**From:** 10/15/2004    **To:** 10/15/2004

**Sorted By:**    Labor Name

**Total Number of Employees in this report:  8**

*Note: Requires a valid value in the Park Alpha field in Labor Groups.*

Date Printed: 11/4/2005  2:47PM

Page 1 of 2

| | | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
| **5843  Burrell, James** | | | | **8.0** | **0.0** | **$192.32** |
| Date | W/O # | Description of Work | Location # | | | |
| 10/15/2004 | | | | 8.0 | 0.0 | $192.32 |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $192.32 |
| **5844  Burton, James** | (continued) | | | **4.0** | **0.0** | **$105.84** |
| Date | W/O # | Description of Work | Location # | | | |
| 10/15/2004 | | | | 4.0 | 0.0 | $105.84 |
| | 552652 | Maint/Repair Road Signs on NB Rock Cre | 26130 | 4.0 | 0.0 | $105.84 |
| **5847  Carroll, Stanley** | (continued) | | | **4.0** | **0.0** | **$99.32** |
| Date | W/O # | Description of Work | Location # | | | |
| 10/15/2004 | | | | 4.0 | 0.0 | $99.32 |
| | 552652 | Maint/Repair Road Signs on NB Rock Cre | 26130 | 4.0 | 0.0 | $99.32 |
| **5849  Creek, Donald** | (continued) | | | **8.0** | **0.0** | **$178.08** |
| Date | W/O # | Description of Work | Location # | | | |
| 10/15/2004 | | | | 8.0 | 0.0 | $178.08 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 4.0 | 0.0 | $89.04 |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 4.0 | 0.0 | $89.04 |
| **5855  Forbes, Alfred** | (continued) | | | **8.0** | **0.0** | **$199.44** |
| Date | W/O # | Description of Work | Location # | | | |
| 10/15/2004 | | | | 8.0 | 0.0 | $199.44 |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $199.44 |
| **5859  Harris, Kevin** | (continued) | | | **8.0** | **0.0** | **$150.80** |
| Date | W/O # | Description of Work | Location # | | | |
| 10/15/2004 | | | | 8.0 | 0.0 | $150.80 |

| | | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
| **5859  Harris, Kevin** | (continued) | | | **8.0** | **0.0** | **$150.80** |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 4.0 | 0.0 | $75.40 |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 4.0 | 0.0 | $75.40 |

| | | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
| **5870  Rose, Louis** | (continued) | | | **8.0** | **0.0** | **$0.00** |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| **10/15/2004** | | | | **8.0** | **0.0** | **$0.00** |
| | 643997 | Labor Dept Compensation  (OWCP) FY-20 | ROCR | 8.0 | 0.0 | $0.00 |

| | | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
| **5877  Wilson, Jimmy** | (continued) | | | **4.0** | **0.0** | **$129.08** |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| **10/15/2004** | | | | **4.0** | **0.0** | **$129.08** |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 2.0 | 0.0 | $64.54 |
| | 552652 | Maint/Repair Road Signs on NB Rock Cre | 26130 | 2.0 | 0.0 | $64.54 |
| | | Hours and Cost Totals for Labor Group: | | 52.0 | 0.0 | $1,054.88 |



*Facility Management Software System*

# Labor Utilization By Labor Group [Detail]

### 1346  ROCR Roads and Trails Crew

**From:** 11/17/2004   **To:** 11/22/2004

**Sorted By:**   Labor  Code

**Total Number of Employees in this report:  8**

*Note: Requires a valid value in the Park Alpha field in Labor Groups.*          Date Printed:  11/4/2005   2:53PM

Page 1 of 4

| | | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
| **5843  Burrell, James** | | | | **32.0** | **0.0** | **$769.28** |
| **Date** | **W/O #** | **Description of Work** | **Location #** | | | |
| **11/17/2004** | | | | **8.0** | **0.0** | **$192.32** |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $192.32 |
| **11/18/2004** | | | | **8.0** | **0.0** | **$192.32** |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $192.32 |
| **11/19/2004** | | | | **8.0** | **0.0** | **$192.32** |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $192.32 |
| **11/22/2004** | | | | **8.0** | **0.0** | **$192.32** |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005 | 26716 | 8.0 | 0.0 | $192.32 |
| **5844  Burton, James  (continued)** | | | | **32.0** | **0.0** | **$846.72** |
| **Date** | **W/O #** | **Description of Work** | **Location #** | | | |
| **11/17/2004** | | | | **8.0** | **0.0** | **$211.68** |
| | 552463 | Maint Paved Trail from Wise Rd along Or | 46627 | 3.0 | 0.0 | $79.38 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 3.0 | 0.0 | $79.38 |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 2.0 | 0.0 | $52.92 |
| **11/18/2004** | | | | **8.0** | **0.0** | **$211.68** |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005 | 26716 | 4.0 | 0.0 | $105.84 |
| | 566242 | Clean Catch Basins on Piney Branch Parkw | 26724 | 4.0 | 0.0 | $105.84 |
| **11/19/2004** | | | | **8.0** | **0.0** | **$211.68** |
| | 552442 | Patch Potholes on Beach Drive FY-2005 | 26716 | 6.0 | 0.0 | $158.76 |
| | 554084 | Paid Leave FY-2005 | ROCR | 2.0 | 0.0 | $52.92 |
| **11/22/2004** | | | | **8.0** | **0.0** | **$211.68** |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005 | 26716 | 8.0 | 0.0 | $211.68 |
| **5847  Carroll, Stanley  (continued)** | | | | **32.0** | **0.0** | **$794.56** |
| **Date** | **W/O #** | **Description of Work** | **Location #** | | | |
| **11/17/2004** | | | | **8.0** | **0.0** | **$198.64** |

| | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|
| **5847   Carroll, Stanley  (continued)** | | | **32.0** | **0.0** | **$794.56** |
| **Date** | **W/O #** | **Description of Work**                          **Location #** | | | |
| | 554084 | Paid Leave FY-2005                                ROCR | 8.0 | 0.0 | $198.64 |
| **11/18/2004** | | | **8.0** | **0.0** | **$198.64** |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005    26716 | 4.0 | 0.0 | $99.32 |
| | 566242 | Clean Catch Basins on Piney Branch Parkw  26724 | 4.0 | 0.0 | $99.32 |
| **11/19/2004** | | | **8.0** | **0.0** | **$198.64** |
| | 552442 | Patch Potholes on Beach Drive FY-2005     26716 | 6.0 | 0.0 | $148.98 |
| | 552654 | Maint/Repair Road Signs on SB Rock Cre    51639 | 2.0 | 0.0 | $49.66 |
| **11/22/2004** | | | **8.0** | **0.0** | **$198.64** |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005    26716 | 8.0 | 0.0 | $198.64 |
| **5849   Creek, Donald  (continued)** | | | **32.0** | **0.0** | **$712.32** |
| **Date** | **W/O #** | **Description of Work**                          **Location #** | | | |
| **11/17/2004** | | | **8.0** | **0.0** | **$178.08** |
| | 552463 | Maint Paved Trail from Wise Rd along Or    46627 | 3.0 | 0.0 | $66.78 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S   46632 | 3.0 | 0.0 | $66.78 |
| | 552470 | Maint Paved Trail on Rock Creek Parkway  46633 | 2.0 | 0.0 | $44.52 |
| **11/18/2004** | | | **8.0** | **0.0** | **$178.08** |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005    26716 | 4.0 | 0.0 | $89.04 |
| | 566242 | Clean Catch Basins on Piney Branch Parkw  26724 | 4.0 | 0.0 | $89.04 |
| **11/19/2004** | | | **8.0** | **0.0** | **$178.08** |
| | 552442 | Patch Potholes on Beach Drive FY-2005     26716 | 5.5 | 0.0 | $122.43 |
| | 554084 | Paid Leave FY-2005                                ROCR | 2.5 | 0.0 | $55.65 |
| **11/22/2004** | | | **8.0** | **0.0** | **$178.08** |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S   46632 | 8.0 | 0.0 | $178.08 |
| **5855   Forbes, Alfred  (continued)** | | | **32.0** | **0.0** | **$797.76** |
| **Date** | **W/O #** | **Description of Work**                          **Location #** | | | |
| **11/17/2004** | | | **8.0** | **0.0** | **$199.44** |
| | 552463 | Maint Paved Trail from Wise Rd along Or    46627 | 3.0 | 0.0 | $74.79 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S   46632 | 3.0 | 0.0 | $74.79 |
| | 552470 | Maint Paved Trail on Rock Creek Parkway  46633 | 2.0 | 0.0 | $49.86 |
| **11/18/2004** | | | **8.0** | **0.0** | **$199.44** |
| | 554084 | Paid Leave FY-2005                                ROCR | 8.0 | 0.0 | $199.44 |
| **11/19/2004** | | | **8.0** | **0.0** | **$199.44** |
| | 552442 | Patch Potholes on Beach Drive FY-2005     26716 | 6.0 | 0.0 | $149.58 |
| | 552654 | Maint/Repair Road Signs on SB Rock Cre    51639 | 2.0 | 0.0 | $49.86 |
| **11/22/2004** | | | **8.0** | **0.0** | **$199.44** |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005    26716 | 8.0 | 0.0 | $199.44 |

