**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MICHAEL AND BETH** | ) | |
| **WEINSTEIN** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 08- 00216 (RJL)** |
| | ) | |
| **UNITED STATES** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO
MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

Plaintiffs, Michael and Beth Weinstein, have brought this action against the

United States for alleged tort liability pursuant to the Federal Tort Claims Act ("FTCA"),

28 U.S.C. § 2671 et seq., as a result of Mr. Weinstein's bicycle accident in Rock Creek

Park in 2005. Specifically, plaintiffs allege that the United States negligently failed to

maintain the Rock Creek Park multi-use trail, and negligently failed to place signs

warning of the surface irregularities, cracks, and hole that allegedly caused Mr.

Weinstein's accident. Defendant moved to dismiss plaintiffs' Complaint, pursuant to

FED. R. CIV. P. 12(b)(1) because the decisions made by Rock Creek Park officials with

regard to the maintenance of the Rock Creek Park Trail and the placement of warning

signs are, in this instance, discretionary functions and therefore immune from suit under

the FTCA, as a matter of jurisdiction. Alternatively, defendant, attaching a Statement of

Material Facts To Which There Is No Genuine Issue, Declaration of Adrienne Coleman,

Superintendent, Rock Creek Park, National Park Service, United States Department of

Interior, and exhibits, requested summary judgment pursuant to FED. R. CIV. P. 56(c).

Plaintiffs, Michael and Beth Weinstein, oppose the Motion to Dismiss, or in the Alternative, for Summary Judgment filed by the defendant, the United States of America ("the Government") on the grounds that decisions about the maintenance and signage on the Rock Creek Park multi-use trail are "not the kind of discretion protected by the discretionary function exception." Plaintiff's Opposition provides no basis for the Court to conclude that the defendant's conduct was not protected by the discretionary function exception. Indeed, plaintiffs' interpretation of the law and authorities on the discretionary function exception is overly narrow and reduces the analysis to a formulaic application of statements about potholes and signs. The District of Columbia Circuit has ruled in <u>Cope v. Scott</u>, 45 F.3d 445 (D.C. Cir. 1995) that courts must resist applying pigeonholed analytical frameworks, and instead determine whether the Government conduct at issue is the type of conduct grounded in social, economic or political policy.

Here, the Government's discretion to limit when and how it conducts maintenance and places warning signs along a portion of the Rock Creek Park multi-use trail intended solely for park visitors to experience the natural setting of the park is grounded squarely in the National Park Service's legislative mandate and resulting management policies that caution against intrusion upon the park's natural setting. Because the Government conduct at issue in this case is the kind that applies discretion grounded in the social, economic and political policies of the National Park Service, it is protected from suit by the discretionary function exception. Accordingly, this Court lacks subject matter jurisdiction over this case and should dismiss it pursuant to FED. R. CIV. P. 12(b)(1). Alternatively, there is no genuine dispute as to the material facts of this matter and the Government is entitled to judgment as a matter of law.

## I.     STANDARD OF REVIEW

Plaintiffs contend that dismissals for lack of subject matter jurisdiction in cases based on federal-question jurisdiction are "exceptional."  Plaintiffs' Opposition at 5. While this statement may apply to federal-question jurisdiction in general, it does not apply to the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq.  Simply stated, the discretionary function exception is a barrier to subject matter jurisdiction under the FTCA.  Loughlin v. United States, 393 F.3d 155, 163 (D.C. Cir. 2004); see also Cope v. Scott, 45 F.3d 445, 448 (D.C. Cir. 1995)("discretionary function determinations are jurisdictional in nature").  Therefore, if the discretionary function exception is found to apply in this case, the Court lacks subject matter jurisdiction and must dismiss the matter pursuant to Rule 12(b)(1).

Further, to survive a motion to dismiss, a complaint must allege facts that would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.  United States v. Gaubert, 499 U.S. 315, 324 (1991).  But the authorities do not hold that the plaintiff in discretionary function exception cases are afforded any presumptions of jurisdiction, as plaintiffs suggest.  Rather, as the Supreme Court instructs, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, *it must be presumed that the agent's acts are grounded in policy when exercising that discretion*."  Id. (emphasis added).

## II.    ARGUMENT

### A.  The Discretionary Function Analysis

#### 1.  Generally

The parties agree that determining whether the discretionary function exception shields the Government's conduct in this case from exposure to a tort action under the FTCA requires a two-part analysis under Gaubert and Berkovitz v. United States, 486 U.S. 531 (1988).  In the first step, the Court must determine whether any federal statute regulation or policy specifically prescribes a course of action for the Government employee or employees in question to follow.  Cope, 45 F.3d at 448.  If a specific course of action is prescribed, the employee(s) had no choice, or discretion, and cannot therefore be protected by the discretionary function exception.  Id.

On the other hand, where a federal statute, regulation or policy lacks a specifically prescribed course of action, the employee's conduct is said to be discretionary.  Id.  In such instances, the second step requires the Court to determine whether the challenged discretionary acts "are of the nature and quality that Congress intended to shield from tort liability."  Id. (quoting United States v. Varig Airlines, 467 U.S. 797, 820 (1984)).  The Supreme Court has interpreted those acts of the nature and quality that Congress intended to shield from tort liability to be those discretionary actions that are "grounded in social, economic, or political goals."  Gaubert, 499 U.S. at 323.  And when the Government's discretionary act is grounded in social, economic, or political policy, courts are not to "second-guess" the Government's exercise of that discretion.  Id.  In other words, if judicial review would encroach upon the agency's balancing of the relevant social,

economic, or political policy, the discretionary function exception applies. <u>Begay v. United States</u>, 768 F.2d 1059, 1064 (9th Cir. 1985).

The analysis does not, however, look to determine whether the *specific* conduct that forms the basis of the plaintiff's allegations were grounded in social, economic, or political goals. <u>Cope</u>, 45 F.3d at 449. Rather the inquiry rests on "whether the *nature* of the decision implicates policy analysis." <u>Id.</u> It is therefore not necessary for the Government to demonstrate an "actual decision," or what the decision maker was thinking, "but whether the *type of decision* being challenged is grounded in social, economic, or political policy." <u>Id.</u> (emphasis added); <u>see also</u>, <u>Kiehn v. United States</u>, 984 F.2d 1100, 1105 (10th Cir. 1993). And because the nature of the decision is what controls, whether the Government was negligent in carrying out the discretion, or otherwise abused the discretion is irrelevant. <u>See</u> 28 U.S.C. § 2680(a); <u>Dalehite v. United States</u>, 346 U.S. 15, 33 (1953). "The question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency." <u>Cope</u>, 45 F.3d at 449.

Finally, the Supreme Court rejects the use of "analytical frameworks" to compartmentalize the discretionary function analysis into a series of rigid rules about what kinds of conduct are shielded from suit and what kinds are not. <u>Cope</u>, 45 F.3d at 449; <u>Gaubert</u>, 499 U.S. at 325-26 (warning that <u>Indian Towing Co., Inc. v. United States</u>, 350 U.S. 61 (1955) could not be broadly interpreted to mean that operational activities could not be discretionary functions within the meaning of the exception). Courts must resist "mechanistic application" of frameworks gleaned from cursory analysis of the various discretionary function exception authorities because it avoids "the proper

analysis:  Whether the nature of the decision involved the exercise of policy judgment."
<u>Cope</u>, 45 F.3d at 449.

### 2.  Plaintiffs Misinterpret the <u>Gaubert</u>-<u>Berkovitz</u> Analysis

#### a.  The Court Must Consider the "Type" of Decision At Issue –
#### Negligence is Irrelevant

In their Opposition, plaintiffs misinterpret the discretionary function exception analysis and urge the Court to review, on a negligence standard, whether the Government should have repaired the hole that allegedly caused Mr. Weinstein's accident, or post a sign warning of the hole.  Plaintiffs contend that this case is not about when and how the Government undertakes maintenance on Rock Creek Park trail, but "about the failure to repair a single substantial pothole,"[1] or, not about the NPS policy to avoid the proliferation of signs but about whether "NPS is liable for failing to place a sign warning of the hazard that caused Mr. Weinstein's accident."  Opposition at 13, 19.  In support of their Opposition, the plaintiffs offer declarations from James Green[2], an engineer and purported bicycle safety expert, and David G. Dionne[3], a purported park trail and park management expert, who offer their opinions about how the alleged Government conduct in this case violates standards and amounts to negligence or an abuse of discretion.

However, <u>Gaubert</u> and <u>Cope</u> are clear that the inquiry does *not* involve the specific decisions or allegations upon which the claims rest, or whether there be actual evidence that those specific decisions involved the application of social, economic or

---

[1]   The Government notes that, in their Complaint, the plaintiffs characterized the alleged defect as "pavement and surface irregularities, such as a pothole and cracks on the path," Complaint at ¶ 7.  In their Opposition, however, plaintiffs now characterize the alleged defect as "a single substantial pothole."  Opposition at 13.

[2]   Plaintiffs' Exhibit G.

[3]   Plaintiffs' Exhibit H.

political policy. "[A]pplicability of the exemption does not turn on whether the challenged decision involved such judgments." <u>Cope</u>, 45 F.3d at 449. Rather, the Court must determine whether the *type* of decision being challenged is grounded in social, economic, or political policy. <u>Gaubert</u>, 499 U.S. at 325. As a result, if the nature of the decision warrants application of the discretionary function exception, the Court cannot consider whether the discretion was abused or carried out in a negligent manner. <u>See</u> 28 U.S.C. § 2680(a); <u>Dalehite</u>, 386 U.S. at 33.

In this case, the plaintiffs assert two claims: that the Government failed to repair an alleged pothole on the multi-use trail in Rock Creek Park, and that the Government failed to post a sign warning Mr. Weinstein of the alleged pothole. But to determine applicability of the discretionary function exception, the Court must determine whether the alleged negligent conduct is the type, or of the nature, that involves an exercise of discretion grounded in social, economic, or political policy. Accordingly, the first question before the Court is not whether the Government should have repaired "a single, substantial pothole," as the plaintiffs contend, but whether Rock Creek Park officials have discretion to undertake maintenance of the multi-use trail and whether that discretion is grounded in social, economic, and political policy. Similarly, the second question before the Court is not, as the plaintiffs suggest, whether the Government should have posted a sign warning Mr. Weinstein of the alleged pothole, but whether park officials have discretion to determine when and how warning signs are posted on the trail, and whether that discretion is grounded in social, economic, or political policy.

And, the credentials of Green and Dionne notwithstanding, because negligence is irrelevant, the declarations offered by the plaintiffs are material only to the extent that

they offer testimony about whether the Government conduct at issue is discretionary, and whether the nature of that discretion is grounded in social, economic, and political policy. The extent to which Green and Dionne offer conclusions about how the Government may have been negligent, or about how the Government may have avoided this accident by repairing the hole or placing a sign is irrelevant and should not be considered.

> b. *The Authorities Cannot Be "Pigeonholed" to Avoid Proper Analysis*

Plaintiffs oppose the Government's motion largely by arguing that "routine" or "mundane" maintenance, such as the filling of a pothole, cannot be shielded by the discretionary function exception, or that the placement of warning signs does not involve discretion grounded in social, economic or political policy. Such statements, however, amount only to "semantic pigeonholing" and do not reflect the proper analysis required to determine applicability of the discretionary function exception. As the D.C. Circuit explained, courts must reject such "analytical frameworks" as "an inappropriate means of addressing the discretionary function exemption." <u>Cope</u>, 45 F.3d at 449. Instead, the Court must conduct the proper analysis: whether the nature of the decision involved an exercise of policy judgment. <u>Id.</u>

**B. NPS's Discretion to Manage the Multi-Use Trail In Rock Creek Park Is Not Subject to Judicial Second-Guessing**

**1. Preliminary Issues**

> a. *The Park Superintendent's Discretion Is Not Disputed*

At no point in their Opposition do the plaintiffs refute the Government's position that the first prong of the <u>Gaubert</u>-<u>Berkovitz</u> test is satisfied because Rock Creek Park officials are afforded the discretion to determine when and how to undertake maintenance of the multi-use trail, and when and how to post signs along the trail.

But to reiterate, NPS's authority to manage our national parks derives from the Organic Act, 16 U.S.C. § 1, which states that NPS's purpose is "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." NPS's mandate under the Organic Act provides that "the Park Service *may balance aesthetic concerns with those of visitor safety* in reaching planning decisions, and that safety concerns will not automatically eclipse all other policy considerations." Shansky v. United States, 164 F.3d 688, 693 (1st Cir. 1999)(emphasis added).

In recognition of these principles, the Park Service Management Policies provide that:

> The saving of human life will take precedence over all other management actions as the Park Service strives to protect human life and provide for injury-free visits. The Service will do this within the constraints of the 1916 Organic Act. The primary— and very substantial—constraint imposed by the Organic Act is that discretionary management activities may be undertaken only to the extent that they will not impair park resources and values . . . . When practicable, and consistent with congressionally designated purposes and mandates, the Service will reduce or remove known hazards and apply other appropriate measures, including closures, guarding, signing, or other forms of education. *In doing so, the Service's preferred actions will be those that have the least impact on park resources and values . . . . These management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level, who must work within the limits of funding and staffing.*

NPS Management Policy 8.2.5.1, "Visitor Safety" (2001)(emphasis added), attached

hereto as Government's Exhibit G.[4]

    The Supreme Court in Gaubert instructed that when statutes or policies grant

discretion "it must be presumed that the agent's acts are grounded in policy when

exercising that discretion." 499 U.S. at 325. It is clear, and in fact, not disputed, that the

statutes and policies at issue grant superintendents of national parks the discretion to

make management decisions about public safety issues that weigh a range of

considerations, and are not based on a simple negligence analysis. The Court should,

therefore, presume that Park Service's decisions about management of the multi-use trail

in Rock Creek Park are grounded in policy.

b.  *The Portion of the Multi-Use Trail At Issue Has a Purely Aesthetic Function*

    Under a proper discretionary function exception analysis, it is critical to note that

the portion of the multi-use trail at issue serves one primary function: to facilitate the

visitor experience of the natural setting of Rock Creek Park itself. See Coleman

Declaration, Government's Exhibit C, at ¶ 8. The portion of the trail in question is,

according to plaintiffs' expert Mr. Dionne, "heavily wooded . . . with mature trees, shrubs

and large boulders and rock surfaces lining the edges of the trail." To the trail's right

exists a "steep slope with mature trees, woody vegetation, boulders and exposed roots . . .