| | | | Regular Hours | OT Hours | Total Cost |
|---|---|---|---|---|---|
| **5859  Harris, Kevin  (continued)** | | | **28.0** | **0.0** | **$526.12** |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| **11/17/2004** | | | | **8.0** | **0.0** | **$150.80** |
| | 552463 | Maint Paved Trail from Wise Rd along Or | 46627 | 3.0 | 0.0 | $56.55 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 3.0 | 0.0 | $56.55 |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 2.0 | 0.0 | $37.70 |
| **11/18/2004** | | | | **4.0** | **0.0** | **$75.40** |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005 | 26716 | 4.0 | 0.0 | $75.40 |
| **11/19/2004** | | | | **8.0** | **0.0** | **$150.80** |
| | 552442 | Patch Potholes on Beach Drive FY-2005 | 26716 | 6.0 | 0.0 | $113.10 |
| | 552654 | Maint/Repair Road Signs on SB Rock Cre | 51639 | 2.0 | 0.0 | $37.70 |
| **11/22/2004** | | | | **8.0** | **0.0** | **$149.12** |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 8.0 | 0.0 | $149.12 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **5870  Rose, Louis  (continued)** | | | | **32.0** | **0.0** | **$0.00** |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| **11/17/2004** | | | | **8.0** | **0.0** | **$0.00** |
| | 643997 | Labor Dept Compensation  (OWCP) FY-2( | ROCR | 8.0 | 0.0 | $0.00 |
| **11/18/2004** | | | | **8.0** | **0.0** | **$0.00** |
| | 643997 | Labor Dept Compensation  (OWCP) FY-2( | ROCR | 8.0 | 0.0 | $0.00 |
| **11/19/2004** | | | | **8.0** | **0.0** | **$0.00** |
| | 643997 | Labor Dept Compensation  (OWCP) FY-2( | ROCR | 8.0 | 0.0 | $0.00 |
| **11/22/2004** | | | | **8.0** | **0.0** | **$0.00** |
| | 643997 | Labor Dept Compensation  (OWCP) FY-2( | ROCR | 8.0 | 0.0 | $0.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **5877  Wilson, Jimmy  (continued)** | | | | **32.0** | **0.0** | **$1,032.64** |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| **11/17/2004** | | | | **8.0** | **0.0** | **$258.16** |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 2.0 | 0.0 | $64.54 |
| | 552463 | Maint Paved Trail from Wise Rd along Or | 46627 | 3.0 | 0.0 | $96.81 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 3.0 | 0.0 | $96.81 |
| **11/18/2004** | | | | **8.0** | **0.0** | **$258.16** |
| | 566242 | Clean Catch Basins on Piney Branch Parkw | 26724 | 3.0 | 0.0 | $96.81 |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005 | 26716 | 4.0 | 0.0 | $129.08 |
| | 552490 | FMSS/CESS Program FY-2005 | ROCR | 1.0 | 0.0 | $32.27 |
| **11/19/2004** | | | | **8.0** | **0.0** | **$258.16** |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $258.16 |
| **11/22/2004** | | | | **8.0** | **0.0** | **$258.16** |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $258.16 |

| | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|
| **Hours and Cost Totals for Labor Group:** | **252.0** | **0.0** | **$5,479.40** |



*Facility Management Software System*

# Labor Utilization By Labor Group [Detail]

### 1346  ROCR Roads and Trails Crew

**From:** 12/26/2004   **To:** 12/30/2004

**Sorted By:   Labor Code**

**Total Number of Employees in this report:  8**

*Note: Requires a valid value in the Park Alpha field in Labor Groups.*

Date Printed:  11/4/2005   2:57PM

Page 1 of 4

| | | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
| **5843  Burrell, James** | | | | **30.5** | **0.0** | **$733.22** |
| **Date** | **W/O #** | **Description of Work** | **Location #** | | | |
| **12/27/2004** | | | | **8.0** | **0.0** | **$192.32** |
| | 552471 | Turn Lights On/Off Road Gates on Beach I | 26716 | 1.5 | 0.0 | $36.06 |
| | 552640 | Maint/Repair Road Signs on Beach Dr FY- | 26716 | 2.5 | 0.0 | $60.10 |
| | 620130 | Remove Parking Meter at Thompson Boat | 51807 | 4.0 | 0.0 | $96.16 |
| **12/28/2004** | | | | **8.0** | **0.0** | **$192.32** |
| | 619322 | PM Service on Kubota #49056 FY-2005 | 26144 | 2.0 | 0.0 | $48.08 |
| | 615628 | PM Service on Sweeper #64885 FY-2005 | 26144 | 5.0 | 0.0 | $120.20 |
| | 552652 | Maint/Repair Road Signs on NB Rock Cre | 26130 | 1.0 | 0.0 | $24.04 |
| **12/29/2004** | | | | **8.0** | **0.0** | **$192.32** |
| | 615639 | PM Service on Vehicle #49059 FY-2005 | 26144 | 2.0 | 0.0 | $48.08 |
| | 615628 | PM Service on Sweeper #64885 FY-2005 | 26144 | 6.0 | 0.0 | $144.24 |
| **12/30/2004** | | | | **6.5** | **0.0** | **$156.26** |
| | 598968 | PM Service on Vehicle #55814 FY-2005 | 26144 | 1.5 | 0.0 | $36.06 |
| | 552603 | Sweep Roadways on Blagden Ave FY-200 | 26719 | 2.0 | 0.0 | $48.08 |
| | 552583 | Sweep Roadways on Piney Branch Parkwa | 26724 | 3.0 | 0.0 | $72.12 |
| **5844  Burton, James  (continued)** | | | | **34.0** | **0.0** | **$899.64** |
| **Date** | **W/O #** | **Description of Work** | **Location #** | | | |
| **12/27/2004** | | | | **8.0** | **0.0** | **$211.68** |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 5.0 | 0.0 | $132.30 |
| | 598967 | Service Bobcat #48901 FY-2005 | 26144 | 2.0 | 0.0 | $52.92 |
| | 619322 | PM Service on Kubota #49056 FY-2005 | 26144 | 1.0 | 0.0 | $26.46 |
| **12/28/2004** | | | | **8.0** | **0.0** | **$211.68** |
| | 552700 | Emptying Litter Containers thru-out RCP F | 26093 | 3.0 | 0.0 | $79.38 |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 5.0 | 0.0 | $132.30 |
| **12/29/2004** | | | | **10.0** | **0.0** | **$264.60** |
| | 552666 | Maint/Repair Cross Trail #4 FY-2005 | 26750 | 4.0 | 0.0 | $105.84 |
| | 552668 | Maint/Repair Cross Trail #5 FY-2005 | 26751 | 4.0 | 0.0 | $105.84 |

| | | | | Regular Hours | OT Hours | Total Cost |
|---|---|---|---|---|---|---|

**5844  Burton, James  (continued)** — 34.0 — 0.0 — $899.64

| Date | W/O # | Description of Work | Location # | Regular Hours | OT Hours | Total Cost |
|---|---|---|---|---|---|---|
| | 615639 | PM Service on Vehicle #49059 FY-2005 | 26144 | 2.0 | 0.0 | $52.92 |
| **12/30/2004** | | | | **8.0** | **0.0** | **$211.68** |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 8.0 | 0.0 | $211.68 |