." Dionne Decl., Plaintiffs' Exhibit H at ¶ 6. Dionne's observations support the

---

[4]  Attached to the Government's Memorandum in Support was a copy of the 2006
version of the NPS Management Policies. Because the 2001 version of the Management
Policies was in effect at the time of Mr. Weinstein's accident, the Government requests
the 2001 version attached hereto be substituted for the 2006 version previously
submitted. The Government, however, knows of no discrepancies between the relevant
portions.

10

Government's position that, unlike in <u>Cope</u> and <u>Hayes</u>, the area of Rock Creek Park in question is a place where visitors are fully immersed in the setting of the Park. There is no vehicle traffic, there are no access points to facilities such as the National Zoo; there is only the natural beauty of Rock Creek National Park. And it is in such areas where the Park Service's discretion to balance policy considerations with public safety is at its zenith.

> **2. Park Service Decisions About When To Undertake Trail Maintenance Are Protected by the Discretionary Function Exception**

According to the plaintiffs, fixing a hole on the portion of the multi-use trail in Rock Creek Park at issue is nothing more than routine maintenance, for which the discretionary function exception does not apply. In other words, the Park Service's maintenance of the multi-use trail is subject only to a negligence standard, and maintenance decisions based on aesthetics or allocation of Rock Creek Park resources can never be protected by the discretionary function exception. Despite plaintiffs' efforts to pigeonhole maintenance questions with statements of overly broad applicability, the authorities indicate the maintenance is not protected by the discretionary function exception only where the maintenance decisions in question do not reflect a genuine nexus to the public policy upon which the discretion is allegedly based.

Plaintiffs rely heavily on one line of dicta in <u>Cope</u> wherein the D.C. Circuit stated that "[t]his case is therefore different from a case involving mundane decisions to fill or not fill potholes, or even the cumulative effect of such decisions." 45 F.3d at 451. Apart from the fact that the statement does not reflect the holding in <u>Cope</u>—which in fact found the Park Service's decisions regarding the management of Beach drive protected by the discretionary function exception—it is more important that <u>Cope</u> involved a commuter

thoroughfare intended for vehicle traffic. The <u>Cope</u> court noted that "while we acknowledge the Park Service's desire to maintain the park in as pristine a state as possible," the government failed to demonstrate how such considerations apply to a road that the Park Service chose "to manage . . . in a manner more amendable to commuting through nature rather than communing with it." <u>Id.</u> at 452. Because the location did not serve a function primarily related to the park visitor's experience of the park, the <u>Cope</u> court rejected the Park Service's contention that management decisions were based on the discretion to weigh policy concerns ahead of safety. <u>Id.</u>

It cannot, however, be said that the <u>Cope</u> court intended its statement about potholes to apply to any hole on any paved surface in Rock Creek Park. Rather, the court explained that there will be circumstances in which the Park Service's management decisions will be grounded in policy considerations and therefore exempt under the FTCA. <u>Id.</u>

Plaintiffs also cite <u>ARA Leisure Servs. v. United States</u>, 831 F.2d 193 (9th Cir. 1987) wherein the court found the Park Service's  road maintenance decisions in that case "involved routine questions of maintenance not 'grounded in social, economic, or political policies.'" 45 F.3d at 451. In <u>ARA Leisure Servs.</u>, five tour bus passengers were killed when the bus rolled over on a poorly maintained road inside Denali National Park. 831 F.2d at 194. While the Ninth Circuit found that the Park Service's discretion to build the road without guardrails was protected by the discretionary function, the court concluded that "there is no clear link between Park Service road policies and the condition of" the road which had eroded from its original width and the edges had softened—which violated the Park Service's policy about road grades and alignment.

831 F.2d at 195.  The court concluded that, "where the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations, the rationale for the exception falls away and the United States will be held responsible for the negligence of its employees."  Id. at 195 (citations omitted).  In other words, in failing to manage the road in compliance with established policy, the Government in the ARA Leisure Servs. case lacked discretion and therefore failed the first prong of the Gaubert-Berkovitz test.  See Baum v. United States, 986 F.2d 716, 723 (4th Cir. 1993)(explaining holding in ARA Leisure Servs.)  This result, however, is inapposite to the instant matter because the Park Service is not subject to controlling standards for when and how park officials repair cracks or holes along the multi-use trail in Rock Creek Park.

Similarly, Indian Towing Co.[5] and Beckford v. United States, 950 F. Supp. 4 (D.D.C. 1997) are not persuasive for the proposition that park maintenance must be pigeonholed and can never be shielded by the discretionary function exception.  In those cases, the government failed to offer any policy on which its discretionary acts were grounded.

But the same cannot be said of the case before the Court.  The Park Service's policies do not mandate a specific standard by which Rock Creek Park officials must abide in making determinations about the maintenance of the park's multi-use trail.  Instead, park officials must weigh public safety issues, such as those presented by the ever-present cracks and holes in the multi-use trail, and choose a course of management that has "the least impact on Park resources and values."  Management Policy 8.2.5.1.

---

[5]   In Indian Towing Co, the Government conceded that its maintenance of the lighthouse was not within the discretionary function exception.  350 U.S. at 64.

Those values include the desire for minimal intrusion upon the natural setting of the park, and the Park Service is free to place such aesthetic concerns ahead of public safety. <u>See Shansky</u>, 164 F.3d at 693.

And because the portion of the multi-use trail at issue is managed solely to facilitate the park visitor's experience of the natural setting of the park, it cannot be said, as in <u>Cope</u>, that the Park Service has chosen to manage the area in manner that gives deliberate deference to safety over aesthetics. In accordance with its policies, Park Officials must be free to determine a course of management of these portions of the trail that will minimally intrude upon the natural setting of the park, and allow for an appropriate allocation of the park's human and financial resources. The statutes and policies at issue give the Park Service discretion to make policy decisions about when to undertake trail maintenance, and because the conduct at issue in this case involves the kind of decisions grounded in that policy, the discretionary function exception applies. The Court is not free to second-guess the Park Service's discretion in this case.

Finally, the evidence that the Park Service does, at times, undertake maintenance on the multi-use trail in Rock Creek Park[6] does not serve to waive the discretionary function exception, or require a different result. In <u>Cope</u>[7], the fact that the Park Service had posted numerous signs did not serve to waive or otherwise mitigate the Park Service's discretion to the extent that the discretionary function exception did not apply. Rather, the signs "justified a finding that . . . the Park Service already had made a specific policy decision to favor safety over aesthetics." <u>Shansky</u>, 164 F.3d at 694 (discussing <u>Cope</u>). Nonetheless, the discretionary function exception does not require that the

---

[6] <u>See</u> Plaintiffs' Exhibit I, National Park Service Daily Work Reports.
[7] And likewise, in <u>Hayes v. United States</u>, 539 F. Supp. 2d 403 (D.D.C. 2008).

14

Government never exercise that discretion and undertake certain conduct, such as the repairs in areas of a park managed exclusively for the park visitor's aesthetic experience—or that the discretion to undertake such conduct be abused, such as the failing to repair areas of a park managed exclusively for the park visitor's aesthetic experience. See 28 U.S.C. § 2680(a); Dalehite, 386 U.S. at 33.

### 3. Park Service Decisions About Signage Along the Multi-Use Trail Are Protected by the Discretionary Function Exception

Plaintiffs further argue that the D.C. Circuit in Cope and this Court in Hayes held that the Park Service's determinations about when and where to place signs along the multi-use trail in Rock Creek Park are not protected by the discretionary function exception. But again, further review of those authorities reveals that they cannot be pigeonholed to support such a result. Rather, Cope and Hayes found that the discretionary function exception did not apply to the Park Service's decisions about when and where to place signs at the locations in question because the Park Service could not demonstrate—given the location of the accidents in question—that the decisions were of the kind grounded in social, economic or political policy.

It is first important to note that the courts in Cope and Hayes concluded that the Manual on Uniform Traffic Control Devices ("MUTCD") and the National Park Service Sign Manual ("Sign Manual") present only "recommendations" for the placement of signs and do not constitute mandatory standards by which park superintendents must base sign-related decisions. Cope, 45 F.3d at 451; Hayes, 539 F. Supp. 2d at 401-02. As a result, "[t]he determination of whether a hazard requiring a warning sign exists and, if so, how and where to provide the warning remains within the discretion and judgment of the individual park managers." Id. at 401. Though plaintiffs offer the opinion of Green and

Dionne that Rock Creek Park officials "violated" the MUTCD and Sign Manual in a variety of ways, such conclusions do not conform with <u>Cope</u> and <u>Hayes</u> and must be rejected.

The plaintiffs do not dispute that Rock Creek Park officials hold discretion to determine whether to post warning signs along the multi-use trail in Rock Creek Park. Along with the broad discretion afforded by the Park Service's management policies to the park superintendent to manage safety issues in a manner with as little impact as possible upon the park's resources, park officials are provided further guidance with regard to signs. <u>See</u> Coleman Decl., Government's Exhibit C at ¶ 13, 14. The Sign Manual instructs park officials to "bear in mind long standing NPS policy to minimally intrude upon the natural or historic setting in National Park System areas, and to avoid an unnecessary proliferation of signs, while striving to ensure the safety of park visitors." <u>Id.</u>; Sign Manual, Government's Exhibit E at 1-1.

The critical distinction between <u>Cope</u> and <u>Hayes</u>, and the case before the Court, is that the Park Service managed the road in <u>Cope</u> and the portion of the multi-use trail in <u>Hayes</u> for purposes not related to the park visitor's experience of the natural setting of the park itself. "As in <u>Cope v. Scott</u>," the <u>Hayes</u> court noted, "the stretch of land involved here is not managed to facilitate the nature experience of park visitors." 539 F. Supp. 2d at 403. As a result, the government "failed to demonstrate how public policy considerations"—such as aesthetic considerations such as minimal intrusion and avoiding the proliferation of signs—"could reasonably affect sign placement decisions along the stretch of the Rock Creek Park Trail in question." <u>Id</u>.

But the Cope court clearly envisioned that parts of the park managed primarily for the park visitor's experience of the natural setting of the park would require a different result:

> We agree that in certain circumstances, decisions will be exempt under the FTCA because they involve difficult policy judgments balancing the preservation of the environment against the blight of excess signs. But this is not one of those circumstances. . . . Here the Park Service has chosen to manage the road in a manner more amenable to commuting through nature than communing with it. Having done so, and having taken steps to warn users of dangers inherent in that use, the Park Service cannot argue that its failure to ensure that those steps are effective involves protected 'discretionary' decisions.

45 F.3d at 452.

The Cope court further noted that where sign decisions are "based on a reasonable desire to protect the experience of the park visitor" the discretionary function exception protects park official's decisions about whether and where to place signs warning of a particular hazard. Accordingly, it is consistent with this rule that the courts in Bowman v. United States, 820 F.3d 1393 (4th Cir. 1987)(directly related to policy of protecting scenic vista) and Zumwalt v. United States, 928 F.2d 951 (10th Cir. 1991)(directly related to policy of protecting wilderness experience) found that the discretionary function applied to the park service's sign decisions, but did not in Boyd v. United States, 881 F.2d 895 (10th Cir. 1989)(no policy justified failure to warn swimmers of boats).

In the case before the Court, the location of the alleged hazard is in a heavily wooded area in which the primary function is to facilitate the park visitor's experience of the park's natural setting. In such a location, the park superintendent must be free to make discretionary determinations about when and how to post warning signs. Consistent with Park Service policy, the Rock Creek Park superintendent has chosen to

avoid a proliferation of signs warning of the various hazards a park visitor may encounter. See Coleman Decl., Government's Exhibit C at ¶ 13, 16. The D.C. Circuit's holding in Cope demonstrates that, in such a location, the superintendent's discretion to weigh these kinds of policy considerations is protected by the discretionary function exception.

Finally, the fact that the portion of the multi-use trail in question contains a sign does not abrogate this result. While it is true that there is one sign posted along the relevant portion of the trail that instructs cyclists to "Walk Your Bike", the sign was not intended to warn cyclists of the alleged hole of which plaintiffs complain, or any hole or condition of the surface of the trail. See Supplemental Declaration of Adrienne Coleman, attached hereto as Government's Exhibit H, at ¶ 5. According to the park superintendent, Rock Creek Park officials determined that due to limited vision resulting from the design of the multi-use trail where it slopes down toward the Porter Street bridge underpass, is shaded by the underpass, and then curves around the slope at the bottom, it would be desirable for cyclists to walk bicycles through the area under the bridge to avoid possible collisions with other trail users, including hikers, joggers, nature observers, walkers, and other cyclists.[8] Id. at ¶ 3. The "Walk Your Bike" sign conveys this instruction. Id.

But the presence of one sign does not serve to waive any protection afforded by the discretionary function exception—park officials maintain the discretion to make sign decisions, and, as a result, install signs. Though the existence of "numerous signs" in Cope was found to mitigate the Government's position that the decisions were protected by the discretionary function exception, the result was dictated not because the presence

---

[8] As plaintiffs' purported expert, Mr. Dionne, observed, the sign "is located near the Klingle Road bridge underpass" and along a curve of the trail. See Dionne Decl. at ¶ 6.

of signs waives the exception, but because the signs served as evidence that park officials placed safety concerns ahead of aesthetic considerations in that part of the park.  45 F.3d at 452; <u>Shanksy</u>, 164 F.3d at 694.

Rock Creek Park officials maintain discretion to determine if and when to place warning signs along those portions of the multi-use trail that it manages primarily for the purpose of facilitating the park visitor's experience of the natural beauty of the park itself.  Because the Park Service is free, under such circumstances, to weigh policy considerations apart from safety concerns, decisions about the placement of warning signs are the kind of decisions grounded in public policy and protected from judicial second guessing by the discretionary function exception.

## IV.    CONCLUSION

For the reasons contained herein and in the defendant's previous memorandum, the United States respectfully requests that the Court dismiss plaintiffs' case for lack of subject matter jurisdiction.  In the alternative, the defendant requests that summary judgment be entered in favor of the defendant because there is no genuine dispute as to the material facts of this matter and the defendant is entitled to judgment as a matter of law.

Respectfully  submitted,


　/s/
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


　/s/
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney


　/s/
WYNEVA JOHNSON, DC Bar #278515
Assistant United States Attorney
555 4th Street, N.W., Room E - 4106
Washington, D.C. 20530
(202) 514-7224



Of Counsel:
Charles B. Wallace, Esq.
U.S. Department of the Interior
Office of the Solicitor

Exhibit G

Management Polices 2001

# Management Policies
## 2001



U.S. Department of the Interior | National Park Service

# 8
# Use of the Parks



The National Park Service will provide visitor enjoyment opportunities that are uniquely suited and appropriate to the superlative natural and cultural resources found within parks.