**5847  Carroll, Stanley  (continued)** — 40.0 — 0.0 — $993.21

| Date | W/O # | Description of Work | Location # | Regular Hours | OT Hours | Total Cost |
|---|---|---|---|---|---|---|
| **12/27/2004** | | | | **8.0** | **0.0** | **$198.65** |
| | 616370 | Replace Bollards on Beach Dr FY-2005 | 26716 | 0.0 | 0.0 | $0.00 |
| | 552471 | Turn Lights On/Off Road Gates on Beach I | 26716 | 1.5 | 0.0 | $37.25 |
| | 552640 | Maint/Repair Road Signs on Beach Dr FY- | 26716 | 2.5 | 0.0 | $62.08 |
| | 620130 | Remove Parking Meter at Thompson Boat ( | 51807 | 4.0 | 0.0 | $99.32 |
| **12/28/2004** | | | | **16.0** | **0.0** | **$397.28** |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $198.64 |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $198.64 |
| **12/29/2004** | | | | **8.0** | **0.0** | **$198.64** |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $198.64 |
| **12/30/2004** | | | | **8.0** | **0.0** | **$198.64** |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $198.64 |

**5849  Creek, Donald  (continued)** — 32.0 — 0.0 — $829.76

| Date | W/O # | Description of Work | Location # | Regular Hours | OT Hours | Total Cost |
|---|---|---|---|---|---|---|
| **12/27/2004** | | | | **8.0** | **0.0** | **$207.44** |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $207.44 |
| **12/28/2004** | | | | **8.0** | **0.0** | **$207.44** |
| | 552474 | Administration FY-2005 | ROCR | 8.0 | 0.0 | $207.44 |
| **12/29/2004** | | | | **8.0** | **0.0** | **$207.44** |
| | 552474 | Administration FY-2005 | ROCR | 8.0 | 0.0 | $207.44 |
| **12/30/2004** | | | | **8.0** | **0.0** | **$207.44** |
| | 552474 | Administration FY-2005 | ROCR | 8.0 | 0.0 | $207.44 |

**5855  Forbes, Alfred  (continued)** — 24.5 — 0.0 — $610.79

| Date | W/O # | Description of Work | Location # | Regular Hours | OT Hours | Total Cost |
|---|---|---|---|---|---|---|
| **12/27/2004** | | | | **4.0** | **0.0** | **$99.72** |
| | 554084 | Paid Leave FY-2005 | ROCR | 4.0 | 0.0 | $99.72 |
| **12/28/2004** | | | | **8.0** | **0.0** | **$199.44** |
| | 619322 | PM Service on Kubota #49056 FY-2005 | 26144 | 2.0 | 0.0 | $49.86 |
| | 615628 | PM Service on Sweeper #64885 FY-2005 | 26144 | 5.0 | 0.0 | $124.65 |
| | 552652 | Maint/Repair Road Signs on NB Rock Cre | 26130 | 1.0 | 0.0 | $24.93 |
| **12/29/2004** | | | | **6.0** | **0.0** | **$149.58** |

| Date | W/O # | Description of Work | Location # | Regular Hours | O/T Hours | Total Cost |
|------|-------|---------------------|------------|---------------|-----------|------------|
| **5855  Forbes, Alfred  (continued)** | | | | 24.5 | 0.0 | $610.79 |
| | 615628 | PM Service on Sweeper #64885 FY-2005 | 26144 | 6.0 | 0.0 | $149.58 |
| **12/30/2004** | | | | 6.5 | 0.0 | $162.05 |
| | 598968 | PM Service on Vehicle #55814 FY-2005 | 26144 | 1.5 | 0.0 | $37.40 |
| | 552603 | Sweep Roadways on Blagden Ave FY-200 | 26719 | 1.0 | 0.0 | $24.93 |
| | 552583 | Sweep Roadways on Piney Branch Parkwa | 26724 | 4.0 | 0.0 | $99.72 |
| **5859  Harris, Kevin  (continued)** | | | | 34.0 | 0.0 | $640.90 |

| Date | W/O # | Description of Work | Location # | | | |
|------|-------|---------------------|------------|---|---|---|
| **12/27/2004** | | | | 8.0 | 0.0 | $150.80 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 5.0 | 0.0 | $94.25 |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 3.0 | 0.0 | $56.55 |
| **12/28/2004** | | | | 8.0 | 0.0 | $150.80 |
| | 552700 | Emptying Litter Containers thru-out RCP F | 26093 | 3.0 | 0.0 | $56.55 |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 5.0 | 0.0 | $94.25 |
| **12/29/2004** | | | | 10.0 | 0.0 | $188.50 |
| | 618115 | Snow & Ice Removal thru-out RCP FY-20 | 26093 | 2.0 | 0.0 | $37.70 |
| | 552666 | Maint/Repair Cross Trail #4 FY-2005 | 26750 | 4.0 | 0.0 | $75.40 |
| | 552668 | Maint/Repair Cross Trail #5 FY-2005 | 26751 | 4.0 | 0.0 | $75.40 |
| **12/30/2004** | | | | 8.0 | 0.0 | $150.80 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 8.0 | 0.0 | $150.80 |
| **5870  Rose, Louis  (continued)** | | | | 32.0 | 0.0 | -$102.72 |

| Date | W/O # | Description of Work | Location # | | | |
|------|-------|---------------------|------------|---|---|---|
| **12/27/2004** | | | | 8.0 | 0.0 | -$25.68 |
| | 554091 | Workman's Compensation (COP) FY-2005 | ROCR | 8.0 | 0.0 | $198.64 |
| | 554091 | Workman's Compensation (COP) FY-2005 | ROCR | -8.0 | 0.0 | -$224.32 |
| | 643997 | Labor Dept Compensation  (OWCP) FY-2( | ROCR | 8.0 | 0.0 | $0.00 |
| **12/28/2004** | | | | 8.0 | 0.0 | -$25.68 |
| | 554091 | Workman's Compensation (COP) FY-2005 | ROCR | 8.0 | 0.0 | $198.64 |
| | 554091 | Workman's Compensation (COP) FY-2005 | ROCR | -8.0 | 0.0 | -$224.32 |
| | 643997 | Labor Dept Compensation  (OWCP) FY-2( | ROCR | 8.0 | 0.0 | $0.00 |
| **12/29/2004** | | | | 8.0 | 0.0 | -$25.68 |
| | 554091 | Workman's Compensation (COP) FY-2005 | ROCR | 8.0 | 0.0 | $198.64 |
| | 554091 | Workman's Compensation (COP) FY-2005 | ROCR | -8.0 | 0.0 | -$224.32 |
| | 643997 | Labor Dept Compensation  (OWCP) FY-2( | ROCR | 8.0 | 0.0 | $0.00 |
| **12/30/2004** | | | | 8.0 | 0.0 | -$25.68 |
| | 554091 | Workman's Compensation (COP) FY-2005 | ROCR | 8.0 | 0.0 | $198.64 |
| | 554091 | Workman's Compensation (COP) FY-2005 | ROCR | -8.0 | 0.0 | -$224.32 |
| | 643997 | Labor Dept Compensation  (OWCP) FY-2( | ROCR | 8.0 | 0.0 | $0.00 |

| | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|
| 5877 | Wilson, Jimmy (continued) | | 32.0 | 0.0 | $1,032.64 |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| 12/27/2004 | | | | 8.0 | 0.0 | $258.16 |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $258.16 |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $258.16 |
| | 554084 | Paid Leave FY-2005 | ROCR | -8.0 | 0.0 | -$258.16 |
| 12/28/2004 | | | | 8.0 | 0.0 | $258.16 |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $258.16 |
| 12/29/2004 | | | | 8.0 | 0.0 | $258.16 |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $258.16 |
| 12/30/2004 | | | | 8.0 | 0.0 | $258.16 |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $258.16 |
| | | Hours and Cost Totals for Labor Group: | | 259.0 | 0.0 | $5,637.44 |



*Facility Management Software System*

# Labor Utilization By Labor Group [Detail]

### 1346 ROCR Roads and Trails Crew

From: 2/1/2005   To: 2/2/2005

Sorted By:   Labor Code

**Total Number of Employees in this report:  8**

*Note: Requires a valid value in the Park Alpha field in Labor Groups.*

Date Printed: 11/4/2005   2:59PM

Page 1 of 2

| Date | W/O # | Description of Work | Location # | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
| **5843  Burrell, James** | | | | **16.0** | **0.0** | **$447.04** |
| **Date** | **W/O #** | **Description of Work** | **Location #** | | | |
| **02/01/2005** | | | | **8.0** | **0.0** | **$223.52** |
| | 634290 | PM Service on Snow Plows FY-2005 | 26144 | 7.0 | 0.0 | $195.58 |
| | 552471 | Turn Lights On/Off Road Gates on Beach I | 26716 | 1.0 | 0.0 | $27.94 |
| **02/02/2005** | | | | **8.0** | **0.0** | **$223.52** |
| | 615639 | PM Service on Vehicle #49059 FY-2005 | 26144 | 8.0 | 0.0 | $223.52 |
| **5844  Burton, James  (continued)** | | | | **13.0** | **0.0** | **$404.69** |
| **Date** | **W/O #** | **Description of Work** | **Location #** | | | |
| **02/01/2005** | | | | **5.0** | **0.0** | **$155.65** |
| | 593478 | PM Service on Vehicle #55789 FY-2005 | 26144 | 3.0 | 0.0 | $93.39 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 2.0 | 0.0 | $62.26 |
| **02/02/2005** | | | | **8.0** | **0.0** | **$249.04** |
| | 552467 | Maint Paved Trail on Glover Rd South to E | 46630 | 3.0 | 0.0 | $93.39 |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 3.0 | 0.0 | $93.39 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 2.0 | 0.0 | $62.26 |
| **5847  Carroll, Stanley  (continued)** | | | | **16.0** | **0.0** | **$448.64** |
| **Date** | **W/O #** | **Description of Work** | **Location #** | | | |
| **02/01/2005** | | | | **8.0** | **0.0** | **$224.32** |
| | 634290 | PM Service on Snow Plows FY-2005 | 26144 | 7.0 | 0.0 | $196.28 |
| | 552471 | Turn Lights On/Off Road Gates on Beach I | 26716 | 1.0 | 0.0 | $28.04 |
| **02/02/2005** | | | | **8.0** | **0.0** | **$224.32** |
| | 552467 | Maint Paved Trail on Glover Rd South to E | 46630 | 3.0 | 0.0 | $84.12 |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 3.0 | 0.0 | $84.12 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 2.0 | 0.0 | $56.08 |
| **5849  Creek, Donald  (continued)** | | | | **8.0** | **0.0** | **$207.44** |
| **Date** | **W/O #** | **Description of Work** | **Location #** | | | |

| | | | | Regular Hours | OH Hours | Total Cost |
|---|---|---|---|---|---|---|
| **5849  Creek, Donald  (continued)** | | | | 8.0 | 0.0 | $207.44 |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| **02/02/2005** | | | | 8.0 | 0.0 | $207.44 |
| | 552474 | Administration FY-2005 | ROCR | 8.0 | 0.0 | $207.44 |
| **5855  Forbes, Alfred  (continued)** | | | | 16.0 | 0.0 | $447.04 |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| **02/01/2005** | | | | 8.0 | 0.0 | $223.52 |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $223.52 |
| **02/02/2005** | | | | 8.0 | 0.0 | $223.52 |
| | 615639 | PM Service on Vehicle #49059 FY-2005 | 26144 | 8.0 | 0.0 | $223.52 |
| **5859  Harris, Kevin  (continued)** | | | | 16.0 | 0.0 | $350.56 |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| **02/01/2005** | | | | 8.0 | 0.0 | $175.28 |
| | 552467 | Maint Paved Trail on Glover Rd South to E | 46630 | 2.0 | 0.0 | $43.82 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 2.0 | 0.0 | $43.82 |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 4.0 | 0.0 | $87.64 |
| **02/02/2005** | | | | 8.0 | 0.0 | $175.28 |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $175.28 |
| **5870  Rose, Louis  (continued)** | | | | 16.0 | 0.0 | $0.00 |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| **02/01/2005** | | | | 8.0 | 0.0 | $0.00 |
| | 643997 | Labor Dept Compensation (OWCP) FY-20 | ROCR | 8.0 | 0.0 | $0.00 |
| **02/02/2005** | | | | 8.0 | 0.0 | $0.00 |
| | 643997 | Labor Dept Compensation (OWCP) FY-20 | ROCR | 8.0 | 0.0 | $0.00 |
| **5877  Wilson, Jimmy  (continued)** | | | | 16.0 | 0.0 | $583.36 |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| **02/01/2005** | | | | 8.0 | 0.0 | $291.68 |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $291.68 |
| **02/02/2005** | | | | 8.0 | 0.0 | $291.68 |
| | 615639 | PM Service on Vehicle #49059 FY-2005 | 26144 | 6.0 | 0.0 | $218.76 |
| | 552467 | Maint Paved Trail on Glover Rd South to E | 46630 | 2.0 | 0.0 | $72.92 |
| | | **Hours and Cost Totals for Labor Group:** | | 117.0 | 0.0 | $2,888.77 |