National parks belong to all Americans, and all Americans should feel welcome to experience the parks. The National Park Service will promote and regulate appropriate use of the parks, and will provide the services necessary to meet the basic needs of park visitors and to achieve each park's mission goals.

8.1  General

MANAGEMENT POLICIES

Many different types of uses take place in the hundreds of parks that comprise the national park system. Some of those uses are carried out by the National Park Service, but many more are carried out by park visitors, permittees, lessees, and licensees. The 1916 Organic Act, which created the National Park Service, directs the Service to conserve park resources "unimpaired" for the enjoyment of future generations. The 1970 National Park System General Authorities Act, as amended in 1978, prohibits the Service from allowing any activities that would cause derogation of the values and purposes for which the parks have been established (except as directly and specifically provided by Congress). Taken together, these two laws impose on NPS managers a strict mandate to protect park resources and values, and a responsibility to actively manage all park uses and, when necessary, to regulate their amount, kind, time, and place. (Throughout Management Policies, the term "impairment" is construed to also encompass "derogation.")

Providing opportunities for appropriate public enjoyment is an important part of the Service's mission. Other park uses—unrelated to public enjoyment—may sometimes be allowed as a right or a privilege if they are not otherwise prohibited by law or regulation. In exercising its discretionary authority, the Service will allow only uses that are (1) appropriate to the purpose for which the park was established, and (2) can be sustained without causing unacceptable impacts to park resources or values. Recreational activities and other uses that would impair a park's resources, values, or purposes cannot be allowed. The only exception is when an activity that would cause impairment is directly and specifically mandated by Congress.

The fact that a park use may have an impact does not necessarily mean it will impair park resources or values for the enjoyment of future generations. Impacts may affect park resources or values and still be within the limits of the discretionary authority conferred by the Organic Act. However, negative or adverse environmental impacts are never welcome in national parks, even when they fall far short of causing impairment. For this reason, the Service will not knowingly authorize a park use that would cause negative or adverse impacts unless it has been fully evaluated, appropriate public involvement has been obtained, and a compelling management need is present. In those situations, the Service will ensure that any negative or adverse impacts are the minimum necessary, unavoidable, cannot be further mitigated, and do not constitute impairment of park resources and values.

When a use is mandated by law, but causes adverse impacts to park resources or values, the Service will take appropriate management actions to avoid or mitigate the adverse effects. When a use is authorized by law, but not mandated, and may cause adverse impacts to park resources or values, the Service will avoid or mitigate the impacts to the point where there will be no unacceptable impacts; or, if necessary, the Service will deny a proposed activity or eliminate an existing activity.

All proposals for park uses will be evaluated for their:

- consistency with applicable laws, Executive orders, regulations, and policies;
- consistency with existing plans for public use and resource management;
- actual and potential effects on park resources and values;
- total costs to the Service, and whether the public interest will be served.

Park superintendents must continually examine all park uses to ensure that unanticipated and unacceptable impacts do not occur. Unless mandated by statute, only uses that meet the criteria listed in section 8.2 may be allowed.

Specific park uses will be guided by the following subsections of this chapter, and must comply also with the other chapters of these Management Policies. The Service will coordinate with appropriate state authorities regarding activities that are subject to state regulation, or to joint state/federal regulation. The regulatory framework for implementing NPS policies governing use of the parks, and for determining when and where activities may be allowed, is found in 36 CFR Parts 2, 3, 4, 5, 7, 12, and 13. Procedures for implementing or terminating a restriction, condition, public use limit, or closure within a park area are found in 36 CFR 1.5 (but see also 36 CFR 13.30 and 43 CFR 36.11(h) for procedures specific to park areas in Alaska). Some activities may be allowed in parks only after park-specific regulations have been published.

*(See Park Management 1.4; Consumptive Uses 8.9. Also see Director's Order #12; 36 CFR 2.1)*

8.2  Visitor Use

Enjoyment of park resources and values by the people of the United States is part of the fundamental purpose of all parks. The Service is committed to providing appropriate, high quality opportunities for visitors to enjoy the parks, and will maintain within the parks an atmosphere that is open, inviting, and accessible to every segment of American society. However, many forms of recreation enjoyed by the public do not require a national park setting, and are more appropriate to other venues. The Service will therefore:

- Provide opportunities for forms of enjoyment that are uniquely suited and appropriate to the superlative natural and cultural resources found in the parks.
- Defer to local, state, and other federal agencies; private industry; and non-governmental organizations to meet the broader spectrum of recreational needs and demands.

To provide for enjoyment of the parks, the National Park Service will encourage visitor activities that:

- Are appropriate to the purpose for which the park was established; and
- Are inspirational, educational, or healthful, and otherwise appropriate to the park environment; and,
- Will foster an understanding of, and appreciation for, park resources and values, or will promote enjoyment through a direct association with, interaction with, or relation to park resources; and
- Can be sustained without causing unacceptable impacts to park resources or values.

The primary means by which the Service will actively foster and provide activities that meet these criteria will be through its interpretive and educational programs, which are described in detail in chapter 7. The Service will also welcome the efforts of private-sector organizations to provide structured activities that meet these criteria. In addition to structured activities, the Service will, to the extent practicable, afford visitors ample opportunity for inspiration, appreciation, and enjoyment through their own personalized experiences, without the formality of program or structure.

The Service will allow other visitor uses that do not meet all the above criteria if they are appropriate to the purpose for which the park was established and they can be sustained without causing unacceptable impacts to park resources or values.

Unless mandated by statute, the Service will not allow visitors to conduct activities that:

■ Would impair park resources or values;
■ Create an unsafe or unhealthful environment for other visitors or employees;
■ Are contrary to the purposes for which the park was established; or
■ Unreasonably interfere with:
  · The atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the park;
  · NPS interpretive, visitor service, administrative, or other activities;
  · NPS concessioner or contractor operations or services; or
  · Other existing, appropriate park uses.

Management controls must be imposed on all park uses to ensure that park resources and values are preserved and protected for the future. If and when a superintendent has a reasonable basis for believing that an ongoing or proposed public use would cause unacceptable impacts to park resources or values, the superintendent must make adjustments to the way the activity is conducted, so as to eliminate the unacceptable impacts. If necessary, the superintendent may (1) temporarily or permanently close a specific area; (2) prohibit a particular use; or (3) otherwise place limitations on the use to ensure that impairment does not occur.

Any closures or restrictions—other than those imposed by law—must be consistent with applicable laws, regulations, and policies, and (except in emergency situations) require a written determination by the superintendent that such measures are needed to:

■ protect public health and safety;
■ prevent unacceptable impacts to park resources or values;
■ carry out scientific research;
■ minimize visitor use conflicts; or
■ otherwise implement management responsibilities.

When practicable, restrictions will be based on the results of study or research, including (when appropriate) research in the social sciences. Any restrictions imposed will be fully explained to visitors and the public. Visitors will be given appropriate

information on how to keep adverse impacts to a minimum, and how to enjoy the safe and lawful use of the parks.

*(See Park Management 1.4; Management of Recreational Use 8.2.2.1. Also see 36 CFR 1.5: "Closures and Public Use Limits"; Director's Order #12: Tourism)*

**8.2.1  Visitor Carrying Capacity**
Visitor carrying capacity is the type and level of visitor use that can be accommodated while sustaining the desired resource and visitor experience conditions in the park. By identifying and staying within carrying capacities, superintendents can prevent park uses that may unacceptably impact the resources and values for which the parks were established. For all zones, districts, or other logical management divisions within a park, superintendents will identify visitor carrying capacities for managing public use. Superintendents will also identify ways to monitor for, and address, unacceptable impacts to park resources and visitor experiences.

When making decisions about carrying capacity, superintendents must utilize the best available natural and social science and other information, and maintain a comprehensive administrative record relating to their decisions. The decision-making process should be based on desired resource conditions and visitor experiences for the area; quality indicators and standards that define the desired resource conditions and visitor experiences; and other factors that will lead to logical conclusions and the protection of park resources and values. The level of analysis necessary to make decisions about carrying capacities is commensurate with the potential impacts or consequences of the decisions. The greater the potential for significant impacts or consequences to park resources and values (or the opportunities to enjoy them), the greater the level of study and analysis needed to support the decisions.

The general management planning process will determine the desired resource and visitor experience conditions that are the foundation for carrying capacity analysis and decision-making. If a general management plan is not current or complete, or if more detailed decision-making is required, a carrying capacity planning process, such as the Visitor Experience and Resource Protection (VERP) framework, should be applied in an implementation plan or an amendment to an existing plan. If the time frame for making decisions is insufficient to allow the application of a carrying capacity planning process, then superintendents must make decisions based on the best available scientific and other information. In either case, such planning must be accompanied by appropriate environmental impact analysis, in accordance with Director's Order #12.

As use changes over time, superintendents must continue to decide if management actions are needed to keep use at acceptable and sustainable levels. If indicators and standards have been prescribed for an impact, the acceptable level is the prescribed standard. If indicators and standards do not exist, the superintendent must determine how much impact can be tolerated before management intervention is required.

If and when park uses reach a level at which they must be limited or curtailed, the preferred choice will be to continue uses that best meet the criteria listed in section 8.2 for preferred uses, and to limit or curtail those that least meet those criteria.

*(See Decision-making Requirements to Avoid Impairments 1.4.7; General Management Planning 2.3.1; Carrying Capacity 5.3.1.6; Management of Recreational Use 8.2.2.1. Also see Director's Order #2: Park Planning)*

**8.2.2  Recreational Activities**
The National Park Service will encourage, allow, or not allow recreational activities according to the criteria listed in section 8.2. Examples of recreational activities that may be encouraged or allowed include, but are not limited to, boating, camping, bicycling, fishing, hiking, horseback riding and packing, outdoor sports, picnicking, scuba diving, cross-country skiing, caving, mountain and rock climbing, and swimming. However, not all of these activities will be appropriate or allowable in all parks; that determination must be made on the basis of park-specific planning. Service-wide regulations addressing aircraft use, off-road bicycling, hanggliding, off-road vehicle use, personal watercraft, and snowmobiling require that special, park-specific regulations be developed before these uses may be allowed in parks. (Somewhat different statutory and regulatory provisions apply to snowmobile, motorboat, and aircraft use in units of the national park system in Alaska.)

The Service will monitor new or changing patterns of use or trends in recreational activities, and assess their potential impacts on park resources. A new form of recreational activity will not be allowed within a park until after an environmental analysis has determined that it will not result in unacceptable impacts on park resources. Restrictions placed on recreational uses that have been found to be appropriate will be limited to the minimum necessary to protect park resources and values, and promote visitor safety and enjoyment.

**8.2.2.1  Management of Recreational Use**
Superintendents will develop and implement visitor use management plans and take management actions, as appropriate, to ensure that recreational uses and activities within the park are consistent with its authorizing legislation or proclamation and do not cause unacceptable impacts to park resources or values. Depending on local park needs and circumstances, these plans may be prepared as coordinated activity-specific documents (such as river use plan, backcountry use plan, wilderness management plan, off-road vehicle use plan, winter use plan); as action plan components of a resource management plan or general management plan; or as a single integrated plan that addresses a broad spectrum of recreational activities. Regardless of their format or complexity, visitor use management plans will (1) contain specific, measurable management objectives related to the activity or activities being addressed; (2) be periodically reviewed and updated; and (3) be consistent with the carrying capacity decisions made in the general management plan.

The Service will seek consistency in recreation management policies and procedures on both a Service-wide and inter-agency basis to the extent practicable. However, because of dif-

ferences in the enabling legislation and resources of individual parks, and differences in the missions of the Service and other federal agencies, an activity that is entirely appropriate when conducted in one location may be inappropriate when conducted in another. The Service will consider a park's purposes and the effects on park resources and visitors when determining the appropriateness of a specific recreational activity.

Superintendents will consider a wide range of techniques in managing recreational use to avoid adverse impacts on park resources and values, or desired visitor experiences. Examples of appropriate techniques include visitor information and education programs; separation of conflicting uses by time or location; "hardening" sites; modifying maintenance practices; and permit and reservation systems. Superintendents may also use their discretionary authority to impose local restrictions, public use limits, and closures, and designate areas for a specific use or activity (see 36 CFR 1.5). Any restriction of appropriate recreational uses will be limited to what is necessary to protect park resources and values, to promote visitor safety and enjoyment, or to meet park management needs. To the extent practicable, public use limits established by the Service will be based on the results of scientific research and other available support data. However, an activity will be restricted or prohibited when, in the judgment of the superintendent, its occurrence, continuation, or expansion would (1) violate the criteria listed in section 8.2, or (2) conflict with the findings of a carrying capacity analysis, and there is no reasonable alternative that would avoid or satisfactorily mitigate the violation or conflict.

Recreational activities that are proposed as organized events or that involve commercialization, advertising, or publicity on the part of participants or organizers are defined as "special events," and are managed in accordance with the policies in section 8.6.2; regulations in 36 CFR 2.50; and criteria and procedures in Director's Order #53: Special Park Uses.

*(See Park Planning Processes 2.3; Wilderness Management Planning 6.3.4.2; General Policy 6.4.1; Carrying Capacity 8.2.1; Commercial Visitor Services 8.2.2.2; River Use 8.2.2.3, Backcountry Use 8.2.2.4; fishing 8.2.2.5; Hunting and Trapping 8.2.2.6; Off-road Vehicle Use 8.2.3.1; Snowmobiles 8.2.3.2; Visitor Safety 8.2.5.1; Native American Use 8.5; Special Park Uses 8.6; Collecting Natural Products 8.8. Also see Director's Order #2: Park Planning, and #12: Conservation Planning and Environmental Impact Analysis)*

**8.2.2.2  Commercial Visitor Services**
The Park Service may permit commercial visitor services that are necessary and appropriate for public use and enjoyment of the park, and that are consistent to the highest practicable degree with the preservation and conservation of the park's resources and values. Commercial visitor services: .

- Will be operated only under concession contracts or commercial use permits;
- Should not be provided within a park if the identified needs for visitor services can be adequately met outside park boundaries; and
- Must comply with chapter 10; Director's Orders #48A: Concession Management, and 48B: Commercial Use Authorizations; and the regulations found in 36 CFR Part 51.

*(See Commercial Services 6.4.4; Planning Criteria for Park Concessions 10.2.2.1; Commercial Use Authorizations 8.3)*

**8.2.2.3  River Use**

A river use management plan will be developed for each park having significant levels of river use, or the potential for such use, unless the planning is accomplished through some other document. Appropriate types and levels of public uses will be identified and managed to prevent adverse impacts on aquatic resources, the riparian environment, and visitor enjoyment. Each river management plan will include specific procedures for disposing of refuse and human waste. Plans should be coordinated with interested state and/or local governments.