*Facility Management Software System*

# Labor Utilization By Labor Group [Detail]

### 1346  ROCR Roads and Trails Crew

From: 2/22/2005   To: 2/25/2005

Sorted By:   Labor Code

**Total Number of Employees in this report:  8**

*Note: Requires a valid value in the Park Alpha field in Labor Groups.*

Date Printed: 11/4/2005  3:02PM

Page 1 of 4

| | | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
| **5843  Burrell, James** | | | | 35.0 | 0.0 | $977.90 |
| **Date** | **W/O #** | **Description of Work** | **Location #** | | | |
| **02/22/2005** | | | | 8.0 | 0.0 | $223.52 |
| | 552471 | Turn Lights On/Off Road Gates on Beach I | 26716 | 1.0 | 0.0 | $27.94 |
| | 552647 | Maint/Repair Road Signs on Glover Rd F | 26720 | 5.0 | 0.0 | $139.70 |
| | 552642 | Maint/Repair Road Signs on Piney Branch | 26724 | 2.0 | 0.0 | $55.88 |
| **02/23/2005** | | | | 11.0 | 0.0 | $307.34 |
| | 586609 | Clean Equip Bay/Storage Area in Maint Ya | 26122 | 3.0 | 0.0 | $83.82 |
| | 615639 | PM Service on Vehicle #49059 FY-2005 | 26144 | 3.0 | 0.0 | $83.82 |
| | 593476 | PM Service on Vehicle #55813 FY-2005 | 26144 | 3.0 | 0.0 | $83.82 |
| | 552640 | Maint/Repair Road Signs on Beach Dr FY- | 26716 | 2.0 | 0.0 | $55.88 |
| **02/24/2005** | | | | 8.0 | 0.0 | $223.52 |
| | 618115 | Snow & Ice Removal thru-out RCP FY-20 | 26093 | 8.0 | 0.0 | $223.52 |
| **02/25/2005** | | | | 8.0 | 0.0 | $223.52 |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $223.52 |
| **5844  Burton, James  (continued)** | | | | 29.0 | 0.0 | $902.77 |
| **Date** | **W/O #** | **Description of Work** | **Location #** | | | |
| **02/22/2005** | | | | 8.0 | 0.0 | $249.04 |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 4.0 | 0.0 | $124.52 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 3.0 | 0.0 | $93.39 |
| | 615639 | PM Service on Vehicle #49059 FY-2005 | 26144 | 1.0 | 0.0 | $31.13 |
| **02/23/2005** | | | | 5.0 | 0.0 | $155.65 |
| | 615639 | PM Service on Vehicle #49059 FY-2005 | 26144 | 5.0 | 0.0 | $155.65 |
| **02/24/2005** | | | | 8.0 | 0.0 | $249.04 |
| | 618115 | Snow & Ice Removal thru-out RCP FY-20 | 26093 | 8.0 | 0.0 | $249.04 |
| **02/25/2005** | | | | 8.0 | 0.0 | $249.04 |
| | 618115 | Snow & Ice Removal thru-out RCP FY-20 | 26093 | 8.0 | 0.0 | $249.04 |

| | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|
| 5847 | Carroll, Stanley (continued) | | 35.0 | 0.0 | $981.40 |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| **02/22/2005** | | | | 8.0 | 0.0 | $224.32 |
| | 552471 | Turn Lights On/Off Road Gates on Beach I | 26716 | 1.0 | 0.0 | $28.04 |
| | 552647 | Maint/Repair Road Signs on Glover Rd F | 26720 | 5.0 | 0.0 | $140.20 |
| | 552642 | Maint/Repair Road Signs on Piney Branch | 26724 | 2.0 | 0.0 | $56.08 |
| **02/23/2005** | | | | 8.0 | 0.0 | $224.32 |
| | 615639 | PM Service on Vehicle #49059 FY-2005 | 26144 | 3.0 | 0.0 | $84.12 |
| | 593476 | PM Service on Vehicle #55813 FY-2005 | 26144 | 3.0 | 0.0 | $84.12 |
| | 552640 | Maint/Repair Road Signs on Beach Dr FY- | 26716 | 2.0 | 0.0 | $56.08 |
| **02/24/2005** | | | | 8.0 | 0.0 | $224.32 |
| | 618115 | Snow & Ice Removal thru-out RCP FY-20 | 26093 | 8.0 | 0.0 | $224.32 |
| **02/25/2005** | | | | 11.0 | 0.0 | $308.44 |
| | 554084 | Paid Leave FY-2005 | ROCR | 5.5 | 0.0 | $154.22 |
| | 662308 | Powerwash Edgewater Stables FY-2005 | 26132 | 4.0 | 0.0 | $112.16 |
| | 598968 | PM Service on Vehicle #55814 FY-2005 | 26144 | 1.5 | 0.0 | $42.06 |

| | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|
| 5849 | Creek, Donald (continued) | | 32.0 | 0.0 | $829.76 |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| **02/22/2005** | | | | 8.0 | 0.0 | $207.44 |
| | 552474 | Administration FY-2005 | ROCR | 8.0 | 0.0 | $207.44 |
| **02/23/2005** | | | | 8.0 | 0.0 | $207.44 |
| | 552474 | Administration FY-2005 | ROCR | 8.0 | 0.0 | $207.44 |
| **02/24/2005** | | | | 8.0 | 0.0 | $207.44 |
| | 552474 | Administration FY-2005 | ROCR | 8.0 | 0.0 | $207.44 |
| **02/25/2005** | | | | 8.0 | 0.0 | $207.44 |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $207.44 |

| | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|
| 5855 | Forbes, Alfred (continued) | | 32.0 | 0.0 | $894.08 |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| **02/22/2005** | | | | 8.0 | 0.0 | $223.52 |
| | 552582 | Sweep Roadways on Beach Dr FY-2005 | 26716 | 3.0 | 0.0 | $83.82 |
| | 552581 | Sweep Roadways on Ross Dr FY-2005 | 26725 | 1.0 | 0.0 | $27.94 |
| | 552589 | Sweep Roadways on Glover Rd FY-2005 | 26720 | 1.0 | 0.0 | $27.94 |
| | 552585 | Sweep Roadways on Joyce Rd FY-2005 | 26722 | 1.0 | 0.0 | $27.94 |
| | 552588 | Sweep Roadways on Wise Rd FY-2005 | 26729 | 1.0 | 0.0 | $27.94 |
| | 615628 | PM Service on Sweeper #64885 FY-2005 | 26144 | 1.0 | 0.0 | $27.94 |
| **02/23/2005** | | | | 8.0 | 0.0 | $223.52 |
| | 615639 | PM Service on Vehicle #49059 FY-2005 | 26144 | 1.0 | 0.0 | $27.94 |
| | 593478 | PM Service on Vehicle #55789 FY-2005 | 26144 | 2.0 | 0.0 | $55.88 |
| | 593476 | PM Service on Vehicle #55813 FY-2005 | 26144 | 1.0 | 0.0 | $27.94 |
| | 552582 | Sweep Roadways on Beach Dr FY-2005 | 26716 | 2.0 | 0.0 | $55.88 |

| Date | W/O # | Description of Work | Location # | Regular Hours | OT Hours | Total Cost |
|------|-------|---------------------|------------|---------------|----------|------------|
| **5855  Forbes, Alfred  (continued)** | | | | **32.0** | **0.0** | **$894.08** |
| | 615628 | PM Service on Sweeper #64885 FY-2005 | 26144 | 1.0 | 0.0 | $27.94 |
| | 598968 | PM Service on Vehicle #55814 FY-2005 | 26144 | 1.0 | 0.0 | $27.94 |
| **02/24/2005** | | | | **8.0** | **0.0** | **$223.52** |
| | 618115 | Snow & Ice Removal thru-out RCP FY-20 | 26093 | 8.0 | 0.0 | $223.52 |
| **02/25/2005** | | | | **8.0** | **0.0** | **$223.52** |
| | 662308 | Powerwash Edgewater Stables FY-2005 | 26132 | 4.0 | 0.0 | $111.76 |
| | 598968 | PM Service on Vehicle #55814 FY-2005 | 26144 | 2.0 | 0.0 | $55.88 |
| | 593476 | PM Service on Vehicle #55813 FY-2005 | 26144 | 2.0 | 0.0 | $55.88 |
| **5859  Harris, Kevin  (continued)** | | | | **32.0** | **0.0** | **$701.12** |