*(See Implementation Planning 2.3.3; National Wild and Scenic Rivers System 4.3.4; Water Resource Management 4.6; Flood plains 4.6.4; Wetlands 4.6.5; Grazing by Domestic and Feral Livestock 8.6.8)*

**8.2.2.4  Backcountry Use**

The Park Service uses the term "backcountry" to refer to primitive, undeveloped portions of parks. This is not a specific management zone, but rather refers to a general condition of land that may occur anywhere within a park. Back-country use will be managed in accordance with a backcountry management plan (or other plan addressing backcountry uses) that is designed to avoid unacceptable impacts on park resources or adverse effects on the visitor enjoyment of appropriate recreational experiences. The Service will seek to identify acceptable limits of impacts, monitor backcountry use levels and resource conditions, and take prompt corrective action when unacceptable impacts occur. Strategies designed to guide the preservation, management, and use of the back-country and to achieve the park's management objectives will be integrated into the park's backcountry management plan. Backcountry under study, proposed, or recommended for wilderness designation will be managed as wilderness.

The number and types of facilities to support visitor use, including sanitary facilities, will be limited to the minimum necessary to achieve a park's backcountry management objectives and to provide for the health and safety of park visitors. To avoid the need for sanitary facilities, public use levels will be managed, where practicable, in accordance with the natural system's ability to absorb human waste. The Service will not provide refuse containers in backcountry areas. All refuse must be carried out, except that combustible materials may be burned when authorized by the superintendent.

*(See Water Resource Management 4.6, Management Facilities 6.3.10; Wilderness Use Management 6.4; Visitor Carrying Capacity 8.2.1; Waste Management 9.1.6.1; Comfort Stations 9.3.3. Also see Director's Order #83: Public Health).*

**8.2.2.5  Fishing**

Recreational fishing will be allowed in parks when it is authorized, or not specifically prohibited, by federal law, provided that it does not jeopardize natural aquatic ecosystems or riparian zones. When fishing is allowed, it will be conducted in accordance with applicable federal laws and treaty rights, and state laws and regulations. The Service may restrict fishing activities whenever necessary to achieve management objectives outlined in a park's resource management plan or to otherwise

protect park resources or public safety, unless such restrictions would violate a federal law or treaty. Before the Service issues regulations or other restrictions, representatives of appropriate tribes and state and federal agencies will be consulted to ensure that all available scientific data is considered in the decision-making process. Any such regulations or other restrictions will be developed with public involvement.

Commercial fishing will be allowed only when specifically authorized by federal law or treaty right.

*(See Implementation Planning 2.3.3; Planning for Natural Resource Management 4.1.1; Harvest of Plants and Animals by the Public 4.4.3; Facilities for Water Recreation 9.3.4.2)*

**8.2.2.6  Hunting and Trapping**

Hunting, trapping, or any other method of harvesting wildlife by the public will be allowed where it is specifically mandated by federal law. Where hunting activity is not mandated, but is authorized on a discretionary basis under federal law, it may take place only after the Service has determined that the activity will not compromise public safety and enjoyment, and that the proposed use is consistent with sound resource management principles.

Hunting and trapping, whether it takes place as a mandated or a discretionary activity, will be conducted in accordance with federal law and applicable laws of the state or states in which a park is located. However, except for Alaska park units (which are subject to regulations published at 36 CFR Part 13), the park in which it occurs must also publish special regulations to govern the activity, and those regulations may be more restrictive than applicable state regulations. For example, the superintendent may designate areas where, and establish periods when, no hunting or trapping will be permitted for reasons of public safety, area administration, wildlife management, or public use and enjoyment. Before the Service issues regulations or other restrictions, representatives of appropriate tribes and state and federal agencies will be consulted to ensure that all available scientific data is considered in the decision-making process. Any such regulations or other restrictions will be developed with public involvement.

*(See Harvest of Plants and Animals by the Public 4.4.3; Genetic Resource Management Principles 4.4.1.2)*

**8.2.2.7  BASE Jumping**

BASE (Buildings, Antennae, Spans, Earth forms) jumping—also known as fixed object jumping—involves an individual wearing a parachute jumping from buildings, antennae, spans (bridges), and earth forms (cliffs). This is not an appropriate public use activity within national park areas, and is prohibited by 36 CFR 2.17(3)..

**8.2.3  Use of Motorized Equipment**

The variety of motorized equipment—including visitor vehicles, concessioner equipment, and Park Service administrative or staff vehicles and equipment—that operates in national parks has the potential to adversely impact park resources, including the park's natural soundscape. In addition to their natural values, natural sounds, such as waves breaking on the shore, the roar of a river, and the call of a loon, form a valued part of the visitor experience. Conversely, the sounds of motor

vehicle traffic, an electric generator, or loud music can greatly diminish the solemnity of a visit to a national memorial, the effectiveness of a park interpretive program, or the ability of a visitor to hear a bird singing its territorial song. Many parks that appear as they did in historical context no longer sound the way they once did.

The Service will strive to preserve or restore the natural quiet and natural sounds associated with the physical and biological resources of parks. To do this, superintendents will carefully evaluate and manage how, when, and where motorized equipment is used by all those—including park staff—who operate equipment in the parks. Uses and impacts associated with the use of motorized equipment will be addressed in park planning processes. Where such use is necessary and appropriate, the least impacting equipment, vehicles, and transportation systems should be used, consistent with public and employee safety. The natural ambient sound level—that is, the environment of sound that exists in the absence of human-caused noise—is the baseline condition, and the standard against which current conditions in a soundscape will be measured and evaluated.

To meet its responsibilities under Executive Order 13149 (Greening the Government Through Federal fleet and Transportation Efficiency), the Service will develop and implement a strategy to reduce its vehicle fleet's annual petroleum consumption.

*(See Soundscape Management 4.9)*

#### 8.2.3.1  Off-road Vehicle Use
Off-road motor vehicle use in national park units is governed by Executive Order 11644 (as amended by Executive Order 11989), which defines off-road vehicles as "any motorized vehicle designed for or capable of cross-country travel on or immediately over, land, water, sand, snow, ice, marsh, swampland, or other natural terrain" (except any registered motorboat or any vehicle used for emergency purposes). Unless otherwise provided by statute, any time there is a proposal to allow a motor vehicle meeting this description to be used in a park, the provisions of the Executive order must be applied.

Within the national park system, routes and areas may be designated for off-road motor vehicle use only by special regulation, and only when it would be consistent with the purposes for which the park unit was established. Routes and areas may be designated only in locations in which there will be no adverse impacts on the area's natural, cultural, scenic, and esthetic values, and in consideration of other visitor uses. The criteria listed in section 8.2 must also be applied to determine whether off-road vehicle use may be allowed. As required by the Executive order and the Organic Act, superintendents must immediately close a designated off-road vehicle route whenever the use is causing, or will cause, unacceptable adverse effects on the soil, vegetation, wildlife, wildlife habitat, or cultural or historic resources.

NPS administrative off-road motor vehicle use will be limited to what is necessary to manage the public use of designated off-road vehicle routes and areas; to conduct emergency operations; and to accomplish essential maintenance, construction, and resource protection activities that cannot be accomplished reasonably by other means.

*(See Park Management 1.4; Minimum Requirement 6.3.5. Also see 36 CFR 4.10)*

#### 8.2.3.2  Snowmobiles
Snowmobile use is a form of off-road vehicle use governed by Executive Order 11644 (as amended by Executive Order 11989) and, in Alaska, by provisions of ANILCA (16 USC 3121 and 3170). Implementing regulations are published at 36 CFR 2.18, 36 CFR Part 13, and 43 CFR Part 36.

NPS administrative use of snowmobiles will be limited to what is necessary to manage public use of snowmobile routes and areas; to conduct emergency operations; and to accomplish essential maintenance, construction, and resource protection activities that cannot be accomplished reasonably by other means.

*(See Minimum Requirement 6.3.5; Management Facilities 6.3.10; General Policy 6.4.1)*

#### 8.2.3.3  Personal Watercraft
Motorized Personal Watercraft (PWC) use is prohibited unless it has been identified as appropriate for a specific park. PWC may be authorized if an evaluation of the park's enabling legislation, resources and values, other visitor uses, and overall management objectives confirms that PWC use is appropriate and consistent with the criteria in section 8.2.

#### 8.2.4  Accessibility for Persons with Disabilities
All reasonable efforts will be made to make NPS facilities, programs, and services accessible to and usable by all people, including those with disabilities. This policy reflects the commitment to provide access to the widest cross section of the public, and to ensure compliance with the intent of the Architectural Barriers Act and the Rehabilitation Act. The Service will also comply with section 507 of the ADA (42 USC 12207), which relates specifically to the operation and management of federal wilderness areas. Specific guidance for implementing these laws is found in the Secretary of the Interior's regulations regarding enforcement of nondiscrimination on the basis of disability in Department of the Interior programs (43 CFR Part 17, Subpart E).

One primary tenet of disability rights requirements is that, to the highest degree reasonable, people with disabilities should be able to participate in the same programs and activities available to everyone else. In choosing among methods for providing accessibility, higher priority will be given to those methods that offer programs and activities in the most integrated setting appropriate. Special, separate, or alternative facilities, programs, or services will be provided only when existing ones cannot reasonably be made accessible. The determination of what is reasonable will be made only after careful consultation with persons with disabilities, or their representatives. Any decision that would result in "less than equal opportunity" is subject to the filing of an official disability rights complaint under the Departmental regulations cited above.

*(See Physical Access for Persons with Disabilities 5.3.2; Accessibility for Persons with Disabilities 6.4.10; Accessibility for Persons with Disabilities 9.1.2. Also see Director's Order #16A: Reasonable Accommodation for Applicants and Employees with Disabilities; Director's Order #42: Accessibility for Visitors with Disabilities)*

## 8.2.5 Visitor Safety and Emergency Response

### 8.2.5.1 Visitor Safety
The saving of human life will take precedence over all other management actions as the Park Service strives to protect human life and provide for injury-free visits. The Service will do this within the constraints of the 1916 Organic Act. The primary—and very substantial—constraint imposed by the Organic Act is that discretionary management activities may be undertaken only to the extent that they will not impair park resources and values.

While recognizing that there are limitations on its capability to totally eliminate all hazards, the Service and its concessioners, contractors, and cooperators will seek to provide a safe and healthful environment for visitors and employees. The Service will work cooperatively with other federal, tribal, state, and local agencies, organizations, and individuals to carry out this responsibility. The Service will strive to identify recognizable threats to the safety and health of persons and to the protection of property by applying nationally accepted codes, standards, engineering principles, and the guidance contained in Director's Orders #50, #58, and #83 and their associated reference manuals. When practicable, and consistent with congressionally designated purposes and mandates, the Service will reduce or remove known hazards and apply other appropriate measures, including closures, guarding, signing, or other forms of education. In doing so, the Service's preferred actions will be those that have the least impact on park resources and values.

The Service recognizes that the park resources it must protect are not only a visitor attraction, but that they may also be potentially hazardous. In addition, the recreational activities of some visitors may be of an especially high-risk, high-adventure type, which pose a significant personal risk to participants, and which the Service cannot totally control. Park visitors must assume a substantial degree of risk and responsibility for their own safety when visiting areas that are managed and maintained as natural, cultural, or recreational environments.

These management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level, who must work within the limits of funding and staffing. Examples include decisions about whether to install warning signs or artificial lighting; distribute weather warnings or advisories; initiate search and rescue operations, or render emergency aid; eliminate potentially dangerous animals; close roads and trails, or install guardrails and fences; and grant or deny backcountry or climbing permits. Some forms of visitor safeguards—such as fences, railings, and paved walking surfaces—typically found in other public venues may not be appropriate or practicable in a national park setting.

*(See Air Quality 4.7.1; Lightscape Management 4.10; General Policy 6.4.1; Siting Facilities to Avoid Natural Hazards 9.1.1.6; Waste Management and Contaminant Issues 9.1.6; Risk Management Program 10.2.4.8; Food Service Sanitation Inspections 10.2.4.14)*

### 8.2.5.2 Emergency Preparedness and Emergency Operations
The National Park Service will develop a program of emergency preparedness in accordance with title VI of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 USC 5195—5197g); National Security Decision Directive 259 (February 4, 1987); Department of the Interior policy; and other considerations at the Washington headquarters, regional, and park levels. The purpose of the program will be to maximize visitor and employee safety and the protection of resources and property. This program will include a systematic method for alerting visitors about potential disasters and evacuation procedures.

Superintendents may assist other agencies with emergencies outside of parks, as authorized by 16 USC 1b(1). To the extent practicable, written agreements with other agencies, in accordance with Director's Order #20, must first be in effect. NPS employees who are outside the area of their jurisdiction, and who are directed by their supervisors to provide emergency assistance to other agencies, will be considered to be acting within the scope of their employment.

Park Service emergency operations will be conducted utilizing the Incident Command System (IS) of the National Interagency Incident Management System. The Unified Command System (within IS) will be utilized when other agencies are involved. Each park superintendent will develop and maintain an emergency operations plan to ensure an effective response to all types of emergencies that can be reasonably anticipated.

As one element of the emergency operations plan, or as a separate document, each park must have an oil and chemical spill response management plan for spills that result from NPS activities or from activities that are beyond the NPS's control (such as commercial through-traffic on roads that pass through a park). The plans will place first priority on responder and public safety. Employees will not be permitted to respond to hazardous material spills unless they are properly qualified and certified in accordance with Director's Order #30C: Hazardous Spill Response. The Service will seek to recover all allowable direct and indirect costs for responding to oil or hazardous materials spills.

Parks that have their own aircraft, or incidents of aircraft contracting, must have an aircraft crash rescue response plan in place.

*(See Emergency Management 5.3.1.1. Also see Director's Order 60A: Aviation Management)*

### 8.2.5.3 Search and Rescue
To provide for the protection and safety of park visitors, the Service will make reasonable efforts to search for lost persons, and to rescue sick, injured, or stranded persons. This responsibility may be fulfilled by Service staff or by qualified search-and-rescue organizations or agencies that are capable of responding to life-threatening emergencies pursuant to the terms of a formal agreement. Deceased persons will be evacuated unless the level of risk to the rescue party is found to be unacceptably high. Search managers and superintendents will jointly determine when to terminate a search. The NPS will

not charge visitors for search-and-rescue operations. Search-and-rescue operations will be conducted utilizing the IS.