| Date | W/O # | Description of Work | Location # | Regular Hours | OT Hours | Total Cost |
|------|-------|---------------------|------------|---------------|----------|------------|
| **02/22/2005** | | | | **8.0** | **0.0** | **$175.28** |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 4.0 | 0.0 | $87.64 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 3.0 | 0.0 | $65.73 |
| | 615639 | PM Service on Vehicle #49059 FY-2005 | 26144 | 1.0 | 0.0 | $21.91 |
| **02/23/2005** | | | | **8.0** | **0.0** | **$175.28** |
| | 615639 | PM Service on Vehicle #49059 FY-2005 | 26144 | 3.0 | 0.0 | $65.73 |
| | 593478 | PM Service on Vehicle #55789 FY-2005 | 26144 | 2.0 | 0.0 | $43.82 |
| | 593478 | PM Service on Vehicle #55789 FY-2005 | 26144 | 3.0 | 0.0 | $65.73 |
| **02/24/2005** | | | | **8.0** | **0.0** | **$175.28** |
| | 618115 | Snow & Ice Removal thru-out RCP FY-20 | 26093 | 8.0 | 0.0 | $175.28 |
| **02/25/2005** | | | | **8.0** | **0.0** | **$175.28** |
| | 618115 | Snow & Ice Removal thru-out RCP FY-20 | 26093 | 8.0 | 0.0 | $175.28 |
| **5870  Rose, Louis  (continued)** | | | | **32.0** | **0.0** | **$897.28** |

| Date | W/O # | Description of Work | Location # | Regular Hours | OT Hours | Total Cost |
|------|-------|---------------------|------------|---------------|----------|------------|
| **02/22/2005** | | | | **8.0** | **0.0** | **$224.32** |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $224.32 |
| **02/23/2005** | | | | **8.0** | **0.0** | **$224.32** |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $224.32 |
| **02/24/2005** | | | | **8.0** | **0.0** | **$224.32** |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $224.32 |
| **02/25/2005** | | | | **8.0** | **0.0** | **$224.32** |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $224.32 |
| **5877  Wilson, Jimmy  (continued)** | | | | **31.0** | **0.0** | **$1,130.26** |

| Date | W/O # | Description of Work | Location # | Regular Hours | OT Hours | Total Cost |
|------|-------|---------------------|------------|---------------|----------|------------|
| **02/22/2005** | | | | **8.0** | **0.0** | **$291.68** |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 2.0 | 0.0 | $72.92 |

|  |  |  | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
| 5877 | Wilson, Jimmy | (continued) | | **31.0** | **0.0** | **$1,130.26** |

| Date | W/O # | Description of Work | Location # | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
|  | 552647 | Maint/Repair Road Signs on Glover Rd F | 26720 | 2.0 | 0.0 | $72.92 |
|  | 552582 | Sweep Roadways on Beach Dr FY-2005 | 26716 | 1.0 | 0.0 | $36.46 |
|  | 552581 | Sweep Roadways on Ross Dr FY-2005 | 26725 | 0.5 | 0.0 | $18.23 |
|  | 552588 | Sweep Roadways on Wise Rd FY-2005 | 26729 | 0.5 | 0.0 | $18.23 |
|  | 554084 | Paid Leave FY-2005 | ROCR | 1.0 | 0.0 | $36.46 |
|  | 552490 | FMSS/CESS Program FY-2005 | ROCR | 1.0 | 0.0 | $36.46 |
| 02/23/2005 |  |  |  | 7.0 | 0.0 | $255.22 |
|  | 615639 | PM Service on Vehicle #49059 FY-2005 | 26144 | 3.0 | 0.0 | $109.38 |
|  | 593476 | PM Service on Vehicle #55813 FY-2005 | 26144 | 3.0 | 0.0 | $109.38 |
|  | 552640 | Maint/Repair Road Signs on Beach Dr FY- | 26716 | 1.0 | 0.0 | $36.46 |
| 02/24/2005 |  |  |  | 8.0 | 0.0 | $291.68 |
|  | 618115 | Snow & Ice Removal thru-out RCP FY-20 | 26093 | 8.0 | 0.0 | $291.68 |
| 02/25/2005 |  |  |  | 8.0 | 0.0 | $291.68 |
|  | 618115 | Snow & Ice Removal thru-out RCP FY-20 | 26093 | 4.0 | 0.0 | $145.84 |
|  | 662308 | Powerwash Edgewater Stables FY-2005 | 26132 | 2.0 | 0.0 | $72.92 |
|  | 552463 | Maint Paved Trail from Wise Rd along Or | 46627 | 0.5 | 0.0 | $18.23 |
|  | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 0.5 | 0.0 | $18.23 |
|  | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 1.0 | 0.0 | $36.46 |
|  |  | **Hours and Cost Totals for Labor Group:** |  | **258.0** | **0.0** | **$7,314.57** |



*Facility Management Software System*

# Labor Utilization By Labor Group [Detail]

### 1346 ROCR Roads and Trails Crew

**From:** 3/24/2005  **To:** 3/30/2005

**Sorted By:**  Labor  Code

**Total Number of Employees in this report: 7**

*Note: Requires a valid value in the Park Alpha field in Labor Groups.*

Date Printed: 11/4/2005   3:04PM

Page 1 of 4

| | | | Location # | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
| | | | | 40.0 | 0.0 | $1,117.60 |
| **5843  Burrell, James** | | | | | | |
| Date | W/O # | Description of Work | Location # | | | |
| 03/24/2005 | | | | 8.0 | 0.0 | $223.52 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 8.0 | 0.0 | $223.52 |
| 03/28/2005 | | | | 8.0 | 0.0 | $223.52 |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005 | 26716 | 6.5 | 0.0 | $181.61 |
| | 552475 | Safety Program FY-2005 | ROCR | 0.5 | 0.0 | $13.97 |
| | 552471 | Turn Lights On/Off Road Gates on Beach I | 26716 | 1.0 | 0.0 | $27.94 |
| 03/29/2005 | | | | 16.0 | 0.0 | $447.04 |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005 | 26716 | 8.0 | 0.0 | $223.52 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 8.0 | 0.0 | $223.52 |
| 03/30/2005 | | | | 8.0 | 0.0 | $223.52 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 6.0 | 0.0 | $167.64 |
| | 552442 | Patch Potholes on Beach Drive FY-2005 | 26716 | 2.0 | 0.0 | $55.88 |
| **5844  Burton, James  (continued)** | | | | 44.0 | 0.0 | $1,369.73 |
| Date | W/O # | Description of Work | Location # | | | |
| 03/24/2005 | | | | 8.0 | 0.0 | $249.04 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 8.0 | 0.0 | $249.04 |
| 03/25/2005 | | | | 4.0 | 0.0 | $124.52 |
| | 552460 | Patch Potholes Southbound Rock Creek Pa | 51639 | 2.0 | 0.0 | $62.26 |
| | 552442 | Patch Potholes on Beach Drive FY-2005 | 26716 | 2.0 | 0.0 | $62.26 |
| 03/28/2005 | | | | 8.0 | 0.0 | $249.05 |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005 | 26716 | 7.5 | 0.0 | $233.48 |
| | 552475 | Safety Program FY-2005 | ROCR | 0.5 | 0.0 | $15.57 |
| 03/29/2005 | | | | 16.0 | 0.0 | $498.08 |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005 | 26716 | 8.0 | 0.0 | $249.04 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 8.0 | 0.0 | $249.04 |
| 03/30/2005 | | | | 8.0 | 0.0 | $249.04 |

| | | | Regular Hours | O.T. Hours | Total Cost |
|---|---|---|---|---|---|
| **5844   Burton, James  (continued)** | | | **44.0** | **0.0** | **$1,369.73** |

| Date | W/O # | Description of Work | Location # | | |
|---|---|---|---|---|---|
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 6.0 | 0.0 | $186.78 |
| | 552442 | Patch Potholes on Beach Drive FY-2005 | 26716 | 2.0 | 0.0 | $62.26 |

| | | | Regular | O.T. | Total |
|---|---|---|---|---|---|
| **5847   Carroll, Stanley  (continued)** | | | **16.0** | **0.0** | **$448.64** |