*(See Management Facilities 6.3.10; General Policy 6.4.1)*

### 8.2.5.4  Emergency Medical Services
The Service will make reasonable efforts to provide appropriate emergency medical services for persons who become ill or injured. An emergency medical services program will be maintained to provide transportation of the sick and injured, and emergency pre-hospital care, which may range from minor first aid to advanced life support in various environmental settings. Transportation may include everything from patrol cars and ambulances, to fixed-wing planes and helicopter air ambulances.

Qualified emergency medical services in local communities may be used if such services can respond rapidly enough in life-threatening emergencies. When such services are not available, the NPS will make a reasonable effort to provide a level of emergency medical service commensurate with park needs, and in response to an emergency medical needs assessment. Each superintendent will develop and implement a program to meet those needs, in accordance with Director's Order #51: Emergency Medical Services. Extended emergency medical services operations will be conducted utilizing the IS.

### 8.2.6  Recreation Fees and Reservations
The National Park Service may charge a recreation admission or use fee at parks when authorized by law. Although these fees may provide for the support of the overall management and operation of parks, they are not intended to totally offset the operational costs associated with a park. Such services include protection; resource management; information and orientation; maintenance of park facilities; and interpretation to foster an understanding and appreciation of each park's resources, management procedures, regulations, and programs. Fees may be instituted for secondary or special services that the NPS cannot, or elects not to, offer because of economic constraints or the need for special skills or equipment, or because they are purely supplemental programs. The Service may also contract for the collection of recreational fees if there is a demonstrated benefit to the collecting park unit. In all cases, fee programs will support park purposes and comply with appropriate Service policies and standards.

*(See Commercial Use Authorizations 10.3. Also see Director's Order #22: Fee Collection)*

### 8.2.6.1  Recreation Fees
Visitors who use federal facilities and services for recreation may be required to pay a greater share of the cost of providing those opportunities than the population as a whole. Under the guidelines and criteria established by law and regulation, the Service will collect recreation fees of the appropriate type for its parks, facilities, and programs. No fees will be collected in circumstances in which the costs of collection would exceed revenue, or where prohibited by law or regulation. Fees charged for recreational activities will be collected only in accordance with the applicable authority, and recreation fee revenues will be managed according to law and policy. Fee rates will be reasonable and equitable, and consistent with criteria and procedures contained in law and NPS guidance docu-

ments. Those who lawfully enter or use a park for activities not related to recreation will not be charged an entrance fee, recreation use fee, or special recreation permit fee. Examples of non-recreation exemptions include persons entering parks for

- First Amendment activities, which are exempt from all fees;
- Special park uses such as agricultural, grazing, and commercial filming activities (all of which are subject to special park use fees);
- NPS-authorized research activities;
- Federal, state, tribal, and local government business; and
- Outings conducted for educational purposes by schools and other bonafide educational institutions.

*(See Fees 8.6.1.2; first Amendment Activities 8.6.3. Also see 36 CFR 71.13)*

### 8.2.6.2  National Park Reservation Service
To better serve park visitors, to ensure the protection of park resources, or to improve operational efficiency, the NPS will operate a national reservation service of its own, or participate in an inter-agency system. A reservation service may involve campgrounds, other facilities, tours, or other services operated or provided by the NPS for visitors. Existing reservation services may be expanded or new services developed, based on NPS needs.

Superintendents are encouraged to have their parks participate in the Service-wide reservation system whenever it will improve visitor services, better market less-used parks, or improve the efficiency of park administration. In order to avoid duplicative costs and confusion, a park must first determine that a Service-wide system already in operation will not accommodate the park's reservation needs, before participating in some other type of reservation system.

*(See Chapter 7: Interpretation and Education)*

## 8.3  Law Enforcement Program

### 8.3.1  General
The law enforcement program is an important tool in carrying out the National Park Service mission. The objectives of the NPS law enforcement program are (1) the prevention of criminal activities through resource education, public safety efforts, and deterrence; and (2) the detection and investigation of criminal activity and the apprehension and successful prosecution of criminal violators. In carrying out the law enforcement program, the Service will make reasonable efforts to provide for the protection, safety, and security of park visitors, employees, concessioners, and public and private property, and to protect the natural and cultural resources entrusted to its care.

Law enforcement is characterized by high risks and inherent dangers to enforcement officers, and by high public expectations that law enforcement activities will be performed in a professional manner. It is therefore essential that the Service issue clear policies and procedures to guide the law enforcement program, and that commissioned employees receive the training and equipment necessary to perform their jobs successfully. The NPS law enforcement program will be managed and supervised in accordance with all applicable laws and regulations; Part 446 of the Department of the Interior Manual;

these Management Policies; and Director's Order #9: Law Enforcement Program (or U.S. Park Police General Orders, as appropriate). To help sustain the high level of public trust necessary for an effective law enforcement program, commissioned employees will adhere to the Department of the Interior's law enforcement code of conduct, and the standards of ethical conduct found in Reference Manual 9.

The authority and responsibility to manage the law enforcement program will flow from the Director to the regional directors, and from regional directors to park superintendents. To aid in meeting their responsibilities, each park superintendent will prepare a Law Enforcement Needs Assessment and update it at least every three years, guided by the Visitor Management-Resource Protection Assessment Program.

### 8.3.2  The Context for Law Enforcement
Park law enforcement activities will be managed by superintendents as part of a comprehensive, interdisciplinary effort to protect resources, manage public use, and promote public safety and appropriate enjoyment. This is in keeping with guidance provided by Congress in 1976 when it amended the General Authorities Act (16 USC 1a-3):

> The Committee intends that the clear and specific enforcement authority contained in this subsection, while necessary for the protection of the Federal employees so involved, will be implemented by the Secretary to ensure that law enforcement activities in our National Park System will continue to be viewed as one function of a broad program of visitor and resource protection. (House Report No. 94-1569, September 16, 1976)

### 8.3.3  Shared Responsibilities
Congress has authorized the designation of certain employees as law enforcement officers, with the responsibility to "...maintain law and order and protect persons and property within areas of the National Park System" (16 U.S.C. 1a-6(b)). Only employees who meet the standards prescribed by, and who are designated by, the Secretary of the Interior may perform law enforcement duties. The duties of these commissioned employees will not be limited to just law enforcement; they will also continue to incorporate a diversity of other protection concerns, as stipulated in House Report No. 94-1569.

The Service recognizes that effective enforcement requires a cooperative community effort. Therefore, employees without law enforcement commissions will continue to share responsibility for the protection of park resources and visitors, and they will be expected to report any apparent violations or suspicious activities. All park employees will be trained to recognize, observe, and record criminal acts and illegal activities. The Service will also encourage and assist park neighbors in the development of cooperative crime prevention and detection programs.

Extended law enforcement operations will be conducted using the NIIMS Incident Command System.

### 8.3.4  Enforcement Authority
Within park boundaries, the Service will fulfill its law enforcement responsibilities using NPS employees. However, the NPS is authorized by 16 USC 1a-6(c) to appoint (deputize) another agency's qualified personnel as special police when it will benefit the administration of a park area. Deputations may be issued only for the purpose of obtaining supplemental law enforcement assistance during emergencies or special events, and not to delegate NPS law enforcement responsibilities to state or local governments. All such appointments must be approved by the park superintendent and supported by a written agreement with the other agency at the park or national level, except when there is insufficient time because of an emergency law enforcement situation.

The Service is also authorized to use appropriated funds for "Rendering of emergency rescue, fire fighting, and [other] cooperative assistance to nearby law enforcement and fire prevention agencies and for related purposes outside of the National Park System" (16 U.S.C. 1b(1)). This authority will be used only after first determining that such actions will facilitate the administration of the park, or be an effective management tool for obtaining mutual assistance from other agencies. Furthermore, the authority will generally be used only in response to an unexpected occurrence that requires immediate action, which may include one or more of the following:

- Emergency responses such as life or death incidents, serious injury/fatality accident/incident scenes, crime scenes involving the protection of human life, officer in trouble, threat(s) to health or safety of the public.
- Emergency or law enforcement incidents directly affecting visitor safety or resource protection.
- Probable-cause felonies and felonies committed in the presence of and observed by National Park Service rangers.
- Misdemeanors committed in the presence of National Park Service rangers that present an immediate threat to the health and safety of the public.

Cooperative assistance rendered to nearby law enforcement agencies outside of park boundaries should be limited to only those actions or efforts that support or assist those agencies. Further, insofar as 16 USC 1b(1) does not confer arrest authority to NPS personnel who act outside park areas, state arrest authority is first needed before NPS personnel may enforce state law or engage in law enforcement activity. The Service may not assume law enforcement responsibility outside of park boundaries in lieu of the legitimate responsibilities of nearby agencies.

### 8.3.5  Jurisdiction
The term "jurisdiction" defines the sphere of authority and outlines the boundaries or territorial limits within which any particular authority may be exercised. Jurisdiction may be either "exclusive," "partial," "concurrent," or "proprietary." Insofar as is practicable, the Service will seek to acquire concurrent legislative jurisdiction for all units of the national park system, as required by the 1976 amendment to the General Authorities Act. Concurrent jurisdiction allows the NPS to enforce federal criminal statutes and also to assimilate state law under 18 USC 13, when no applicable federal law or regulation exists. Concurrent jurisdiction will allow for the more efficient conduct of both state and federal law enforcement functions within the parks.

MANAGEMENT POLICIES

### 8.3.6  Use of Force
Commissioned employees may use a wide variety of defensive equipment and force options in response to various threats and other enforcement situations. The primary consideration is the timely and effective application of the appropriate level of force required to establish and maintain lawful control. The only justifications for the use of force are:

■ To defend self;
■ To defend others;
■ To effect an arrest;
■ To restrain or control violent, threatening, or resistive behavior, or to disperse an unlawful group.

Commissioned employees may use deadly force only when necessary; that is, when the ranger has an objectively reasonable belief, in light of the facts and circumstances confronting the ranger, that the subject of such force poses an imminent danger of death or serious physical injury to the ranger or to another person. "Deadly force" is the use of any force that is likely to cause death or serious physical injury. Deadly force does not include force that is not likely to cause death or serious physical injury, but unexpectedly results in such death or injury.

If force other than deadly force reasonably appears to be sufficient to accomplish an arrest or otherwise accomplish the law enforcement purpose, that is the preferred level of force. In no instance may deadly force be utilized unless such use is objectively reasonable under the circumstances.

Animals may be destroyed when necessary in self-defense or in the defense of others. Pets or feral animals that are running at large and observed in the act of killing, injuring, or molesting humans, livestock, or wildlife may be destroyed, as provided by regulations at 36 CFR 2.15(c).

### 8.3.7  Public Information and Media Relations
The National Park Service will provide information to the public and the news media in accordance with applicable laws, Departmental policy, and Director's Order #75: Media Relations. Superintendents should identify appropriate opportunities to (1) enhance deterrence by publicizing arrests, weapons seizures, and successful prosecutions; (2) highlight cooperation and assistance activities such as Park Watch; and (3) educate the public about the full range of threats to, and the difficulty in protecting, park resources.

The right of the public to obtain information about government operations and activities is subject to the requirements of FOIA and the Privacy Act.

### 8.4  Overflights and Aviation Uses

A variety of aircraft, including military, commercial, general aviation, and aircraft used for National Park Service administrative purposes, fly in the airspace over national parks. While there are many legitimate aviation uses, overflights can adversely affect park resources and values and interfere with visitor enjoyment. The Service will take all necessary steps to avoid or to mitigate adverse effects from aircraft overflights.

Because the nation's airspace is managed by the Federal Aviation Administration (FAA), the Service will work constructively and cooperatively with the FAA, as well as with national defense and other agencies, to ensure that authorized aviation activities affecting units of the national park system occur in a safe and appropriate manner, with minimal impact on park resources and values and visitor experiences. The Service will build and maintain a cooperative and problem-solving relationship with national defense agencies to address the congressionally mandated mission of each agency, and which will prevent or mitigate any adverse effects of military training or operational flights on park resources or visitors. Cooperation is essential because the other agencies involved have statutory authorities and responsibilities that must be recognized by the Service.

*(See Soundscape Management 4.9. Also see Director's Orders #47: Soundscape Preservation and Noise Management; #60: Aviation Management)*

### 8.4.1  Alaska and Remote Areas
Aviation can provide an important, and in some cases the preferred, means of access to remote areas in certain parks, especially in Alaska. In such cases, access by aircraft may make an important contribution to the protection and enjoyment of those areas. Dependence on aviation will be fully considered

and addressed in the planning process for those parks. Alaska parks have specific regulations concerning fixed-wing aircraft, published at 36 CFR Part 13, and 43 CFR 36.11(f).

### 8.4.2  Education
The Service will develop educational materials for the general public and for aviation interests, describing the importance of the natural soundscape and tranquility to park visitors, as well as the need for cooperation from the aviation community.

*(See Chapter 7: Interpretation and Education; Soundscape Management 4.9)*

### 8.4.3  General Aviation
The Service will work closely with the FAA and with general aviation organizations to ensure that general aviation operations over units of the national park system are conducted in accordance with applicable FAA advisories and "fly-friendly" techniques and procedures designed to help pilots minimize impacts on national parks. The Service will seek the assistance of these organizations in problem resolution if general aviation concerns arise over national parks.

### 8.4.4  Administrative Use
Aviation is a necessary and acceptable management tool in some parks when used in a manner consistent with the NPS mission. Aviation activities will comply with all applicable policies and regulations issued by the Department of the Interior, the FAA, and the NPS. In its administrative use of aircraft, the Service will:

■ Use, to the maximum extent practicable, the quietest aircraft available for its aviation operations.
■ Limit official use of flights over parks to those needed to support or carry out emergency operations or essential management activities in cases where there are no practical

alternatives or when alternative methods would be unreasonable. Full consideration will be given to safety; wilderness management implications; impacts on resources, values, or visitors; impacts on other administrative activities and overall cost-effectiveness.

- Plan, schedule, and consolidate flights so as to avoid or minimize adverse impacts on park resources and values and visitor enjoyment.
- Require other agencies that request to use aircraft within park boundaries to comply with the standards and policies applicable to NPS aircraft.

*(Also see Director's Order #60: Aviation Management)*

### 8.4.5  Military Aviation

The Service will work cooperatively with agencies of the Department of Defense in order to address the congressionally mandated missions of all agencies. In addition, the Service will prevent or strive to mitigate any adverse effects of overflights related to military training or operational low-level overflights on park resources, values, or visitor experiences in national park units. Superintendents are responsible for opening lines of communication with base commanders controlling Military Training Routes or Military Operations Areas that may affect their parks, and for developing formal agreements that mitigate identified impacts.