| Date | W/O # | Description of Work | Location # | | |
|---|---|---|---|---|---|
| **03/24/2005** | | | **8.0** | **0.0** | **$224.32** |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 8.0 | 0.0 | $224.32 |
| **03/28/2005** | | | **8.0** | **0.0** | **$224.32** |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005 | 26716 | 6.5 | 0.0 | $182.26 |
| | 552475 | Safety Program FY-2005 | ROCR | 0.5 | 0.0 | $14.02 |
| | 552471 | Turn Lights On/Off Road Gates on Beach I | 26716 | 1.0 | 0.0 | $28.04 |

| | | | Regular | O.T. | Total |
|---|---|---|---|---|---|
| **5849   Creek, Donald  (continued)** | | | **40.0** | **0.0** | **$1,037.20** |

| Date | W/O # | Description of Work | Location # | | |
|---|---|---|---|---|---|
| **03/24/2005** | | | **8.0** | **0.0** | **$207.44** |
| | 552474 | Administration FY-2005 | ROCR | 8.0 | 0.0 | $207.44 |
| **03/25/2005** | | | **8.0** | **0.0** | **$207.44** |
| | 552474 | Administration FY-2005 | ROCR | 8.0 | 0.0 | $207.44 |
| **03/28/2005** | | | **8.0** | **0.0** | **$207.44** |
| | 552474 | Administration FY-2005 | ROCR | 8.0 | 0.0 | $207.44 |
| **03/29/2005** | | | **8.0** | **0.0** | **$207.44** |
| | 552474 | Administration FY-2005 | ROCR | 8.0 | 0.0 | $207.44 |
| **03/30/2005** | | | **8.0** | **0.0** | **$207.44** |
| | 552474 | Administration FY-2005 | ROCR | 8.0 | 0.0 | $207.44 |

| | | | Regular | O.T. | Total |
|---|---|---|---|---|---|
| **5855   Forbes, Alfred  (continued)** | | | **44.0** | **0.0** | **$1,229.36** |

| Date | W/O # | Description of Work | Location # | | |
|---|---|---|---|---|---|
| **03/24/2005** | | | **8.0** | **0.0** | **$223.52** |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 8.0 | 0.0 | $223.52 |
| **03/25/2005** | | | **4.0** | **0.0** | **$111.76** |
| | 552460 | Patch Potholes Southbound Rock Creek Pa | 51639 | 2.0 | 0.0 | $55.88 |
| | 552442 | Patch Potholes on Beach Drive FY-2005 | 26716 | 2.0 | 0.0 | $55.88 |
| **03/28/2005** | | | **8.0** | **0.0** | **$223.52** |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $223.52 |
| **03/29/2005** | | | **16.0** | **0.0** | **$447.04** |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005 | 26716 | 8.0 | 0.0 | $223.52 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 8.0 | 0.0 | $223.52 |
| **03/30/2005** | | | **8.0** | **0.0** | **$223.52** |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 6.0 | 0.0 | $167.64 |

| | | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
| **5855  Forbes, Alfred  (continued)** | | | | **44.0** | **0.0** | **$1,229.36** |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| | 552442 | Patch Potholes on Beach Drive FY-2005 | 26716 | 2.0 | 0.0 | $55.88 |

| | | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
| **5859  Harris, Kevin  (continued)** | | | | **43.5** | **0.0** | **$953.09** |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| **03/24/2005** | | | | **8.0** | **0.0** | **$175.28** |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 8.0 | 0.0 | $175.28 |
| **03/25/2005** | | | | **8.0** | **0.0** | **$175.28** |
| | 603070 | PM Service on Vehicle #35302 FY-2005 | 26144 | 4.0 | 0.0 | $87.64 |
| | 552460 | Patch Potholes Southbound Rock Creek Pa | 51639 | 2.0 | 0.0 | $43.82 |
| | 552442 | Patch Potholes on Beach Drive FY-2005 | 26716 | 2.0 | 0.0 | $43.82 |
| **03/28/2005** | | | | **5.5** | **0.0** | **$120.51** |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005 | 26716 | 4.0 | 0.0 | $87.64 |
| | 552475 | Safety Program FY-2005 | ROCR | 0.5 | 0.0 | $10.96 |
| | 566242 | Clean Catch Basins on Piney Branch Parkway | 26724 | 1.0 | 0.0 | $21.91 |
| **03/29/2005** | | | | **14.0** | **0.0** | **$306.74** |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005 | 26716 | 2.0 | 0.0 | $43.82 |
| | 552459 | Patch Potholes Northbound Rock Creek Pa | 26130 | 4.0 | 0.0 | $87.64 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 8.0 | 0.0 | $175.28 |
| **03/30/2005** | | | | **8.0** | **0.0** | **$175.28** |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 6.0 | 0.0 | $131.46 |
| | 552442 | Patch Potholes on Beach Drive FY-2005 | 26716 | 2.0 | 0.0 | $43.82 |

| | | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
| **5877  Wilson, Jimmy  (continued)** | | | | **48.0** | **0.0** | **$1,750.08** |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| **03/24/2005** | | | | **8.0** | **0.0** | **$291.68** |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $291.68 |
| **03/25/2005** | | | | **8.0** | **0.0** | **$291.68** |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $291.68 |
| **03/28/2005** | | | | **8.0** | **0.0** | **$291.68** |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005 | 26716 | 6.5 | 0.0 | $236.99 |
| | 552475 | Safety Program FY-2005 | ROCR | 0.5 | 0.0 | $18.23 |
| | 566242 | Clean Catch Basins on Piney Branch Parkway | 26724 | 1.0 | 0.0 | $36.46 |
| **03/29/2005** | | | | **16.0** | **0.0** | **$583.36** |
| | 566240 | Clean Catch Basins on Beach Dr FY-2005 | 26716 | 6.0 | 0.0 | $218.76 |
| | 552459 | Patch Potholes Northbound Rock Creek Pa | 26130 | 2.0 | 0.0 | $72.92 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 8.0 | 0.0 | $291.68 |
| **03/30/2005** | | | | **8.0** | **0.0** | **$291.68** |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 6.0 | 0.0 | $218.76 |
| | 552442 | Patch Potholes on Beach Drive FY-2005 | 26716 | 2.0 | 0.0 | $72.92 |

| | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|
| Hours and Cost Totals for Labor Group: | 275.5 | 0.0 | $7,905.70 |



*Facility Management Software System*

# Labor Utilization By Labor Group [Detail]

### 1346 ROCR Roads and Trails Crew

From: 5/24/2005   To: 5/24/2005

Sorted By:    Labor Code

**Total Number of Employees in this report:   6**

*Note: Requires a valid value in the Park Alpha field in Labor Groups.*

Date Printed:  11/4/2005   3:09PM

Page 1 of 2

| | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|
| **5843  Burrell, James** | | | **8.0** | **0.0** | **$223.52** |

| Date | W/O # | Description of Work | Location # | | |
|---|---|---|---|---|---|
| 05/24/2005 | | | 8.0 | 0.0 | $223.52 |
| | 566242 | Clean Catch Basins on Piney Branch Parkw | 26724 | 3.0 | 0.0 | $83.82 |
| | 566264 | Clean Catch Basins on Southbound Rock C | 51639 | 2.5 | 0.0 | $69.85 |
| | 566249 | Clean Catch Basins on Northbound Rock C | 26130 | 2.5 | 0.0 | $69.85 |
| **5844  Burton, James  (continued)** | | | **8.0** | **0.0** | **$249.05** |