### 8.4.6  Commercial Air Tour Management

The National Parks Air Tour Management Act of 2000, and implementing FAA regulations, provide for a joint FAA/NPS planning process that will lead to the management of commercial air tours over national parks by the FAA (with the exception of parks in Alaska, which are specifically excluded from the process). The NPS, as a cooperating agency, will assist the FAA in developing an air tour management plan (ATMP) for each park with existing or proposed air tours. Superintendents will work cooperatively with the FAA, air tour operators, and other stakeholders in the development of ATMPs, and will determine the nature and extent of impacts on natural and cultural resources and visitor experience opportunities inside park boundaries. The FAA, with responsibility for ensuring the safe and efficient use of the nation's airspace and for protecting the public health and welfare from aircraft noise, will implement the ATMP and regulate commercial air tours in accordance with it.

### 8.4.7  Permitted Overflights

When issuing permits for activities such as filming or research, in which the use of aircraft is proposed, the superintendent will impose conditions to protect park resources and values from adverse impacts. Permit requests will be denied if the activity will have unacceptable impacts on a park's resources, values, or desired visitor experiences.

### 8.4.8  Airports and Landing Sites

Private or commercial aircraft may be operated in parks only on lands or water surfaces designated by the Park Service as landing sites through special regulation. (See section 8.4.1 regarding Alaska and some remote areas.)  The Service will evaluate and manage aircraft landing sites under its jurisdiction to ensure that the use of the sites will have no unacceptable impacts on park resources and values, public safety, or visitor enjoyment. Existing sites that meet these criteria and that have been designated as a result of previously established use may be retained as long as

the administrative need for them continues. New sites will be designated only where essential to provide administrative access to remote areas (other than wilderness), and only where the site can be established, used, and maintained without the need for new construction or major site improvements.

The National Park Service will also work with entities having jurisdiction over landing sites and airports adjacent to parks for the purpose of preventing, reducing, or otherwise mitigating the effects of aircraft operations. Whether landing sites or airports are situated within or adjacent to parks, the objective will be to minimize noise and other impacts, and confine them to the smallest and most appropriate portion of the park as possible, consistent with safe aircraft operations.

*(Also see 36 CFR 2.17; 43 CFR 36.11(f); Reference Manual 47)*

## 8.5  Native American Use

The National Park Service will develop and implement its programs in a manner that reflects knowledge of and respect for the cultures of Native American tribes or groups with demonstrated ancestral ties to particular resources in parks. Evidence of such ties will be established through systematic archeological or ethnographic studies, including ethnographic oral history and ethnohistory studies, or a combination of these sources. For purposes of these policies, the term "Native American" includes American Indians, Alaskan natives, native peoples of the Caribbean, native Hawaiians, and other native Pacific islanders. The term will be applicable to federally and state-recognized tribes and to those Native Americans who are defined by themselves and known to others as members of a named cultural unit that has historically shared a set of linguistic, kinship, political, or other distinguishing cultural features.

The Service will regularly and actively consult with traditionally associated Native American individuals or groups regarding planning, management, and operational decisions that affect subsistence activities, sacred materials or places, or other ethnographic resources with which they are historically associated. Information about the outcome of these consultations will be made available to those consulted.

In developing its plans and carrying out its programs, the Service will ensure the following:

- Park Service general regulations governing access to and use of natural and cultural resources in parks will be applied in an informed and balanced manner that is consistent with park purposes, does not unreasonably interfere with Native American use of traditional areas or sacred resources, and does not violate the criteria listed in section 8.2 for use of the parks.
- Superintendents will establish and maintain consulting relationships with potentially affected Native American tribes or groups.
- Management decisions will reflect knowledge about and understanding of potentially affected Native American cultures and people, gained through research and consultations with the potentially affected groups.

AIRFA (42 USC 1996) states that "henceforth it shall be the policy of the United States to protect and preserve for

American Indians their inherent right to freedom to believe, express, and exercise the traditional religions of the American Indians, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." The National Park Service recognizes that site-specific worship is vital to Native American religious practices. As a matter of policy, and in keeping with the spirit of the law, the Service will be as unrestrictive as possible in permitting Native American tribes access to park areas to perform traditional religious, ceremonial, or other customary activities at places that have been used historically for such purposes, provided the criteria listed in section 8.2 are not violated. In allowing religious access by other entities, including nonrecognized Indian groups, the NPS will consider requests individually, being mindful to not take actions which will either advance or inhibit religion. The Service will not direct visitor attention to the performance of religious observances unless the Native American group so wishes.

With regard to consumptive use of park resources, current NPS policy is reflected in regulations published at 36 CFR 2.1. These regulations allow superintendents to designate certain fruits, berries, nuts, or unoccupied seashells which may be gathered by hand for personal use or consumption if it will not adversely affect park wildlife or the reproductive potential of a plant species, or otherwise adversely affect park resources. The regulations do not authorize the taking, use, or possession of fish, wildlife, or plants for ceremonial or religious purposes, except where specifically authorized by Federal statute or treaty rights, or where hunting, trapping, or fishing are otherwise allowed. These regulations are under review, and NPS policy is evolving in this area.

The Service will protect sacred resources to the extent practicable and in a manner consistent with the goals of the traditionally associated Native American tribe or group, when authorized under NHPA. The location and character of sacred sites will be withheld from public disclosure, if disclosure will cause significant invasion of privacy, risk harm to the historic resource, or impede the use of a traditional religious site by practitioners.

As with other non-recreational users, members of Native American tribes or groups may enter parks for traditional non-recreational activities without paying an entrance fee.

The ceremonial use of peyote will be limited to members of the Native American Church during religious ceremonies, in accordance with regulations of the Department of Justice, Drug Enforcement Administration ("Special Exempt Persons, Native American Church," 21 CFR 1307.31).

*(See Consultation 5.2.1; Ethnographic Resources 5.3.5.3; first Amendment Activities 8.6.3; Consumptive Uses 8.9. Also see Executive Order 13007; Director's Orders #71A: Relationships with Indian Tribes, and #71B: Indian Sacred Sites)*

**8.6  Special Park Uses**

**8.6.1  General**
A special park use is defined as a short-term activity that takes place in a park area, and that:

- Provides a benefit to an individual, group, or organization rather than the public at large;
- Requires written authorization and some degree of management control from the Service in order to protect park resources and the public interest;
- Is not prohibited by law or regulation;
- Is not initiated, sponsored, or conducted by the Service; and
- Is not managed under a concession contract (see chapter 10), a recreation activity for which the NPS charges a fee, or a lease (see chapter 5).

**8.6.1.1  Requests for Permits**
Each request to permit a special park use or to renew authorization of an existing use will be reviewed and evaluated by the superintendent according to the terms of applicable legislation, regulations, and management planning documents, using criteria and procedures outlined in Director's Order #53: Special Park Uses. When considering permit requests, superintendents will take into account the Service-wide implications of their decisions. A superintendent must deny initial requests, or requests for renewal, upon finding that the proposed activity would not be allowed under the criteria listed in section 8.2. The superintendent likewise must terminate previously authorized special park uses based on such a finding.

**8.6.1.2  Fees**
Appropriate fees for cost recovery, as well as performance bond and liability insurance requirements, will be imposed, consistent with applicable statutory authorities and regulations. All costs incurred by the Service in writing the permit, monitoring, providing protection services, restoring park areas, or otherwise supporting a special park use will be reimbursed by the permittee. When appropriate, the Service will also include a fair charge for the use of the land or facility.

*(See Park Management 1.4; Recreation Fees and Reservations 8.3; Special Events 8.6.2)*

**8.6.2  Special Events**

**8.6.2.1  General**
Special events—such as sports, pageants, regattas, public spectator attractions, entertainment, ceremonies, and encampments—may be permitted by the superintendent when (1) there is a meaningful association between the park area and the event, and (2) the event will contribute to visitor understanding of the significance of the park area. However, a permit must be denied if the event would be disallowed under the criteria listed in section 8.2. The superintendent must ensure that appropriate permit conditions are imposed for special events.

The Park Service will not permit the public staging of special events that are conducted primarily for the material or financial benefit of organizers or participants; or are commercial in nature; or that demand in-park advertising or publicity; or for which a separate public admission fee is to be charged. However, park buildings or specially designated locations that are suitable and appropriate may be made available for private, "by-invitation-only" events. Admission fees for, or any other monies associated with the "by-invitation-only" event, may not be collected by the permittee on park premises.

Large scale events will be managed utilizing the NIBS Incident Command System.

*(See Special Events 6.4.5; Personal Services 7.3.1; Cultural Demonstrators 7.5.6; Facilities for Arts and Culture 9.3.1.7. Also see 36 CFR 2.50 and 36 CFR 7.96)*

### 8.6.2.2  Helium-Filled Balloons

Helium-filled balloons pose a danger to the health and safety of marine wildlife (such as sea turtles and sperm whales) and create a litter problem. Therefore, no releases of helium-filled balloons into the atmosphere within a park will be authorized, except for research or planning purposes. Releasing balloons indoors where they can be retrieved may be authorized under permit.

### 8.6.2.3  Fireworks Displays

Fireworks displays will not be permitted if they pose an unacceptable risk to park resources or values. In all instances, the decision to approve or deny a request will be made by the superintendent, following consultation with the regional safety officer. Fireworks displays will be conducted in compliance with the National Fire Protection Association Code for the Display of Fireworks (NFPA 1123).

### 8.6.2.4  Sale of Food or Merchandise

The sale of food in the parks is allowed when managed under a permit which does not conflict with a concession contract, and complies with applicable public health codes and Director's Order #83: Public Health. The sale of printed material as defined in 36 CFR 2.52, 36 CFR 7.96(k), and Reference Manual 53, is allowed; but the sale of all other merchandise, including, but not limited to, T-shirts, clothing, and arts and crafts, is prohibited. These restrictions do not apply to sales operations managed under concession contracts or under agreements with cooperating associations operating within their designated sales areas. *(For the sale of products produced in the conduct of living exhibits, interpretive demonstrations, or park programs, see section 7.5.6 of chapter 7.)*

*(Also see 60 FR 17639, April 7, 1995)*

### 8.6.3  First Amendment Activities

The National Park Service will authorize the use of park land for public assemblies, meetings, demonstrations, religious activities, and other public expressions of views protected under the First Amendment of the U.S. Constitution, in accordance with NPS regulations. To ensure public safety and the protection of park resources and values, and to avoid assigning the same location and time to two or more activities, the Service may manage these activities by issuing a permit to regulate the time, location, number of participants, use of the facilities, and number and type of equipment used, but not the content of the message presented.

For all parks except those within the National Capital Region, locations that are available for public assemblies and other First Amendment activities, including the sale and distribution of printed matter, will be so designated by the superintendent on a map in accordance with procedures and criteria found in NPS regulations (36 CFR 1.5, 1.7, 2.51, and 2.52), unless the sites are otherwise protected from public disclosure, such as sites sacred to Native Americans or sites with vulnerable natural and cultural resources. National Capital Region parks

are subject to special demonstration regulations found at 36 CFR 7.96(g)(4)(iii), and do not have such areas designated by the superintendent.

When the Service allows one group to use an area or facility for expressing views, it must provide other groups with a similar opportunity, if requested. No group wishing to assemble lawfully may be discriminated against or denied the right of assembly, provided that all permit conditions are met. Whenever religious activities are conducted in parks, any Park Service actions pertaining to them must reflect a clearly secular purpose, must have a primary effect that neither advances nor inhibits religion, and must avoid "excessive governmental entanglement with religion."

NPS staff on duty in an area in which a First Amendment activity is being conducted will be neutral toward the activity, but will remain responsible for the protection of participants, spectators, private property, public property, and park resources. On-duty staff may not participate in a First Amendment activity. NPS employees exercising their First Amendment rights when off-duty must not, in any way, imply any official Park Service endorsement of the activity.

When a permit is requested for the exercise of First Amendment rights, including freedom of assembly, speech, religion, and the press, the superintendent will issue the permit without any requirement for fees, cost recovery, bonding, or insurance. The superintendent will issue or deny a first Amendment permit request under 36 CFR 2.51 within 2 business days after receiving a proper application. National Capital Parks subject to special demonstration regulations found at 36 CFR 7.96(g)(3) are deemed granted within 24 hours of receipt.

*(See Confidentiality 5.2.3. Also see Reference Manual 53)*

### 8.6.4  Rights-of-Way for Utilities and Roads

#### 8.6.4.1  General

A right-of-way is a special park use allowing a utility to pass over, under, or through NPS property. It may be issued only pursuant to specific statutory authority, and generally only if there is no practicable alternative to such use of Park Service lands. The criteria listed in section 8.2 must also be met.

When an application for a right-of-way is submitted, the superintendent will establish conditions, and develop documentation of compliance with NEPA, NHPA, and other statutory compliance requirements as appropriate. Due to the potentially high costs and values associated with rights-of-way, special attention will be paid to fees and the recovery of a fair market value for use of the land. New rights-of-way will be executed by the regional director; conversions from other authorizing documents, amendments, and renewals of existing rights-of-way may be signed by the superintendent. A right-of-way issued by the Park Service is considered a temporary document, and does not convey an interest in land.

National Park Service regulations pertaining to the issuance of rights-of-way are in 36 CFR Part 14; Department of the Interior regulations pertaining to rights-of-way in Alaska are found in 43 CFR Part 36. Additional guidance can be found

MANAGEMENT POLICIES

in Director's Order #53, and Reference Manual 53: Special Park Uses. A utility or road right-of-way proposed for a park in Alaska is subject to the authorities and procedural requirements of title XI of ANILCA.

*(See Park Management 1.4, Rights-of-Way 6.4.8. Also see Director's Order #53)*

**8.6.4.2   Utilities**
Utility rights-of-way over lands administered by the NPS are governed by statutory authorities in 16 USC 5 (electrical power transmission and distribution, radio and TV, and other forms of communication facilities), and 16 USC 79 (electrical power, telephone, and water conduits). Rights-of-way issued under 16 USC 5 or 79 are discretionary, and conditional upon a finding by the Service that the proposed use will not cause unacceptable impacts to park resources, values, or purposes, and is not incompatible with the public interest.

**8.6.4.3   Telecommunication Antenna Sites**
Requests to site non-NPS telecommunication antennas and related facilities on Park Service lands will be considered in accordance with the Telecommunications Act of 1996 (47 USC 332 note), which authorizes the NPS to issue rights-of-way permits for telecommunications services. Superintendents will accept an application for a telecommunications antenna site only from a Federal Communications Commission licensee authorized to provide these services.