| Date | W/O # | Description of Work | Location # | | |
|---|---|---|---|---|---|
| 05/24/2005 | | | 8.0 | 0.0 | $249.05 |
| | 566242 | Clean Catch Basins on Piney Branch Parkw | 26724 | 3.0 | 0.0 | $93.39 |
| | 566264 | Clean Catch Basins on Southbound Rock C | 51639 | 2.5 | 0.0 | $77.83 |
| | 566249 | Clean Catch Basins on Northbound Rock C | 26130 | 2.5 | 0.0 | $77.83 |
| **5847  Carroll, Stanley  (continued)** | | | **8.0** | **0.0** | **$224.32** |

| Date | W/O # | Description of Work | Location # | | |
|---|---|---|---|---|---|
| 05/24/2005 | | | 8.0 | 0.0 | $224.32 |
| | 566242 | Clean Catch Basins on Piney Branch Parkw | 26724 | 3.0 | 0.0 | $84.12 |
| | 566264 | Clean Catch Basins on Southbound Rock C | 51639 | 2.5 | 0.0 | $70.10 |
| | 566249 | Clean Catch Basins on Northbound Rock C | 26130 | 2.5 | 0.0 | $70.10 |
| **5855  Forbes, Alfred  (continued)** | | | **7.8** | **0.0** | **$217.93** |

| Date | W/O # | Description of Work | Location # | | |
|---|---|---|---|---|---|
| 05/24/2005 | | | 7.8 | 0.0 | $217.93 |
| | 566242 | Clean Catch Basins on Piney Branch Parkw | 26724 | 3.0 | 0.0 | $83.82 |
| | 566264 | Clean Catch Basins on Southbound Rock C | 51639 | 2.5 | 0.0 | $69.85 |
| | 566249 | Clean Catch Basins on Northbound Rock C | 26130 | 2.3 | 0.0 | $64.26 |
| **5859  Harris, Kevin  (continued)** | | | **8.0** | **0.0** | **$175.28** |

| Date | W/O # | Description of Work | Location # | | |
|---|---|---|---|---|---|

| | | | Regular Hours | OT Hours | Total Cost |
|---|---|---|---|---|---|
| **5859  Harris, Kevin  (continued)** | | | 8.0 | 0.0 | $175.28 |

| Date | W/O # | Description of Work | Location # | Regular Hours | OT Hours | Total Cost |
|---|---|---|---|---|---|---|
| **05/24/2005** | | | | 8.0 | 0.0 | $175.28 |
| | 566242 | Clean Catch Basins on Piney Branch Parkw | 26724 | 2.0 | 0.0 | $43.82 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 4.0 | 0.0 | $87.64 |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 2.0 | 0.0 | $43.82 |

| | | | | Regular Hours | OT Hours | Total Cost |
|---|---|---|---|---|---|
| **5877  Wilson, Jimmy  (continued)** | | | | 8.0 | 0.0 | $291.68 |

| Date | W/O # | Description of Work | Location # | Regular Hours | OT Hours | Total Cost |
|---|---|---|---|---|---|---|
| **05/24/2005** | | | | 8.0 | 0.0 | $291.68 |
| | 566242 | Clean Catch Basins on Piney Branch Parkw | 26724 | 3.0 | 0.0 | $109.38 |
| | 566264 | Clean Catch Basins on Southbound Rock C | 51639 | 1.0 | 0.0 | $36.46 |
| | 566249 | Clean Catch Basins on Northbound Rock C | 26130 | 1.0 | 0.0 | $36.46 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 2.0 | 0.0 | $72.92 |
| | 552490 | FMSS/CESS Program FY-2005 | ROCR | 1.0 | 0.0 | $36.46 |
| | | **Hours and Cost Totals for Labor Group:** | | 47.8 | 0.0 | $1,381.78 |



*Facility Management Software System*

# Labor Utilization By Labor Group [Detail]

### 1346  ROCR Roads and Trails Crew

**From:** 7/11/2005  **To:** 7/11/2005

**Sorted By:**    Labor  Code

**Total Number of Employees in this report:  6**

*Note: Requires a valid value in the Park Alpha field in Labor Groups.*

Date Printed:  11/4/2005   3:10PM

Page 1 of 2

| | | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
| **5843  Burrell, James** | | | | **8.0** | **0.0** | **$223.52** |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| 07/11/2005 | | | | 8.0 | 0.0 | $223.52 |
| | 552638 | Grade Unpaved Surface at Battery Kemble | 31450 | 8.0 | 0.0 | $223.52 |
| **5844  Burton, James  (continued)** | | | | **8.0** | **0.0** | **$249.04** |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| 07/11/2005 | | | | 8.0 | 0.0 | $249.04 |
| | 552638 | Grade Unpaved Surface at Battery Kemble | 31450 | 8.0 | 0.0 | $249.04 |
| **5847  Carroll, Stanley  (continued)** | | | | **8.0** | **0.0** | **$224.32** |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| 07/11/2005 | | | | 8.0 | 0.0 | $224.32 |
| | 552638 | Grade Unpaved Surface at Battery Kemble | 31450 | 8.0 | 0.0 | $224.32 |
| **5855  Forbes, Alfred  (continued)** | | | | **8.0** | **0.0** | **$223.52** |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| 07/11/2005 | | | | 8.0 | 0.0 | $223.52 |
| | 554084 | Paid Leave FY-2005 | ROCR | 8.0 | 0.0 | $223.52 |
| **5859  Harris, Kevin  (continued)** | | | | **8.0** | **0.0** | **$175.28** |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| 07/11/2005 | | | | 8.0 | 0.0 | $175.28 |
| | 552638 | Grade Unpaved Surface at Battery Kemble | 31450 | 8.0 | 0.0 | $175.28 |
| | 552638 | Grade Unpaved Surface at Battery Kemble | 31450 | -8.0 | 0.0 | -$175.28 |
| | 552638 | Grade Unpaved Surface at Battery Kemble | 31450 | 2.0 | 0.0 | $43.82 |
| | 552470 | Maint Paved Trail on Rock Creek Parkway | 46633 | 3.0 | 0.0 | $65.73 |
| | 552469 | Maint Paved Trail at Klingle Rd Bridge S | 46632 | 3.0 | 0.0 | $65.73 |

| | | | | Regular Hours | O/T Hours | Total Cost |
|---|---|---|---|---|---|---|
| 5877 | Wilson, Jimmy | (continued) | | 8.0 | 0.0 | $291.68 |

| Date | W/O # | Description of Work | Location # | | | |
|---|---|---|---|---|---|---|
| 07/11/2005 | | | | 8.0 | 0.0 | $291.68 |
| | 552638 | Grade Unpaved Surface at Battery Kemble | 31450 | 8.0 | 0.0 | $291.68 |
| | | Hours and Cost Totals for Labor Group: | | 48.0 | 0.0 | $1,387.36 |

**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MICHAEL AND BETH WEINSTEIN,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | Civil Action No. 08-00216 (RJL) |
| v. | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Defendant.** | : | |

## ORDER

Upon consideration of Defendant United States' Motion to Dismiss or for Motion for Summary Judgment, any Opposition thereto, and the entire record herein, it is by this Court this _____ day of _____, 2008 hereby

**ORDERED** that Defendant United States' Motion to Dismiss or for Motion for Summary Judgment is **DENIED**.

_____
Judge Richard J. Leon

COPIES TO:

William P. Lightfoot
Koonz, McKenney, Johnson,
DePaolis & Lightfoot, LLP
2001 Pennsylvania Avenue NW, Suite 450
Washington, DC 20006
wlightfoot@koonz.com

*Attorney for Plaintiff Michael and Beth Weinstein*

Wyneva Johnson, Esquire
U.S. ATTORNEY'S OFFICE FOR D.C.
Judiciary Center Building
555 4th Street, NW
Civil Division
Washington, DC 20530
(202) 514-7224
(202) 514-8780 (fax)
wyneva.johnson@usdoj.gov

*Attorney for Defendant United States*