As with other special park uses, telecommunication proposals must meet the criteria listed in section 8.2. In addition:

■ Superintendents will encourage preliminary meetings with telecommunication antenna applicants who wish to discuss the pending applications and address NPS concerns. Similar meetings should be held during the decision-making process, as necessary, particularly if the superintendent is considering denying the application.
■ Superintendents will consider the safety of the visiting public when reviewing telecommunication antenna applications, including the potential benefit of having telephone access to emergency law enforcement and public safety services.
■ Reviews under NEPA and NHPA will be conducted expeditiously and consistent with all applicable statutes, and within timetables established under Director's Order #53.

**8.6.4.4   Roads and Highways**
Right-of-way permits are not issued for roads and highways within the federal aid highway system. These highways require specific statutory authority. A request for lands for highway purposes under 23 USC 107(d) or 317 is subject to compliance with 23 USC 138—commonly referred to as 4(f)). The 4(f) evaluation is to be completed by the Secretary of Transportation and concurred in by the Secretary of the Interior. There are no general NPS statutory authorities for non-NPS roads or for gas pipelines; however, individual park enabling legislation may provide such authorizations. If park-specific enabling legislation is absent, the Service will generally object to proposals for the use of park lands for highway purposes that do not directly benefit a park.

*(See Fees 8.6.1.2; Non-NPS Roads 9.2.1.2,Construction and Expansion Proposals 9.2.1.2.2. Also see Director's Order #87D: Non-NPS Federal Aid Roads)*

**8.6.5   Access to Private Property**
The Park Service will not prevent access to the private property of adjacent landowners, as well as the property of landowners within park boundaries, when

■ It would contribute in a material way to the park's mission, without causing unacceptable impacts to park resources or values, or the purposes for which the park was established; or
■ Access is the landowner's right by law or by deed reservation.

When one of these circumstances exist, commercial vehicles will be allowed access to private property only in accordance with 36 CFR 5.6, "Commercial Vehicles."

**8.6.6   Filming and Photography**

**8.6.6.1   General**
The National Park Service will encourage filming and photography when it will promote the protection and public enjoyment of park resources, provided that the activity does not violate the criteria listed in section 8.2.

Filming and photography activities that do not necessarily promote the protection and public enjoyment of parks, but which meet the section 8.2 criteria, will also be permitted. For the purposes of this policy, "filming" is defined as any technology that may be used for recording images or the sound tracks associated with them, including still, motion, and video filming.

**8.6.6.2   Permits and Fees**
A permit will be required for any filming or photography that (1) involves the use of a model, set, or prop; (2) requires entry into a closed area; or (3) requires access to the park after normal visiting hours.

A permit will not be required for a visitor using a camera and/or a recording device for his/her own personal use within normal visitation areas and hours. Press coverage of breaking news never requires a permit; however, it is subject to the restrictions and conditions necessary to protect park resources and public health and safety, and to prevent impairment of park resources and values.

Appropriate fees for cost recovery and use of Park Service lands and/or facilities, as well as performance bond and liability insurance requirements, will be imposed. All costs incurred by the Service in writing the permit, monitoring, providing protection services, or otherwise supporting filming or photography activities will be reimbursed by the permittee as a condition of the permit.

**8.6.6.3   NPS Participation**
The Service's participation is governed by the following:

■ The NPS may actively assist filming and photography activities that promote public understanding and appreciation of the national park system, and the Director may authorize use of the arrowhead symbol for such filming projects.
■ A superintendent may request a credit line, provided that the content or subject matter of the filming project would not reflect adversely on the National Park Service.
■ Park Service employees, while on duty or in uniform, will not be employed by filming permittees.

- Identifiable NPS equipment, uniforms, or insignia must not be portrayed in any way that would imply Service endorsement of a product or service.
- The NPS will not censor the content of any filming project, or require finished film products for review, files, or documentation purposes. However, a superintendent may review a story board or other material offered by the applicant to help determine whether (1) a credit line would be appropriate, or (2) it would be appropriate for the NPS to actively assist a filming activity or authorize use of the arrowhead symbol.

Additional guidance is provided by Director's Order #53: Special Park Uses; and by Reference Manual 53.

*(Also see Director's Order #52D: Arrowhead Symbol)*

### 8.6.7 Agricultural Uses

Agricultural uses and activities are authorized in parks in accordance with the direction provided by a park's enabling legislation and general management plan. Agricultural practices and techniques, including the use of pesticides and other biocontrol agents such as genetically modified or engineered organisms, should be specified in an approved resource management plan, and are subject to review and approval by the NPS integrated pest management (IPM) program manager. These practices and techniques are also subject to the provisions of federal and state laws, NPS regulations and policies, and Director's Orders #53 and #77-7. In general, agricultural activities should be conducted in accordance with accepted, best management practices.

Agricultural activities, including demonstration farms, prescribed to meet a park's management objectives, will be allowed if (1) they do not result in unacceptable impacts to park resources, values, or purposes; (2) they conform to activities that occurred during the historic period; and (3) they support the park's interpretive themes. Agricultural uses that do not conform to those in practice during the historic period may be allowed if (1) they are authorized by the park's enabling legislation; (2) they are retained as a right subsequent to NPS land acquisition; (3) they contribute to the maintenance of a cultural landscape; or (4) they are carried out as part of a living exhibit or interpretive demonstration.

The Service may issue leases or special use permits to individuals or organizations to conduct agricultural activities that are allowed on park lands under the criteria listed in the preceding paragraph. The use of a lease (versus a special use permit) is appropriate only when (1) specifically authorized by the park's enabling legislation; or (2) it is part of an historic preservation program authorized by 16 USC 470h-3; or (3) it is associated with a building that is leased pursuant to 16 USC 1a-2(k). NPS and concession employees living in parks may cultivate gardens for personal use under terms and conditions established by the superintendent. Such use will not be permitted if it would have unacceptable impacts on park resources, values, or purposes, or visitor enjoyment thereof. In urban parks, areas may be designated for community recreational gardening under the same conditions.

*(See Park Planning Processes 2.3; Biological Resource Management 4.4; Pest Management 4.4.5; Cultural Landscapes 5.3.5.2; Personal Services 7.3.1. Also see Director's Order #77-7: Integrated Pest Management)*

### 8.6.8 Domestic and Feral Livestock

#### 8.6.8.1 General
The NPS will allow livestock use only when the use is consistent with the criteria listed in section 8.2, and the use is either:

- Specifically authorized by a park's enabling legislation;
- Required under a reserved right of use arising from the acquisition of a tract of land;
- Required in order to maintain a historic scene; or
- Conducted as a necessary and an integral part of a recreational activity appropriate to a park.
- Where livestock use (including cattle, sheep, goats, horses, mules, burros, reindeer, llamas, and alpacas) occurs in parks, it will be categorized as (1) livestock operations, (2) recreational stock, (3) trespass animals, or (4) feral herds. No livestock use or activity, regardless of how authorized, will be allowed that would cause unacceptable impacts to a park's resources, values, or purposes. In particular, livestock use that depletes or degrades non-renewable resources, or whose effects cannot be satisfactorily mitigated, will not be allowed.

#### 8.6.8.2 Managing the Use
Where domestic or feral livestock use occurs, the National Park Service will foster "best management practices" that protect vegetation, and wildlife and its habitat; safeguard sensitive species; control proliferation of exotic species; conserve soil; protect riparian areas and ground water; avoid toxic contamination; and preserve cultural sites. Integrated pest management methods and pesticide use on and around livestock must comply with NPS pest management policy in section 4.4.11. Livestock may be used as part of an integrated program to control exotic plants.

The National Park Service must manage its resources in a manner that conserves them for future generations. Park uses, including domestic and feral livestock, that may jeopardize the sustainability of a park's natural and cultural resources must be evaluated continuously. Livestock, including trail stock, will be kept within the carrying capacity of the area to be used. Managers must regulate livestock so that ecosystem dynamics, and the composition, condition, and distribution of native plants and animal communities, are not significantly altered or otherwise threatened, and cultural values are protected. Conflicts with public use and enjoyment must be kept to a minimum.

The use of pack-in feed, preferably pellets, is encouraged for all recreational stock while on the trail, and is required whenever grazing would have unacceptable impacts on a park's resources. When not being actively used for recreation in a park, livestock will either be removed from the park or be confined within an appropriate corral or other structure, and it will be fed pelletized feed or hay that is free of weed seeds. Livestock activities must be discontinued whenever they would be disallowed by the criteria listed in section 8.2.

In parks with legislation that states that livestock use is administered by another agency, the superintendent will work closely with the other agency to manage the amounts and types of use, and to ensure that the best management practices are followed. Administration by another agency does not release the NPS from its responsibility to ensure that the activity is managed in compliance with the NPS mission and all applicable laws and policies.

**94**   MANAGEMENT POLICIES

#### 8.6.8.3  Management Plans

Each park that allows domestic or feral livestock, including parks where the livestock use is administered by another agency, will prepare a livestock management plan designed to sustain and protect park resources and values. Restrictions will be placed on the amount and type of use to protect resources and values, and to minimize conflicts with visitors. Particular attention will be given to protecting wetland and riparian areas, sensitive species and their habitats, water quality, and cultural resources. Natural and cultural resource protection will be given first priority when determining livestock management priorities. A monitoring program must be implemented, and will be used to detect change and adjust management to protect resources.

Plans will include an evaluation of impacts as directed by NEPA and NHPA. Benefits and impacts must be carefully weighed. A rigorous assessment is especially important for areas with unique natural and cultural resources, low precipitation, limited vegetation cover, water quality concerns, highly erodable soils, or sensitive species. Areas that have been continuously grazed for long periods, or that are in poor ecological health, will require special emphasis in the plan. Until a plan is completed for livestock operations or recreational stock, environmental impact analysis will be done when the permitting document is issued or renewed.

#### 8.6.8.4  Permitting Instruments

Livestock activities by parties other than the NPS will be conducted only pursuant to the terms and conditions of a special use permit, lease, concession contract, or commercial use authorization. The use of a lease (versus some other instrument) is appropriate only when (1) specifically authorized by the park's enabling legislation; or (2) it is part of an historic preservation program authorized by 16 USC 470h-3; or (3) the livestock use is associated with a building that is leased pursuant to 16 USC 1a-2(k).

In addition to any other penalty provisions, violation of the terms and conditions of the permitting instrument may result in revocation of the livestock use privilege. In parks where the NPS shares livestock allotment management with another government agency, or where another government agency, through legislation, administers the use, a general agreement between agencies is necessary to describe the relationship and responsibilities.

#### 8.6.8.5  Structures

No structures except those specifically authorized by law or approved by the National Park Service will be allowed in parks to increase livestock numbers, sustain livestock in areas in which they cannot otherwise be sustained, or introduce livestock into areas that previously had not been open to livestock. The Service will not expend funds to construct or maintain livestock structures unless there is a direct benefit to the protection of park resources. The permittee may be required to remove structures when livestock activities are no longer authorized.

*(See Management of Exotic Species 4.4.4; Water Resource Management 4.6; Identification and Designation of the Wilderness Resource 6.2; Grazing and Livestock Driveways 6.4.7; Equestrian Trails 9.2.3.3; Miscellaneous Management Facilities 9.4.5. Also see Director's Order #77-3: Domestic and Feral Livestock, and Reference Manual 77-3; Director's*

*Order #53: Special Park Uses, and Reference Manual 53; Director's Order #77-7: Integrated Pest Management)*

### 8.6.9  Military Operations

In general, military activities are discouraged in parks, except for study of military history at related NPS sites. Periodically, an armed services unit may request the use of park areas for non-combat exercises such as search-and-rescue and outdoor survival. Determining when and where military units may conduct such activities is a discretionary decision of the superintendent. A permitted military activity must conform to the following conditions:

- A permit will be issued that clearly states all necessary conditions or stipulations to protect park resources and visitors;
- All applicable park rules and regulations will be followed;
- No weaponry will be carried, displayed, or used, except for ceremonial purposes or authorized public demonstrations;
- The activity will be conducted away from visitor use locations and out of public view (except where a public demonstration is specifically authorized);
- The military organization will designate a liaison officer who will be available to the superintendent throughout the exercise; and
- Permittees will be educated about how the purpose, mission, and regulations of the park differ from their own missions, especially in regard to resource protection and visitor use and enjoyment.

National security and law enforcement agencies, such as the CIA, FBI, and state police, may wish to conduct similar exercises. These requests should be evaluated in the same way as military special use requests.

### 8.6.10  Cemeteries and Burials

#### 8.6.10.1  National Cemeteries

All national cemeteries administered by the National Park Service will be managed as historically significant resources, and as integral parts of larger historical parks. Burials in national cemeteries will be permitted, pursuant to applicable regulations, until available space has been filled. The management and preservation of national cemeteries are subject to the provisions of the National Cemeteries Act of 1973; NPS "National Cemetery Regulations" (36 CFR Part 12); and Director's Order #61: National Cemeteries.

The enlargement of a national cemetery for additional burials constitutes a modern intrusion, compromising the historical character of both the cemetery and the historical park, and will not be permitted.

#### 8.6.10.2  Family Cemeteries

The burial of family members in family cemeteries that have been acquired by the Park Service in the course of establishment of parks will be permitted to the extent practicable, pursuant to applicable regulations, until space allotted to the cemeteries has been filled. Family members (or their designees) will be allowed access for purposes of upkeep and commemoration (such as wreath-laying and religious rituals) that do not jeopardize safety or resource protection. Park superintendents will keep active files on cemeteries for the purpose of responding to requests and inquiries.

*(Also see Director's Order #19: Records Management)*

### 8.6.10.3  Other Burials and the Scattering of Ashes

Other burials or re-interments outside established cemeteries in parks will be prohibited except where permitted by cultural resource policies. The scattering of ashes from cremation may be permitted by a superintendent, in accordance with NPS general regulations in 36 CFR 2.62, and applicable state laws. Authorization to scatter ashes must take into account potential conflicts with the spiritual or cultural practices of the indigenous people associated with the area.

*(See Stewardship of Human Remains and Burials 5.3.4;
Cultural Resources 6.3.8, Consultation 7.5.5)*

### 8.6.11  Other Special Park Uses

Other special park uses that may be allowed under permit or special regulations include the use of explosives, and the use of portable power equipment. Specific guidance is provided in 36 CFR Part 2; Director's Order #53: Special Park Uses; and Reference Manual 53.

### 8.7  Mineral Exploration and Development

Mineral exploration and development include exploration, extraction, production, storage, and transportation of minerals. Mineral exploration or development may be allowed in parks only when prospective operators demonstrate that they hold rights to valid mining claims, federal mineral leases, or non-federally-owned minerals. If this right is not clearly demonstrated, the National Park Service will inform the prospective operator that, until proof of a property right is shown, the Service will not further consider the proposed activity. If the Service determines that the proposed mineral development would impair park resources, values, or purposes, or does not meet approval standards under applicable NPS regulations and cannot be sufficiently modified to meet those standards, the Service will seek to extinguish the associated mineral right through acquisition, unless otherwise directed by Congress. In some parks, all or certain types of mineral development are specifically prohibited by law.

All persons who conduct mineral development within parks will do so only in conformance with applicable laws, regulations, and NPS policies. These laws include the Mining in the Parks Act; the Mineral Leasing Act; the Acquired Lands Mineral Leasing Act; the Surface Mining Control and Reclamation Act of 1977; the National Park System General Authorities Act; ANILCA; and enabling statutes for individual parks. Applicable regulations include 36 CFR Part 9, Subpart A and Subpart B; 43 CFR Parts 3100–3500; and special use regulations. Persons may not use or occupy surface lands in a park for purposes of removing minerals outside the park unless provided for in law. General management plans, land protection plans, and other planning documents for parks with mining claims, federal mineral leases, or non-federally-owned mineral interests will address these non-federal property interests as appropriate. Lands with mineral interests will be zoned according to their anticipated management and use, based on their resource values, park management objectives, and park-specific legislative provisions relating to mineral interests.

*(See Park Planning Processes 2.3; Land Protection Plans 3.3;
Identification and Designation of the Wilderness Resource
6.2; Mineral Development 6.4.9)*

### 8.7.1  Mining Claims

The location of new mining claims pursuant to the General Mining Act of 1872 is prohibited in all park areas. The National Park Service may permit mineral development only on existing patented and valid unpatented mining claims in conformance with the park's enabling legislation and the regulations for mining claims in 36 CFR Part 9, Subpart A. The Service may initiate a validity examination on unpatented mining claims at any time. The Service will perform a validity examination of all unpatented mining claims before approving any operations on such claims in accordance with 36 CFR Part 9, Subpart A. However, a validity examination is not required prior to the NPS authorization of activities that are conducted only to re-claim a site. All mineral development and use of resources in connection with a claim will be confined to the boundaries of the claim itself, except for the access and transport that are permitted under 36 CFR Part 9, Subpart A; or, for Alaska, 43 CFR Part 36.

### 8.7.2  Federal Mineral Leases

All parks are closed to new federal mineral leasing except for three national recreation areas (Lake Mead, Whiskeytown, and Glen Canyon), in which Congress has explicitly authorized federal mineral leasing in each area's enabling legislation. Through park planning documents, the National Park Service has closed portions of these areas to federal mineral leasing because of the presence of sensitive resources. No person may explore for federal minerals in any of these areas except under a lease issued pursuant to regulations in 43 CFR Part 3100, or under a prospecting permit pursuant to 43 CFR 3500. Before consenting to a federal mineral lease or subsequent mineral development connected with a lease, the regional director must find, in writing, that leasing and subsequent mineral development will not result in a significant adverse effect on park resources or administration.

Some park areas contain leases that existed at the time the park was created or expanded. These leases are valid existing rights, and will continue to exist until such time as they expire under the regulations that govern federal mineral leasing (43 CFR Parts 3100 and 3500).

### 8.7.3  Non-federally-owned Minerals

Non-federal mineral interests in park units consist of oil and gas interests, or rights to mineral interests other than oil and gas (such as private outstanding mineral rights, mineral rights through general land grant patents, homestead patents, or other private mineral rights that did not derive from the General Mining Act). The Park Service governs activities associated with these two categories of non-federal mineral rights under separate regulatory schemes.

The Park Service may approve operations associated with non-federal oil and gas interests under the standards and procedures in 36 CFR Part 9, Subpart B. If an operator's plan fails to meet the approved standards of these regulations, the NPS generally has authority to deny the operation, and may initiate acquisition. Absent a decision to acquire the property, application of the regulations is not intended to result in a

taking of the property interest, but rather to impose reasonable regulation of the activity.

The Service may approve operations associated with non-federal mineral interests, other than oil and gas, under 36 CFR Part 5, "Commercial and Private Operations," and 36 CFR 1.6. The Service must determine that operations associated with these mineral interests would not adversely impact "public health and safety, environmental, or scenic values, natural or cultural resources, scientific research, implementation or management responsibilities, proper allocation and use of facilities, or the avoidance of conflict among visitor use activities ...." If the operation cannot be sufficiently mitigated to meet this standard, the NPS may seek to acquire the mineral interest.

### 8.8  Collecting Natural Products

The collection of natural products for personal use or consumption is governed by NPS general regulations contained in 36 CFR 2.1. A superintendent may designate certain fruits, berries, nuts, or unoccupied seashells that can be gathered by hand for personal use or consumption upon a written determination by the superintendent that such an activity will not adversely affect park wildlife or the reproductive potential of a plant species or otherwise adversely affect park resources. In some cases, peer-reviewed scientific information may be needed to support the determination. The collection of minerals or rocks for personal use will be allowed only when specifically authorized by federal law or treaty rights.

While campfires are a traditional element of camping and the park experience, the gathering of firewood will be prohibited, except where subsistence use is authorized by federal law, or in specific areas designated by a superintendent in which dead and down wood may be collected for campfires or in small quantities for other uses within the park. Natural resource products that accumulate as a result of site clearing for development, hazard tree removal, vista clearing, or other management actions will be recycled through the ecosystem when practicable. When recycling is not practicable, the products may be disposed of by other means. Disposal may be accomplished by contract, if the result of the work done under contract and the value are calculated in the contract cost, or by sale at fair market value in accordance with applicable laws and regulations. Wood that accumulates as a result of the management actions described above may also be used for park purposes, such as heating public buildings or offices, or for interpretive campfire programs.

*(See Consumptive Uses 8.9, Natural and Cultural Studies, Research, and Collection Activities 8.10.  Also see Director's Order #18: Wildland Fire Management)*

### 8.9  Consumptive Uses

Consumptive uses of park resources may be allowed only when they are:

- Specifically authorized by federal law or treaty rights (such as hunting, trapping, or mining in specifically identified parks);
- Specifically authorized pursuant to other existing rights (such as a right retained by a donor of the land on which the use would occur);

- Grazing activities authorized in accordance with section 8.6.8.1; or
- Traditional visitor activities, such as fishing or berry picking, that are authorized in accordance with NPS general regulations.

As a matter of policy, the Service general supports the limited and controlled consumption of natural resources for traditional religious and ceremonial purposes, and is moving toward a goal of greater access and accommodation. As a general matter, a superintendent may not allow consumptive use of park resources by any particular group to the exclusion of others.

Current NPS policy is reflected in regulations published at 36 CFR Part 13. The general regulations at 36 CFR 2.1 allow superintendents to designate certain fruits, berries, nuts, or unoccupied seashells which may be gathered by hand for personal use or consumption if it will not adversely affect park wildlife or the reproductive potential of a plant species, or other wise adversely affect park resources. The regulations do not authorize the taking , use, or possession of fish, wildlife, or plants for ceremonial or religious purposes, except where specifically authorized by Federal statute or treaty rights, or where hunting, trapping, or fishing are otherwise allowed.

The 36 CFR Part 13 regulations address the consumptive use of park resources for subsistence purposes in Alaska, where it is allowed in the 10 parks and "expanded areas" established by ANILCA. Some park-specific enabling acts (e.g., Big Cypress National Preserve and Kaloka-Honokohau National Historical Park) also allow subsistence or other traditional uses of park resources.

*(See Park Management 1.4; Harvest of Plants and Animals by the Public 4.4.3;General 8.1, Native American Use 8.5. Also see 36 CFR Part 13, Subpart B)*

### 8.10  Natural and Cultural Studies Research and Collection Activities

Studies, research, and collection activities by non-NPS personnel involving natural and cultural resources will be encouraged and facilitated when they otherwise comport with NPS policies. Scientific activities that involve field work or specimen collection, or have the potential to disturb resources, the visitor experience, or park operations, require a permit issued by the superintendent that prescribes appropriate conditions for protecting park resources, visitors, and operations.

*(See Studies and Collections 4.2; Independent Research 5.1.2; Independent and Commercial Studies 8.11.3)*

### 8.11  Social Science Studies

#### 8.11.1  General
The National Park Service will facilitate social science studies that support the NPS mission by providing an understanding of park visitors, the non-visiting public, gateway communities and regions, and human interactions with park resources. This approach will provide a scientific basis for park planning, development, operations, management, education, and interpretive activities. Investigators will be encouraged to use the parks for scientific studies whenever such use is consistent with Service policies that recognize the scientific value of

parks as laboratories. Specific guidance is provided in Director's Order #78: Social Science.

Studies include short- or long-term scientific investigations in NPS areas that may involve social science surveys and research. The data and information acquired through scientific activities conducted in the parks will be made broadly available to park managers, the scientific community, and the public, except where legal restrictions apply. Studies may include projects conducted by researchers and scholars with universities, foundations, state and federal agencies, and NPS staff. The NPS will promote cooperative relationships with educational and scientific institutions and qualified individuals when specialized expertise exists that can be of significant assistance to the Service in obtaining information, and when the opportunity for research and study in the parks offers institutions a significant benefit to their programs. NPS facilities and assistance may be made available to qualified researchers conducting NPS-authorized studies. NPS or other federally funded studies that rely on survey instruments are strictly regulated and must be approved by the NPS, the Department of the Interior, and the Office of Management and Budget before they can be used to gather information directly from visitors or the general public.

*(See Information Resources Management 1.7; Studies and Collections 4.2; Research 5.1, Planning 5.2; Special Park Uses 8.6; NPS-supported Studies 8.11.2; Independent and Commercial Studies 8.11.3)*

### 8.11.2  NPS-supported Studies
The National Park Service is responsible for the identification and acquisition of needed inventory, monitoring, and research, as well as for the interpretation of the management and operational implications of such studies. The Service will use the best available science to assist park managers in addressing management needs and objectives that have been identified in legislation and planning documents.

The Service will support studies to:

■ Reach a level of understanding that will minimize "crisis" management;
■ Ensure a systematic and fully adequate park information base;
■ Provide a sound basis for policy, planning, and decision-making;
■ Develop effective strategies, methods, and technologies to predict, avoid, or minimize adverse impacts on resources, visitors, and related activities;
■ Determine causes of resource management problems;
■ Further understand park ecosystems and related human social systems, and document their components, condition, and significance;
■ Evaluate visitor satisfaction with services, facilities, and recreational opportunities;

■ Ensure that the interpretation of park resources and issues reflects current standards of scholarship for the history, science, and condition of the resources; and
■ Evaluate performance measures in support of strategic plan goals.

Superintendents may authorize park staff to carry out routine duties without requiring a research/collecting permit. NPS-supported research will rely on high-quality methods, and undergo peer review. NPS-supported scientists will be expected to publish their findings in refereed journals, among other outlets.

### 8.11.3  Independent and Commercial Studies
Non-NPS social science studies conducted in parks are not required to address specifically identified NPS management issues or information needs. However, these studies (excluding research in museum collections) require an NPS research/collecting permit. The studies must conform to NPS policies and other guidance regarding activities such as the collection and publication of data, conduct of studies, and wilderness restrictions, pursuant to the terms and conditions of the permit. NPS research/collecting permits may include requirements that permittees provide parks, within reasonable time-frames, with the appropriate field notes (subject to ethical guidelines of the appropriate discipline), data, information about the data, catalog data, progress reports, interim and final reports, and publications derived from the permitted activities. Projects will be administered and conducted only by fully qualified personnel, and will conform to current standards of scholarship.

The collection of data from the public and employees to support the research, development, and marketing of commercial products or services may be permitted only in limited circumstances. Such activity will not be permitted when the superintendent determines that it would impose an undue burden on visitors and/or employees, and/or when it has the potential to adversely impact park resources or detract from visitors' experiences in the park. All necessary data collection permits must be obtained, including the Scientific Research and Collecting Permit, as well as the permission of the park superintendent. Names and addresses and any other unique identifying information collected from park visitors and/or employees cannot be distributed, shared, or sold for commercial purposes.

*(Also see Director's Order #84: Library Resources)*

### 8.11.4  Management and Conduct of Studies
All studies in parks will employ non-destructive methods to the maximum extent possible, so as to avoid the irretrievable commitment of park resources. Studies will be preceded by an approved scope of work, proposal, or other detailed written description of the work to be performed.

*(See Studies and Collections 4.2. Also see Director's Order #74: Studies and Collecting)*

Exhibit H

Supplemental Declaration of
Adrienne Coleman

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL AND BETH WEINSTEIN Plaintiffs, | ) ) ) ) |
| v. | ) Civil No. 1:08-CV-00216 ) |
| UNITED STATES OF AMERICA | ) ) |
| Defendant. | ) ) ) |

SUPPLEMENTAL DECLARATION OF ADRIENNE COLEMAN

I, Adrienne Coleman, make this declaration in lieu of an affidavit pursuant to 28 U.S.C. § 1746. I am aware that this declaration may be filed in the United States District Court for the District of Columbia, and that it is the legal equivalent of a statement under oath.

1. I am the Superintendent of Rock Creek Park, National Park Service ("NPS"), U.S. Department of the Interior, 3545 Williamsburg Lane N.W., Washington, DC 20008. I have been so employed since May 1997.

2. There is a sign located along the multi-use trail in Rock Creek Park under the Porter Street bridge in the general vicinity of the intersection of Klingle Road and Beach drive that instructs cyclists to "Walk Your Bike."

3. In an exercise of discretion, Rock Creek Park officials determined that a due to limited vision resulting from the design of the multi-use trail where it slopes down toward the Porter Street bridge underpass, is shaded by the underpass, and then curves around the slope at the bottom, it would be desirable for cyclists to walk

bicycles through the area under the bridge to avoid possible collisions with other trail users, including hikers, joggers, nature observers, walkers, and other cyclists. The "Walk Your Bike" sign conveys this instruction.

4. The "Walk Your Bike" sign near the Porter Street bridge underpass is not intended to warn cyclists of any condition of the surface of the multi-use trail.

5. There are no other signs along the multi-use trail in this vicinity.

I declare under penalty of perjury that the foregoing is true and correct based upon my knowledge, information and belief, and based upon information provided by employees of the United States Department of the Interior and records maintained by that agency.

Dated this 30th day of June, 2008.

Adrienne Coleman
Superintendent
Rock Creek Park
National Park Service
U.S. Department of the Interior
3545 Williamsburg Lane N.W.
Washington, DC 20008